14

Windows Live Hotmail Print Message

Page 1 of 1

## FW: Work Injury Procedure Reminder

**From:** Tracy.VanDeWeg@spectrum-health.org
**Sent:** Mon 7/09/07 11:21 AM
**To:** akboettcher@yahoo.com; ander717joel@yahoo.com; w104sda@yahoo.com; robertbajnrauh@gmail.com; bonacd1@msu.edu; lakanth@gmail.com; dierkshelde.2@wright.edu; vdo32@yahoo.com; Evert.eriksson@gmail.com; greenjoe@msu.edu; kkharm0@hotmail.com; bradleyhorak@sbcglobal.net; hortonza@yahoo.com; nichole_ingalls@yahoo.com; jennin94@msu.edu; jessicaketo@sbcglobal.net; sabrinakidd@mac.com; nathan.kiewiet@gmail.com; mjloewen@hotmail.com; nlorenz@suite-speed.com; chrismasci@gmail.com; mckenzie@medicine.nodak.edu; jamclellan@hotmail.com; emitchell@meduohio.edu; dnagle@medicine.nodak.edu; kcneaman@hotmail.com; kokeefe@meduohio.edu; oliphantjl@atnmail.com; meilingerott@hotmail.com; ampatel1@gmail.com; rpiazzaMD@gmail.com; rogoway@sbcglobal.net; sarah_schultz@hotmail.com; jdslaikeu@hotmail.com; stouff17@yahoo.com; jtanner@usc.edu; bwheatley@slumed.edu; Andrea_M_Wolf@yahoo.com

FYI

---

**From:** Ferguson, Karalyn [mailto:Karalyn_Ferguson@grmerc.net]
**Sent:** Tuesday, July 03, 2007 11:57 AM
**To:** Program Coordinators
**Cc:** Bolthouse, Nancy
**Subject:** Work Injury Procedure Reminder
**Importance:** High

I have received quite a few notifications from various departments at Spectrum of residents stating they are SH employee's when they have a injury or exposure on the job. Please remind your residents they are GRMERC Employees. Any injury or exposure they sustain on the job needs to be reported to me within 24 hrs. They can seek treatment as needed at the hospital, ER or pharmacy but they do need to let the provider know to bill GRMERC for the workers comp and identify themselves as a GRMERC employee. Same process for any injuries onsite at Saint Mary's.

I have also had a few residents submit the bills under their personal health insurance policy. They are not liable for the cost of treatment's they receive due to a work related injuries/exposures, it is all covered under our workers compensation insurance.

Thank you for your assistance.

*Karalyn R. Ferguson, PHR*
Human Resources Representative
Grand Rapids Medical Education & Research Center
for Health Professions
1000 Monroe Ave NW
Grand Rapids, MI 49503
Phone 616.732.6285
Fax 616.732.6269

This email may contain confidential and privileged material for the sole use of the intended recipient and GRMERC. Any review or distribution by others is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

# Plaintiff Deposition

# LOEWEN, M.D. v. GRAND RAPIDS MEDICAL EDUCATION PARTNERS, ET AL

## MARGARET LOEWEN, M.D.

### August 30, 2011

*Prepared for you by*



BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO

Bingham Farms/Southfield • Grand Rapids
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens

MARGARET LOEWEN, M.D.
August 30, 2011

## Page 13

1 here today, do you have any intention to specialize in
2 any particular form of medicine in the future?
3 A. I would like to complete my general surgery residency.
4 Q. Do you have any prospects or entities where you
5 believe you may enter a residency program?
6 A. No, I do not. I have not pursued -- as I've stated, I
7 haven't pursued this, so I haven't attempted to make
8 contacts or to develop that possibility.
9     MR. LIEBER: For the record, that would be
10 part of the injunctive relief that she is seeking in
11 this case.
12     MR. BRETZ: Okay.
13 BY MR. BRETZ:
14 Q. All right, I want to go back to the 2004-2005 time
15 frame. I would like you to, if you can, give me a
16 thumbnail sketch of how you came to apply to the
17 GRMERC -- is that fair to say it that way?
18 A. That's fine.
19 Q. Okay -- the GRMERC residency program.
20 A. Hmm-hmm. When I decided that I wanted to enter a
21 general surgery residency program, I needed to apply
22 to a variety of programs. I interviewed all over the
23 Midwest, and the chair of the department of surgery at
24 Indiana University, Keith Lillemoe, a highly-respected
25 general surgeon who is the author of textbooks in

## Page 14

1 general surgery, recommended that if I wanted to stay
2 close to northern Indiana, he would recommend the
3 Michigan State programs.
4     And so I did apply and interviewed at two
5 of the Michigan State programs. GRMERC was one of
6 them.
7 Q. What was the other?
8 A. Lansing.
9 Q. I'm not familiar with that. Is that the entire name?
10 Is there more to that?
11 A. That was the Michigan State program that was located
12 in Lansing, whereas this one was located in Grand
13 Rapids.
14 Q. Okay. And who did you -- you interviewed with GRMERC,
15 is that correct?
16 A. I interviewed for residency with the Michigan State
17 program in Grand Rapids. It was not my understanding
18 that there was a separate entity called GRMERC at that
19 point.
20 Q. Okay. With whom did you interview?
21 A. I interviewed with the faculty of Michigan State who
22 were involved in teaching and instructing and guiding
23 the development of the general surgery residents.
24 They were also the faculty who were involved in the
25 Michigan State College of Human Medicine training of

## Page 15

1 general surgery as a clinical rotation, and so on.
2 Q. Okay. Did you interview at any time with anyone
3 employed by GRMERC?
4 A. At the time I was not aware that anybody was employed
5 by GRMERC. I don't believe I was aware of GRMERC at
6 all until I saw the contract and there was an
7 administrative name at the top, basically describing
8 the contract.
9 Q. Did you interview with Dr. Marc Schlatter?
10 A. I did.
11 Q. Okay, when was that?
12 A. That would have been, I believe it was December of
13 2004. I think it was December 7, perhaps.
14 Q. And was that interview one-on-one with him, or were
15 there others?
16 A. There were others. I interviewed with him, and with
17 Stan Sherman and Jayne Paulson, and I think it
18 may have been Paul Kemmeter. I don't recall. To the
19 best of my recollection, it was Paul Kemmeter.
20     MS. KELLEY: I'm sorry, I didn't hear the
21 third name.
22     THE WITNESS: Jayne Paulson.
23     MR. BRETZ: Paul Kemmeter and Stan Sherman.
24 A. Did you hear the other names?
25 BY MR. BRETZ:

## Page 16

1 Q. Yes, Schlatter, Sherman, Paulson, and Kemmeter, may
2 have been Kemmeter, correct?
3 A. Correct.
4 Q. Okay. Where did that take place?
5 A. That took place in the general surgery offices, across
6 the street from Spectrum -- actually a part of
7 Spectrum, I should say, because that building is also
8 where the chief clinic is located, and that's
9 contiguous with the offices of the general surgery
10 program.
11 Q. Did any of those four, assuming it was four, describe
12 where they were employed?
13 A. I'm sure they did. I don't recall --
14 Q. No, I want to know what you remember.
15 A. What I remember?
16 Q. Yes.
17 A. I knew that there were two hospital systems where I
18 would be working and that would require my services
19 where I would receive my training. They were the
20 Spectrum hospitals, which are multiple, as you're
21 aware, as well as St. Mary's.
22 Q. Okay, that wasn't my question.
23 A. Okay.
24 Q. Did any of those four individuals say where they were
25 employed?

MARGARET LOEWEN, M.D.
August 30, 2011

### Page 17

1        MR. LIEBER: If you recall.
2    BY MR. BRETZ:
3    Q.  If you recall.
4    A.  Where they were employed.  It was my understanding
5        that they each had their own surgical practices, and I
6        would assume that they had -- I guess what I would say
7        is they were affiliated with the hospitals, because
8        they wouldn't be able to have -- to conduct their
9        surgeries without having staff privileges.
10   Q.  Right.  So each of them was in a position like you are
11       today?
12       MR. LIEBER: Objection --
13   A.  Correct.
14       MR. LIEBER: -- to the form of the
15       question.
16   BY MR. BRETZ:
17   Q.  I believe you said correct?  Each of them --
18       MR. LIEBER: If you know the answer.
19   BY MR. BRETZ:
20   Q.  Each of them had their own private practice, separate
21       from the hospitals, is that correct?
22   A.  It's hard for me to answer that question, because to
23       say one way or the other would be making assumptions
24       on my part, which isn't actually a fair statement on
25       my part.  So I can't say.

### Page 18

1    Q.  Well, I'm following up on what you just told me.
2    A.  Okay.
3    Q.  You said each of them had their own practice, correct?
4    A.  Hmm-hmm.  Well, each of them, my understanding was
5        that each of them had their own set of patients.  In
6        terms of medical -- in medical terms we call that a
7        practice.
8            Now, how that group is affiliated with the
9        surgeon, whether there's a -- where the patient comes
10       from is actually pretty important, so it makes for a
11       complicated answer.
12           What I'm saying is that -- what I'm saying
13       is that all of those surgeons who were interviewing me
14       had affiliations with the hospitals or they wouldn't
15       be able to do surgery.  I am not saying that they were
16       not employed by those hospitals.  I never made that
17       assumption.
18   Q.  Okay.  I was just simply going off what you said.
19       Each had their own practice, separate from the
20       hospital, correct?
21   A.  Yes, but that doesn't mean that they also didn't
22       have -- in addition to that practice, that they
23       probably also had additional affiliations and
24       employment relationships.
25   Q.  Well, do you know -- you said each of them had their

### Page 19

1        own practice and each was affiliated with one of the
2        two hospitals, or both hospitals?
3    A.  And, in addition to that, they were also faculty at
4        Michigan State.
5    Q.  Right.  Do you know whether Schlatter, Sherman,
6        Paulson, or Kemmeter was actually an employee of
7        either Spectrum or St. Mary's?
8        MR. LIEBER: You mean at that time?
9    BY MR. BRETZ:
10   Q.  Do you know?
11   A.  I don't.
12   Q.  Do you know today?
13   A.  I do.
14   Q.  What do you know?  Do you know whether Sherman,
15       Paulson, Kemmeter, or Schlatter is an employee of
16       St. Mary's today?
17   A.  It's my understanding that Dr. Sherman is not an
18       employee of St. Mary's.  It is my understanding that
19       Dr. Schlatter is an employee of Spectrum.
20   Q.  Okay, that wasn't my question.
21   A.  Okay.
22   Q.  Listen carefully.  Do you know, sitting here today,
23       whether Dr. Schlatter has ever been an employee of
24       St. Mary's?
25   A.  I don't know.

### Page 20

1    Q.  Okay.  Do you know, sitting here today, whether
2        Dr. Sherman has ever been an employee of St. Mary's?
3    A.  I don't know that, either.
4    Q.  Okay.  Do you know, sitting here today, whether
5        Dr. Kemmeter has ever been an employee of St. Mary's?
6    A.  I don't know.
7    Q.  And, sitting here today, do you know whether
8        Dr. Paulson has ever been an employee of St. Mary's?
9    A.  I don't know.
10   Q.  Okay.  Now, let's go over those today with respect to
11       Spectrum, okay?
12   A.  Okay.
13   Q.  Let's start with Dr. Paulson.  Do you know whether she
14       has ever been an employee of Spectrum?
15   A.  I don't.
16   Q.  Dr. Kemmeter, do you know whether he has ever been an
17       employee of Spectrum?
18   A.  I don't.
19   Q.  Okay.  Dr. Sherman, do you know whether he has ever
20       been an employee of Spectrum?
21   A.  No, I don't.
22   Q.  Dr. Schlatter, do you know whether he has ever been
23       employed by -- an employee of Spectrum?
24   A.  I believe that he is, yes.
25   Q.  Okay.  On what do you base that?

MARGARET LOEWEN, M.D.
August 30, 2011

## Page 21

1    A. I base that on his position as the director of the
2       general surgery program and the fact that he has an
3       office in the building that accommodates the general
4       surgery program, which is the location of the chief
5       clinic, which is owned and operated by Spectrum
6       Hospital, and, in addition to that, he has an email
7       address that ends with Spectrum's user, whatever,
8       website.
9    Q. Okay. You said -- so you told me three things. I
10      want to go over those. That he's the director of the
11      general surgery program of what?
12   A. Residency program.
13   Q. Okay, of GRMERC?
14   A. The Michigan State GRMERC program.
15   Q. Okay. Other than his title, do you have any other
16      facts that would link his directorship to an
17      employment relationship with Spectrum?
18   A. Can you -- I'm sorry, if you could restate that?
19   Q. Sure. You said you think Schlatter was an employee of
20      Spectrum because he's the director of the general
21      surgery residency program, he has an office at
22      Spectrum, and he has an email address with the
23      Spectrum suffix on it, right --
24   A. Correct.
25   Q. -- those are the three things? Other than that, have

## Page 22

1       you ever seen any contract between Schlatter and
2       Spectrum?
3    A. I have not seen a contract, no.
4    Q. Okay. Has anyone told you that Schlatter is an
5       employee of Spectrum?
6    A. I think that there was a very pervasive understanding
7       among the residents that the general surgery program
8       was, was run by Spectrum.
9    Q. Okay, that wasn't my question. Has anyone told you
10      that Schlatter is an employee of Spectrum?
11   A. No, I don't think anybody has told me that.
12   Q. Have you ever seen any documents that would indicate,
13      other than the three things you mentioned, that would
14      indicate he is an employee of Spectrum?
15   A. I don't recall seeing any other documents, no.
16   Q. Okay. So you had this interview. What happened next?
17   A. Oh, I'm sorry, may I correct myself? Can I add a
18      little bit more information?
19         There were documents that I received from
20      Dr. Schlatter that had Michigan State/Butterworth
21      Hospital/Blodgett Hospital on the letterhead, which,
22      in a sense, would suggest that he was in fact an
23      employee or he wouldn't be using that letterhead.
24   Q. Okay, so that's a fourth --
25   A. Yes.

## Page 23

1    Q. -- thing that you would reference, that he had
2       letterhead that referenced several hospitals,
3       Butterworth, Spectrum, and Blodgett?
4    A. Yes.
5    Q. And did that letterhead also reference GRMERC?
6    A. No, it did not. Michigan State and then Spectrum.
7    Q. MSU, Spectrum --
8    A. Spectrum hospitals.
9    Q. -- hospitals, okay. Did you ever see any reference to
10      St. Mary's on that letterhead?
11   A. No.
12   Q. Okay. So you had the interview. What happened next?
13   A. I had the interview, and I continued to interview with
14      a number of different residency programs, and then we
15      were asked, as residents, to rank our preference when
16      it came to our number one, two, three, four, five,
17      through whatever number of residency programs, and I
18      ranked this program number one.
19   Q. And who do you submit that ranking to?
20   A. There was a kind of computer match system that puts
21      the rankings of programs together with the rankings of
22      the residents.
23   Q. And what entity collects them?
24   A. I don't remember the name of the organization, but it
25      is an organization that oversees the match of

## Page 24

1       residencies throughout the country.
2    Q. So when you rank -- you said I ranked this program
3       number one, was it the GRMERC program?
4    A. It was the Michigan State general surgery residency
5       program.
6    Q. When you say Michigan State, you're referring to the
7       college?
8    A. I'm referring to the name that they provided me.
9    Q. Okay. Did you have any other rankings, or did you
10      just rank the one program?
11   A. No, I ranked others, as well.
12   Q. Okay. At some point you were sent an agreement, a
13      resident agreement --
14   A. Yes.
15   Q. -- to sign?
16   A. Hmm-hmm.
17   Q. And did you sign that before you started the official
18      program?
19   A. Yes, I did.
20   Q. Okay. And you ended up signing a series of resident
21      agreements, is that correct?
22   A. That is correct.
23   Q. And they were annual?
24   A. Yes.
25   Q. Okay. Let me show you -- we can mark it as an

MARGARET LOEWEN, M.D.
August 30, 2011

---

Page 25

1 exhibit, but it's been produced. This is GRMEP
2 Bates-stamped 317 through 321. Give us one second and
3 we'll make a copy of this.
4 (Recess taken at 9:41 a.m.)
5 (Back on the record at 9:43 a.m.)
6 MARKED FOR IDENTIFICATION
7 DEPOSITION EXHIBIT 1
8 9:43 a.m.
9 BY MR. BRETZ:
10 Q. So I've given you Exhibit 1, which is Bates-stamped
11 317 through 321 --
12 MS. LACHMAN: We were going to number
13 exhibits consecutively.
14 MR. BETZ: Oh, okay.
15 MS. LACHMAN: Were you still willing to do
16 that? We were starting at, it would be 23.
17 MR. LIEBER: Do you want to just call this
18 D-1? It doesn't matter to me.
19 MR. BRETZ: It doesn't matter to me,
20 either.
21 MR. LIEBER: However you want to do it,
22 however you guys want to do it is okay with us.
23 MR. BRETZ: I just need to have somebody
24 help me track.
25 MS. LACHMAN: I'll keep track. We're on

Page 26

1 23.
2 MR. BRETZ: All right.
3 MR. LIEBER: Okay, Exhibit 23.
4 MR. BRETZ: So let's regroup here.
5 MARKED FOR IDENTIFICATION:
6 DEPOSITION EXHIBIT 23
7 9:43 a.m.
8 BY MR. BRETZ:
9 Q. We're going to give you Exhibit 23, which is
10 Bates-stamped 317 through 321. Do you recognize this?
11 A. I do.
12 Q. This is the first -- is this the first resident
13 agreement you received?
14 A. Yes.
15 Q. Okay. And that's your signature on page 321?
16 A. Yes, it is.
17 Q. Okay. And this was an agreement between you and Grand
18 Rapids Medical Education Consortium, correct?
19 A. Yes.
20 Q. And this was an employment agreement, correct?
21 A. Correct.
22 Q. And how did you receive this? Were you physically
23 given it? Did you get it in the mail? Do you
24 remember?
25 A. I believe it was mailed.

Page 27

1 Q. Okay. And did you sign this before you actually
2 started the program?
3 A. I did.
4 Q. Okay. The signature date for you is April 13, '05.
5 Do you remember the date you actually started, first
6 physically appeared?
7 A. Actually physically appeared, it was the middle of
8 June.
9 Q. Okay. And then annually you received a contract like
10 this --
11 A. Yes.
12 Q. -- between you and GRMERC, correct?
13 A. Yes, although the contract changed somewhat in the
14 wording over the years, but yes, essentially.
15 Q. It's substantially the same, is that fair?
16 MR. LIEBER: Objection, form. How would
17 she know?
18 MR. BRETZ: Okay.
19 BY MR. BRETZ:
20 Q. Have you read it?
21 A. I read it and I know it was different, and I don't
22 know how I would quantify --
23 MR. LIEBER: Yeah, that's okay.
24 BY MR. BRETZ:
25 Q. Each of the agreements you signed annually --

Page 28

1 A. Yes.
2 Q. -- were between you and GRMERC, is that correct?
3 A. Yes.
4 Q. Okay. And it was not between you and any other entity
5 other than GRMERC, correct?
6 A. It was -- GRMERC was I would say the administration
7 for --
8 Q. No, listen to my question. That's not what I'm
9 asking. Did you sign any contracts between yourself
10 and any entity other than GRMERC?
11 MR. LIEBER: I'm going to object to this
12 question as calling for a legal conclusion, and she
13 can explain -- I think she should be able to explain
14 it any way she wants.
15 MR. BRETZ: It's not a legal conclusion.
16 MR. LIEBER: Well --
17 BY MR. BRETZ:
18 Q. I'm asking you if you signed any contracts with any
19 other party between 2005 and 2009 other than with
20 GRMERC. Can you answer that question?
21 A. Well, can I explain why I'm hesitating? No?
22 Q. I'd like a yes or no first, if you can tell me.
23 Either you don't recall, or it's yes or no.
24 MR. LIEBER: That's all -- we object to
25 that.

MARGARET LOEWEN, M.D.
August 30, 2011

---

Page 29

BY MR. BRETZ:
Q. Did you sign any contracts with any other entity between 2005 and 2009 other than with GRMERC?
    MR. LIEBER: You can -- I'm going to object to the form of the question as calling for a legal conclusion, and also because the deponent is being asked to answer in a way that she doesn't choose and is being constrained.
    But, with those caveats, you can try to answer the question.
BY MR. BRETZ:
Q. Do you want me to restate it?
A. Yes, please.
Q. Okay. You said earlier that this Exhibit 23 was an employment agreement between yourself and GRMERC, correct?
A. Yes.
Q. And you said you signed a series of these agreements between 2005 and 2009, is that correct?
A. Yes.
Q. Okay. My question is, did you sign any other agreement between 2005 and 2009 with any other entity other than GRMERC?
A. Well, the answer overtly is no. However, what I am wanting to say is that there are -- there is a group

---

Page 30

of entities who are included in the GRMERC group that I -- in other words, this heading, Grand Rapids Medical Education & Research Center for Health Professions, is actually an administrative arm of a number of other organizations, and I just want to make sure that they're not excluded from my answer.
Q. Well, this agreement indicates it's between you and Grand Rapids Medical Education Consortium, Inc., d/b/a Grand Rapids Medical Education & Research Center for Health Professions, referred to as GRMERC, a Michigan nonprofit corporation --
    MR. LIEBER: Objection --
BY MR. BRETZ:
Q. -- correct?
    MR. LIEBER: -- to arguing with the witness. The document speaks for itself and she's allowed to explain.
    MR. BRETZ: I did no reading from a document that was arguing, but, nonetheless, that's --
A. Can I read from the document if you could?
BY MR. BRETZ:
Q. Well, let me finish my question.
A. Okay.
Q. That's a contract between you and GRMERC, according to the writing here, correct?

---

Page 31

A. That is at the top of the page. May I continue on down the page and add some words that is directly from this contract?
Q. Sure.
A. Okay, thank you. I'm not going to read all of the applicable information, but a couple of things I want to draw to your attention, and that is, under 2c, it says:
    Perform duties and responsibilities under this agreement to the best of resident's abilities and at the level of -- a level of competence commensurate with resident's level of advancement and responsibility, as determined by the program director and related GRMERC and hospital officials.
Q. Correct.
A. Okay. The next paragraph is similar. It speaks about comply with all applicable policies, procedures, rules and regulations of GRMERC and the hospitals.
    So how is it that, you know, that they are not linked, based on -- is my question.
    MR. LIEBER: Okay, we can't ask questions. We can only answer them.
    THE WITNESS: Well, I'm trying to point out why I want to clarify --
    MR. LIEBER: No, I understand.

---

Page 32

    THE WITNESS: -- because they're separating them in that phrase. So I want to make sure that I make clear that I'm not eliminating the hospitals from their obligations and their involvement.
BY MR. BRETZ:
Q. And what GRMERC provided you was an educational experience, correct?
A. Employment.
Q. And an educational experience?
A. It was both, yes.
Q. It was both. You were paid and you were learning, fair enough?
A. Yes.
Q. And part of that educational experience was to take place at a variety of hospitals, some of them owned by Spectrum, some of them owned by Trinity, is that correct?
A. Well, that's also where the employment was. You can't -- so what you're saying, basically --
Q. Please, just answer my question. Part of the educational experience was that you would be placed or receive some education at the hospitals, some of which were owned by Spectrum, some of which were owned by Trinity, is that correct?
A. That is correct.

---



MARGARET LOEWEN, M.D.
August 30, 2011

---

Page 33

1    Q.   Okay.  In fact, that's what the recital says --
2    A.   Hmm-hmm.
3    Q.   -- that you desire to participate in an education
4         experience offered by GRMERC and the participating
5         hospitals, that's collectively referred to as the
6         hospitals, right?
7    A.   Right.
8              MR. LIEBER:  Object to -- okay, the
9         document speaks for itself.
10             MR. BRETZ:  Okay.
11   BY MR. BRETZ:
12   Q.   I want to go to the last of the series of contracts
13        that you signed.  We'll label that Exhibit 24.
14             MARKED FOR IDENTIFICATION:
15             DEPOSITION EXHIBIT 24
16             9:51 a.m.
17   BY MR. BRETZ:
18   Q.   Is that your signature on that agreement?
19   A.   Yes, it is.
20   Q.   Okay.  And you signed this on May 7, 2009?
21   A.   Yes, I did.
22   Q.   And this is Bates-stamped from document 1 -- or page
23        through 06, right?
24   A.   Hmm-hmm.
25   Q.   Yes?

---

Page 34

1    A.   Yes.
2    Q.   And this is for the one-year term beginning July 1,
3         2009, and ending June 30, 2010?
4    A.   Yes.
5    Q.   And was this the last in the series of resident
6         agreements that you signed between yourself and
7         GRMERC?
8    A.   Yes.
9    Q.   Okay.  I want you to look at paragraph 2g.  The last
10        sentence says, in that paragraph says the resident's
11        sole compensation and benefits are described in
12        section 4 below, and the preceding sentence says that
13        you cannot accept any other compensation from a third
14        party.  Is that correct?
15   A.   I'm sorry, where are you reading from now?
16   Q.   Second page --
17   A.   Okay.
18   Q.   -- paragraph 2g.
19   A.   G, not accept or require compensation of any kind or
20        nature from any patient or third party, yes.
21   Q.   Okay.  So one of your obligations throughout your
22        term --
23   A.   Hmm-hmm.
24   Q.   -- was that you couldn't accept income from any other
25        party other than GRMERC, is that correct?

---

Page 35

1    A.   Let's see, well, again, I find this kind of a
2         difficult question to answer because of the fact that
3         this contract also continually refers to the hospitals
4         as being included in the requirements of my work.  And
5         I have a hard time just separating them out for this
6         question.
7    Q.   Well, I want you to read the words and tell me if that
8         was your understanding.  Was it one of your
9         obligations that you were not to accept or require
10        compensation of any kind --
11   A.   Hmm-hmm.
12   Q.   -- from any patient or third party for any services
13        offered or rendered?  Was that your understanding?
14   A.   Yes.
15   Q.   Okay.  And was it your understanding that this
16        agreement, this series of agreements --
17   A.   Right.
18   Q.   -- were your sole compensation and benefits?
19   A.   Yes.
20   Q.   Okay.  And this describes your compensation and
21        benefits in paragraph 4, at least for the period from
22        June 2009 to June 2010, correct?
23   A.   Yes.
24   Q.   Did you ever receive compensation in the form of a
25        check or cash from St. Mary's or Trinity Health?

---

Page 36

1    A.   No.
2    Q.   Did you ever receive compensation in the form of a
3         check or cash from Spectrum?
4    A.   No.
5              MR. LIEBER:  When you say -- excuse me,
6         when you say compensation, you just mean any payment
7         for services?
8              MR. BRETZ:  Yes.
9    A.   You mean cash, basically?
10   BY MR. BRETZ:
11   Q.   Yes.
12   A.   No.
13   Q.   And did you ever receive compensation or payment from
14        Michigan State University?
15   A.   No.
16   Q.   Okay.  You were a W-2 employee?  Do you know what that
17        means?
18   A.   I don't.
19   Q.   Okay.  You got a check on a biweekly basis for the
20        total amount of $49,000 a year, is that correct?
21   A.   Yes.
22   Q.   And that check came from a GRMERC account?
23   A.   It did.
24   Q.   Okay.  And was there withholding applied to that
25        check?

---

MARGARET LOEWEN, M.D.
August 30, 2011

Page 37

1    A.  Yes.
2    Q.  And there was withholding for taxes?
3    A.  Hmm-hmm.
4    Q.  Yes?
5    A.  Yes.
6    Q.  And did you have a retirement savings fund?
7    A.  No.
8    Q.  Okay.  Was there withholding for Social Security --
9    A.  Yes.
10   Q.  -- FICA, and the like?
11   A.  Yes.
12   Q.  Okay.  And you received at the end of the year a
13       W-2 --
14   A.  Hmm-hmm.
15   Q.  -- for your taxes, and that was from GRMERC, correct?
16   A.  Right.
17   Q.  Okay.  Did you ever receive a W-2 from Trinity or
18       St. Mary's?
19   A.  No.
20   Q.  Did you ever receive a W-2 from Spectrum?
21   A.  No.
22   Q.  Did you ever receive a W-2 from Michigan State
23       University?
24   A.  No.
25   Q.  Okay.  Paragraph 4a describes group benefits, right?

Page 38

1    A.  Yes.
2    Q.  Okay.  And, as stated, we saw in the earlier
3        paragraph, this is your sole source of benefits,
4        right?
5    A.  No, no.
6    Q.  Okay.
7            MR. LIEBER:  Objection, form.
8    BY MR. BRETZ:
9    Q.  Let's go back to 2g again.  It says:  Resident's sole
10       compensation and benefits are described in section 4
11       below, right?
12   A.  Yes.
13   Q.  Okay.  And let's look again at the back of the
14       document, on page 6, section 17.  It states that:
15       This agreement contains the entire agreement of the
16       parties relating to these matters.  Do you see that
17       sentence?
18   A.  What number is that?
19   Q.  Section 17, on page 6.
20   A.  Okay.
21   Q.  It's a heading called entire agreement.  The agreement
22       that you signed says:  This agreement contains the
23       entire agreement of the parties relating to these
24       matters, right?
25   A.  That's what it says, yes.

Page 39

1    Q.  Okay.  And you didn't have any other agreements,
2        correct?
3    A.  I did not have any other agreements.
4    Q.  Okay.  So you didn't have any other agreements from
5        any party from 2005 to 2009 for compensation or
6        benefits, is that correct?
7    A.  That is correct.  However, may I please read from the
8        contract again?
9    Q.  Well, there's no question pending --
10           MR. LIEBER:  Well --
11   BY MR. BETZ:
12   Q.  -- I just want an answer to that question.
13   A.  Well, there is, actually, because benefits clearly
14       were not provided entirely by GRMERC.
15           MR. LIEBER:  Go ahead, you can answer.
16   A.  What I'm saying is that we had a lot of benefits
17       provided by the hospitals, and I guess I would say the
18       hospitals, primarily.
19           Michigan State also provided us with some
20       benefits, intangibles, and I don't think that -- I
21       mean, they were significant, so I don't think that we
22       can say that --
23   BY MR. BRETZ:
24   Q.  Let's go through it.
25   A.  All right.

Page 40

1    Q.  Group benefits --
2    A.  Yes.
3    Q.  -- paragraph 4a --
4    A.  Okay.
5    Q.  -- you had health insurance, dental insurance,
6        short-term disability, long-term stability, and life
7        insurance --
8    A.  Yes.
9    Q.  -- right?
10   A.  Correct.
11   Q.  Those were provided exclusively by GRMERC, correct?
12   A.  Yes, correct.
13   Q.  Item b, other benefits:  Vacation, including
14       time off, conference attendance, illness.  That was
15       provided exclusively by GRMERC, correct?
16   A.  Yes.
17   Q.  Okay.  You had to call in and make your requests to
18       GRMERC, correct --
19   A.  No.
20   Q.  -- for vacation?
21   A.  No.
22   Q.  Okay.  How did you -- if you wanted to take a
23       vacation, who did you tell?
24   A.  I talked to the program coordinator, and then --
25   Q.  Who was that, I'm sorry?

MARGARET LOEWEN, M.D.
August 30, 2011

---

Page 41

1    A.  That was --
2    Q.  Was that Ms. VanDeWeg?
3    A.  Yes, Tracy, Tracy VanDeWeg, and then she would submit
4        the request to Dr. Schlatter.
5    Q.  Okay.  And Tracy is a GRMERC employee?
6    A.  I understood she was a Spectrum employee.
7    Q.  Okay.  Do you know?
8    A.  Yes, she's a Spectrum employee.
9    Q.  You know she's a Spectrum employee?
10   A.  She had a Spectrum email address, just like
11       Dr. Schlatter did.
12   Q.  Did she ever tell you she's a Spectrum employee?
13   A.  I don't recall that she did.
14   Q.  Okay.  Other than her email address, do you have any
15       other evidence that she's a Spectrum employee?
16   A.  She worked in the Spectrum offices.
17   Q.  Other than that?
18   A.  I don't believe so.
19   Q.  Okay.  If she was to testify that she's an employee of
20       GRMERC, which is a Michigan nonprofit corporation,
21       would you disagree with that?
22            MR. LIEBER:  Objection, calls for
23       speculation.
24   BY MR. BRETZ:
25   Q.  Would you?

---

Page 42

1            MR. LIEBER:  You don't need to answer that.
2    BY MR. BRETZ:
3    Q.  Would you?
4            MR. LIEBER:  Move on.  No, she's not going
5        to answer that.  It calls for speculation.  There's no
6        such testimony.
7            MR. BRETZ:  Well, I think she's been
8        speculating quite a bit here.  I'm trying to find out
9        what she knows and doesn't know.
10           MR. LIEBER:  Well, she doesn't know what
11       VanDeWeg is going to testify to.  It's just your
12       saying it, and it's speculation.
13   BY MR. BRETZ:
14   Q.  Well, let me ask you this.  Are you speculating as to
15       whether she's employed by Spectrum or not?
16   A.  I never saw her contract with her employer, so ...
17   Q.  So you would be speculating?
18           MR. LIEBER:  Objection, it's argument.
19   BY MR. BRETZ:
20   Q.  Am I right?
21           MR. LIEBER:  She's given what evidence she
22       has.
23   BY MR. BRETZ:
24   Q.  Okay.  You said she had an office in the Spectrum
25       building and she had a Spectrum email suffix.  Other

---

Page 43

1        than that, do you have any other indicia or evidence
2        that she was employed by Spectrum?
3    A.  No.
4    Q.  Okay.  So you made your request to Tracy for time off,
5        and that would go to Schlatter?
6    A.  Hmm-hmm.
7    Q.  Yes?
8    A.  Yes.
9    Q.  And, in fact, Dr. Schlatter signs this contract,
10       correct?
11   A.  Correct.
12   Q.  He's the program director for general surgery, is that
13       correct?
14   A.  Yes.
15   Q.  And he signs it on behalf of Grand Rapids Medical
16       Education & Research Center, correct?
17   A.  He signs it on behalf of the general surgery residency
18       program, and that's on the contract with GRMERC.
19   Q.  Right.  He signs it under the heading Grand Rapids
20       Medical Education & Research Center, correct?
21   A.  Hmm-hmm.
22   Q.  Yes?
23   A.  Yes.
24   Q.  Okay.  And the contract was solely between you and
25       GRMERC, right?

---

Page 44

1    A.  No.
2    Q.  That's what it says at the top, doesn't it?
3    A.  No.
4    Q.  Do you know -- you said earlier you don't know whether
5        Schlatter was employed by Spectrum or not, other than
6        the few items you mentioned?
7    A.  He never showed me the contract of his employment.
8    Q.  Okay.  So you would make the request to Tracy and
9        Schlatter would approve it for vacation?
10   A.  Yes.
11   Q.  Okay.  You also were entitled to attend a conference,
12       under item b2?
13   A.  Yes.
14   Q.  And you were to get reimbursed for that?
15   A.  Yes.
16   Q.  And your check would come from GRMERC?
17   A.  Yes.
18   Q.  You were entitled to leaves of absence for family, or
19       medical, or personal, correct?
20   A.  That is in the contract, yes.
21   Q.  And it says see GME policies for that, right?
22   A.  Yes.
23   Q.  And those were Grand Rapids Medical Education
24       policies?
25   A.  Yes.

---

MARGARET LOEWEN, M.D.
August 30, 2011

## Page 45

1  Q.  Okay.  And for time off or leaves, would that be the
2      same process?  You would ask Tracy, and Schlatter
3      would approve it?
4  A.  Yes.
5  Q.  You also had a benefit for employee assistance.  Did
6      you ever have reason to use that?
7  A.  No.  I'm not sure what you mean by that, even.
8  Q.  Well, I'm reading from the contract.  Item b4 talks
9      about employee assistance program?
10 A.  No.  Counseling, no, never.
11 Q.  Counseling, grief, and substance abuse?
12 A.  Nothing at all.
13 Q.  Do you know how that program worked?
14 A.  I don't.
15 Q.  Okay.  Then it talks about other benefits, correct --
16 A.  Correct.
17 Q.  -- item 4c?
18 A.  Yes.
19 Q.  We're on page 3 of Exhibit 24, right?
20 A.  Yes.
21 Q.  And you got food services at the hospitals, correct?
22 A.  Yes, correct.
23 Q.  And did you take advantage of that?
24 A.  I did.
25 Q.  Okay.  And do you know whether that food service was

## Page 46

1      available to other doctors who had privileges at the
2      hospital?
3  A.  As in residents?  I know about the residents.  I'm not
4      sure about the other doctors who were not residents.
5  Q.  Do you know whether -- some residents, some doctors,
6      I'm sorry, at these hospitals have staff privileges,
7      correct?
8  A.  Right.
9  Q.  And they're not employees of the hospitals, correct?
10 A.  It depends.
11 Q.  Some are not, right?
12 A.  Some are not.
13 Q.  Yes.  Do you know whether any nonemployed independent
14     contractor doctors who had privileges at these
15     hospitals also got a discount on food in the
16     cafeterias?
17 A.  I don't know.
18         MR. LIEBER:  Objection, asked and answered.
19 BY MR. BRETZ:
20 Q.  Do you know?
21 A.  No, I don't.
22 Q.  Okay.  So you got a discount or a credit on food at
23     the hospitals, right?
24 A.  Not a discount, it was actually free.
25 Q.  Okay.

## Page 47

1  A.  We had a card, and all our uses were tallied.  So,
2      yes, it was free.
3  Q.  Up to $2200, right?
4  A.  Right.
5  Q.  You got parking at a location to be identified by the
6      hospitals, right?
7  A.  Yes.
8  Q.  And that was free?
9  A.  Yes.
10 Q.  Do you know whether the parking is free for anyone at
11     St. Mary's?
12         MR. LIEBER:  Who is anyone?  Patients?
13         MR. BRETZ:  Yeah.
14 BY MR. BRETZ:
15 Q.  Any person.  Do you know what any person means?
16 A.  It was -- I'm not sure, honestly.  I don't think it
17     was free.  I don't know, but --
18 Q.  You don't know, okay.
19 A.  But I know that it was assigned parking.  We parked in
20     certain places and we had a badge, and so -- I mean, I
21     didn't look into that, so I have no idea.
22         MR. WURST:  If you want to swear me in, I
23     can give you the answer.
24         MR. BRETZ:  Having just been a consumer.
25 BY MR. BRETZ:

## Page 48

1  Q.  Pager, who gave you the pager?
2  A.  The hospitals, both hospitals.  We got one from
3      St. Mary's and one from Spectrum.
4  Q.  Okay.  Do you know whether GRMERC paid the hospitals
5      to provide you that pager?
6  A.  No, I don't.
7  Q.  Call rooms.  What's a call room?
8  A.  That is a place where providers of medical care can go
9      to sleep at night when they're between shifts, or when
10     they need to be available but also need to get some
11     rest.
12 Q.  Okay.  So there was a bed at St. Mary's and a bed at
13     Spectrum where you could go?
14 A.  Yes.
15 Q.  Okay.  Lab coats.  Who provided you the lab coats?
16 A.  The general surgery program did.  I think they came
17     through GRMERC.
18 Q.  Okay.  Retirement plan.  It talks about the GRMERC
19     principal voluntary 403(b).  You said you did not
20     participate, is that right?
21 A.  That is correct.
22 Q.  But, to your knowledge, did GRMERC exclusively provide
23     the 403(b) plan?
24 A.  I don't know, honestly.
25 Q.  Okay.  And professional liability insurance.  It says

MARGARET LOEWEN, M.D.
August 30, 2011

Page 65

1  A.  They would set -- they would, in fact, make the rooms
2     available at certain times, but the case would be
3     determined by the surgeon -- the time of the case
4     would be determined by the surgeon.
5  Q.  And at St. Mary's, the time for the cases, was that
6     set by the surgeon with whom you were working?
7  A.  The time for the cases was set by, yes, the surgeon
8     and the anesthesiologist, the staff, basically, when
9     they could get together.
10 Q.  Okay.  So you'd work with certain surgeons at
11    St. Mary's who'd set, along with a team of doctors,
12    set the time for these cases?
13 A.  Yes.
14 Q.  Okay.  And, to your knowledge, were any of these
15    surgeons or physicians employees of St. Mary's during
16    your tenure between 2005 and 2009?
17 A.  My understanding is that there were physicians who
18    were teaching physicians who did have employment
19    contracts with the hospitals, yes.
20 Q.  Okay.  Well, you saw the affidavit -- did you see the
21    affidavit in this case filed by Tom Carroll, the human
22    resources director at St. Mary's?
23 A.  I don't believe so.
24 Q.  Okay.  Have you ever seen any of these employment
25    contracts between any of these surgeons who provided

Page 66

1     you instruction and St. Mary's?
2  A.  I have not seen contracts, no.
3  Q.  Okay.  There's an affidavit on file from Tom Carroll,
4     the HR director at St. Mary's, which states that none
5     of the instructors, surgical instructors are employees
6     of St. Mary's or have been.  Are you familiar with
7     that affidavit?
8  A.  No.
9  Q.  Okay.  Do you have any facts to dispute that
10    affidavit?
11        MR. LIEBER:  Objection.  She hasn't seen
12    the affidavit.
13        MR. BRETZ:  Okay.
14 BY MR. BRETZ:
15 Q.  Do you have any facts to dispute the claim or the
16    assertion that none of the surgeons who provided you
17    instruction at St. Mary's are employees of St. Mary's?
18    Do you have any facts?
19        MR. LIEBER:  Counsel, I'm going to object
20    to the form of this question, because employee under
21    Title VII is actually a legal term, and you can -- if
22    you want to define employee for her and ask her
23    whether she agrees with that definition in regard to
24    these surgeons, I think that would be a proper
25    question.  But without it, we're in the realm of what

Page 67

1     may be a dispute about the law.
2  BY MR. BRETZ:
3  Q.  I asked you for facts.  I didn't ask you for your
4     legal opinion.  You're not an attorney, right?
5  A.  No, I'm not.
6  Q.  You understand what facts are?
7  A.  Yes.
8  Q.  Okay.  And I asked you if you didn't understand the
9     question to please tell me.
10 A.  Hmm-hmm, yes.
11 Q.  I didn't ask your lawyer for that, and I didn't ask
12    him to make speaking objections or instructive
13    objections.
14        MR. LIEBER:  I know, but this is a
15    foundation, legal objection, as to what you mean by
16    employee, and we're asking you to clarify it.
17 BY MR. BRETZ:
18 Q.  Do you have any facts, not supposition or speculation,
19    but facts, that any of the surgeons who provided you
20    instruction at St. Mary's were in fact employed by
21    St. Mary's?
22 A.  Well, here's the problem.  I know that there were
23    surgeons who were involved in the administration of
24    St. Mary's.  And whether they were paid for those
25    services, I don't have any, any facts, no.  I don't

Page 68

1     have any documents to share.
2  Q.  Okay.  So the surgeon would -- we kind of went off on
3     a little tangent here.  We were talking about other
4     benefits, and you listed an additional three things.
5     You were talking about the surgeons set the time for
6     the cases, correct?  We've talked about that?
7  A.  Can I, can I -- yes, we did talk about that --
8  Q.  Okay.
9  A.  -- but can I add to that?  Obviously, there would have
10    to be a cooperative effort between the hospitals and
11    the surgeons.  It was never just the surgeons.  A
12    surgeon can't operate without the staff and the
13    operating room being ready, and the equipment,
14    et cetera, et cetera, et cetera.
15 Q.  That's true at all hospitals --
16 A.  Right.
17 Q.  -- right?
18 A.  Yes.
19 Q.  If you want to do a surgery, whether you're an
20    employee or not, you need to coordinate with the
21    hospital and make sure the room is available, right?
22 A.  Right.
23 Q.  The same as when you go into Prowers, you need to make
24    sure that certain rooms are available for you to do
25    any procedures you need to do, right?

MARGARET LOEWEN, M.D.
August 30, 2011

## Page 73

1    talking over one another. I'll try to avoid that for
2    the court reporter's sake.
3        You see the bottom Bates stamp there, ML?
4    A.  Yes.
5    Q.  Is that Margaret Loewen, do you know? Was this what
6    you produced to us?
7        MR. LIEBER: We will agree that this is
8    what her attorneys produced --
9        MR. BRETZ: Okay.
10       MR. LIEBER: -- okay?
11   BY MR. BRETZ:
12   Q.  I'm not sure I got an answer to this question.
13   Each year did you get or receive from GRMERC a
14   resident manual?
15   A.  I know that I had received more than one. I don't
16   recall that I got one every year.
17   Q.  Okay. Did you receive this one, Exhibit 25?
18   A.  I did. I believe I did.
19   Q.  And how did you get this --
20   A.  There was --
21   Q.  -- was it handed to you? Was it there for pickup, if
22   you recall?
23   A.  I think at the beginning of the program they were
24   giving us hard copies and it was in a binder, that was
25   the first one I received, and then later on there were

## Page 74

1    some revisions, and it was kind of optional whether or
2    not we went to find one or pick one up. Then I think
3    the very last one actually had it on -- was reproduced
4    on a CD --
5    Q.  Okay.
6    A.  -- on a disk, but otherwise, I didn't -- I had not
7    printed this up.
8    Q.  Okay. So I'm clear, this one was given to you on a
9    CD?
10   A.  I believe so.
11   Q.  Okay. Who gave it to you?
12   A.  That would be the program coordinator.
13   Q.  Is that Ms. VanDeWeg?
14   A.  Yes.
15   Q.  Okay. And she passed them out? Did all the residents
16   come and pick one up, if you remember?
17   A.  I don't recall.
18   Q.  Okay. And this gives you an introduction to MERC,
19   GRMERC, right?
20   A.  Yes.
21   Q.  And if you look at Bates stamp page 0038 --
22   A.  Yes.
23   Q.  -- GRMERC has a corrective action and grievance
24   process policy?
25   A.  Yes.

## Page 75

1    Q.  And was this the policy that applied to you?
2    A.  Well, you know, honestly, I would have to compare it
3    to the pages I actually had received, because this
4    would have been for the program here that preceded my
5    termination.
6    Q.  This was what was produced by you. My question was,
7    did GRMERC's corrective action and grievance process
8    policy cover you during your residency --
9    A.  Yes.
10   Q.  -- with the -- okay.
11   A.  Yes, it did.
12   Q.  Okay. This has a variety of other policies about duty
13   hours, on-call activities, required by GRMERC,
14   correct?
15   A.  Yes.
16   Q.  It has a policy on page 46 about eligibility and
17   selection to the program, as administered by GRMERC,
18   is that correct?
19   A.  Yes.
20   Q.  Page 48 has an evaluation and promotion policy?
21   A.  Right.
22   Q.  And is this the evaluation and promotion policy that
23   applied to you during your residency?
24   A.  I believe it is.
25   Q.  Are you on page 48?

## Page 76

1    A.  I am.
2    Q.  Okay. In the middle there's a sentence that says: It
3    is the responsibility of the program director --
4    that's Dr. Schlatter?
5    A.  Yes.
6    Q.  It is the responsibility of the program director and
7    the respective residency education committee to review
8    its evaluation criteria and evaluation process
9    regularly concerning the process of the resident in
10   accordance with dot-dot-dot, okay? Is that correct?
11   A.  Yes.
12   Q.  Okay. We established the program director is
13   Dr. Schlatter?
14   A.  Yes.
15   Q.  And then it talks about the respective residency
16   education committee. Respective. Is that depending
17   on the specialty or program that the resident is in?
18   A.  Yes, that's how I read it.
19   Q.  Okay. And did you have a surgical education
20   committee?
21   A.  We did. We had a general surgery surgical education
22   committee. The SEC is what they called it.
23   Q.  Okay. And I've seen an affidavit that you filed --
24   A.  Hmm-hmm.
25   Q.  -- and I can show that to you, if you wish, but I

MARGARET LOEWEN, M.D.
August 30, 2011

Page 77

1    believe that you said it's your understanding that the
2    surgery education committee --
3    A.  Yes.
4    Q.  -- was all of the surgical faculty?
5    A.  Yes.
6    Q.  Is that still your understanding today?
7    A.  Yes.
8    Q.  So there wasn't a carve-out or a subset of that group,
9        it was the entire group who sat as that committee --
10   A.  Hmm-hmm, yes.
11   Q.  -- the entire faculty?
12   A.  That's what I understood.
13   Q.  Okay.  How did you get that understanding?
14   A.  Because every Wednesday morning or periodically, maybe
15       it wasn't weekly, but periodically there would be a
16       meeting of the surgical education committee, and, from
17       what I understood, all of the faculty attended it.  I
18       never attended that meeting.
19           That was a meeting that was held at the
20       beginning of the conference, the general surgery
21       conference time, which did meet every Wednesday.
22           So periodically there would be a meeting of
23       the surgical education committee, and that would be
24       located at Spectrum Hospital, in the auditorium, and
25       all of the available, I would suppose all of the

Page 78

1    available teaching surgeons would come to that
2    meeting, and they would discuss various issues that
3    had to do with the administration of the program.
4    Q.  And, if you know -- you said all of the available.
5        Was attendance optional at these every-Wednesday
6        meetings?
7    A.  I don't know.
8    Q.  You never went?
9    A.  I never went.  I wasn't allowed to go.
10   Q.  Did you ever see an agenda --
11   A.  No.
12   Q.  -- of these meetings?  Did you ever hear what was
13       discussed in meetings, at any particular meeting?
14   A.  Always.
15   Q.  Okay, how did you hear about that?
16   A.  Faculty from the meeting would talk about discussions
17       that had gone on at surg ed meetings.
18   Q.  Okay.  What were the kinds of topics that you heard
19       were discussed, subject areas?
20   A.  These topics would have to do with the educational
21       quality of the program, have to do with whether or not
22       residents were going to be promoted, and I know that
23       the day that I was terminated, Dr. Schlatter told me
24       that the surgical education committee had met the day
25       before, and that there had been an approval given to

Page 79

1    my termination.
2        How that was done, I don't know, whether it
3    was a unanimous, whether it was taken by a vote,
4    whether it was kind of an assent.  I honestly don't
5    know what that process is.
6    Q.  Okay.  Were you ever in the building when this
7        committee met --
8    A.  In the building?
9    Q.  -- such that you could see people coming in and out of
10       the room?  Were you ever in a position to see that?
11   A.  There were times -- yes, there were times when our
12       conference would be designated to start at the hour
13       after that committee was supposed to be completed,
14       have their business completed, that we would arrive,
15       residents would arrive at the door, waiting until we
16       could be let in.
17   Q.  So you sometimes passed in the hall?
18   A.  Yes.
19   Q.  And how many people, by estimate, would be attending
20       these meetings?
21   A.  I'm sure it varied, but there would probably be at
22       least a dozen at each meeting.  That's my guess.  And
23       it's kind of supposition, because I wasn't there.
24   Q.  Well, sometimes you saw them coming out of the room,
25       right?

Page 80

1    A.  Right.
2    Q.  Okay.  And, fair enough, it's --
3    A.  And, of course, there was more than one door in those
4        rooms, so I don't, I don't really know.
5    Q.  This talks about a resident would be promoted if
6        endorsed by the program director and the respective
7        committee, right?
8    A.  Yes.
9    Q.  It doesn't talk about discipline or termination.  It
10       just talks about evaluation and promotion, correct,
11       this policy, on page 48?
12   A.  Let's see.  Yeah, this page only speaks about
13       evaluation and promotion, that's correct.
14   Q.  Okay, and we've --
15   A.  Oh, I'm sorry, let me just quickly finish reading this
16       paragraph.
17   Q.  Go ahead.
18   A.  Well, the way that it's stated makes it sound like the
19       education committee, if not found to be satisfactory,
20       would -- if a decision is made to not promote a
21       resident to the next level, then the program director
22       will proceed according to the corrective action and
23       grievance process policy.
24   Q.  Correct.
25   A.  Yeah.

MARGARET LOEWEN, M.D.
August 30, 2011

Page 93

1  physicians, correct me if I'm wrong, have their own
2  practice or work out of a practice separate from the
3  hospitals at which they have privileges, is that your
4  understanding?
5  A.  That's my understanding, yes.
6  Q.  Okay.  And with respect to each of these physicians,
7  do you have any facts that any of them are employees
8  of Trinity Health or St. Mary's?
9       MR. LIEBER:  Same objection as before,
10  without a clarification of employee, as a foundation,
11  and also because it calls for a legal understanding.
12  BY MR. BRETZ:
13  Q.  Can you answer my question, Dr. Loewen?  Do you want
14  me to repeat it?
15  A.  I am aware that there were two surgeons that did have
16  administrative jobs with the two major hospital groups
17  that I worked at.
18  Q.  Okay.  I want to limit my question --
19  A.  Okay.
20  Q.  -- to St. Mary's/Trinity Health for this purpose.
21  A.  Okay.
22  Q.  So let me restate it.  Your attorney can object.
23  A.  Okay.
24  Q.  I want your understanding of what an employee is,
25  okay, and I want you to use your own experience at

Page 94

1  Prowers, and how you have privileges at that hospital
2  and are employed at the clinic, okay --
3       MR. LIEBER:  I'm going to object to that --
4  BY MR. BRETZ:
5  Q.  -- I want you to relate to that --
6       MR. LIEBER:  -- that has nothing to do with
7  this, that's subsequent employment, as to whether
8  someone's an employee back before and the subject of a
9  lawsuit.
10       MR. BRETZ:  Okay.
11       MR. LIEBER:  So I'm going to object to the
12  form of that question.
13       MR. BRETZ:  Well, I haven't even finished
14  the question, but if I may --
15       MR. LIEBER:  Go ahead.
16  BY MR. BRETZ:
17  Q.  I want your understanding of how your employment
18  relationship, you can use that as your reference, how
19  your employment relationship works in your current
20  situation, and this is my question --
21  A.  Can I -- okay, go ahead.
22  Q.  The general surgery residency faculty is listed on
23  pages 117 through 123 for the years 2008-2009.  I want
24  you to tell me if you have any facts that any of these
25  faculty members were employees of Trinity Health or

Page 95

1  St. Mary's during that time.
2       MR. LIEBER:  Same objection, and objection
3  to the foundation as you've given it to the question.
4  So it's an objection to form.
5  A.  So I don't have any facts that link the two.  I do
6  want to say, however, that you can't use my work
7  situation as an example, because we don't teach
8  residents.  We're not teaching faculty.  It's a very
9  different setting.
10  BY MR. BRETZ:
11  Q.  Right, but I just -- I understand that.  Now, you said
12  there were two doctors who may have been employed, as
13  you understood it, by one of the health systems that
14  we're talking about?
15  A.  Actually, what I wanted to say is that Dr. Labine had
16  administrative duties with Trinity, that I was aware
17  of.  He was involved in directing the trauma teams,
18  and he also had I think authority with regard to the
19  surgery program.
20       I know that, in addition, at Spectrum, that
21  Dr. Rodriguez had a similar capacity in his role with
22  regard to the surgical suites, the direction of the
23  staff there, policies and --
24  Q.  Some administrative function?
25  A.  Administrative functions, definitely.

Page 96

1  Q.  Okay.
2  A.  And I wanted to also add one more thing.  It was my
3  understanding from the conversation that I was
4  involved with and also overheard Dr. Rodriguez saying
5  that he was hoping to take on that position, and had
6  to give up some of the other work that he was doing to
7  be able to take on that contract.
8       So my understanding, to the best of my
9  knowledge, was that he had an employment contract with
10  Spectrum at that time.
11  Q.  Do you know what that contract called for?
12  A.  I never saw the contract.
13  Q.  Do you know what it was for?
14  A.  To be the chief, chief of surgery, essentially.
15  Q.  Chief of surgery?
16  A.  Yeah.
17  Q.  And do you know whether that was an employment
18  contract or simply an administrative contract?
19       MR. LIEBER:  Objection, form of the
20  question, and I would ask that it be rephrased.
21  BY MR. BRETZ:
22  Q.  Do you know whether that was an employment contract?
23       MR. LIEBER:  And the same continuing
24  objection to the term employment.
25  A.  I would say that it was an employment contract.  I

MARGARET LOEWEN, M.D.
August 30, 2011

Page 101

1    where you would be reporting?
2    A.  Yes.
3    Q.  Okay.  So let's deal with the second half of your
4        residency program.  Could you walk me through as best
5        you can, and I didn't do it, I didn't live it, so I
6        need some help from you --
7    A.  Hmm-hmm.
8    Q.  -- how your daily routine would go?
9    A.  Okay.
10   Q.  When did you get a schedule, how did you report,
11       et cetera.
12   A.  This is gonna take a while.
13   Q.  Okay, I'm looking for an overview, if you can.
14   A.  All right.  An overview is that the residency
15       coordinator was an administrator who coordinated the
16       efforts of all the senior residents who actually
17       developed the schedule in conjunction with the program
18       director.
19   Q.  I'm sorry, the senior residents, with the program
20       director, did the schedule?
21   A.  The chief residents, that would be the fifth-year
22       residents --
23   Q.  Okay.
24   A.  -- actually were responsible to write and schedule for
25       all of the residents in their hospitals or on the

Page 102

1        rotations that they were responsible for.
2    Q.  And the idea was to get all the residents into each
3        specialty for exposure and education, is that fair?
4    A.  Their goal was to cover, basically, to make sure that
5        all of the patients were cared for on the rotation
6        that they were responsible for.  The chief residents
7        only scheduled general surgery residents for general
8        surgery rotations.  There were a multitude of
9        rotations that were scheduled by others.
10           And some of them, for example, colorectal,
11       would have been scheduled by that program coordinator
12       or their secretary, or somebody who was in charge of
13       that particular, that particular rotation.
14   Q.  Okay.
15   A.  So it varied, okay?
16   Q.  So the schedules varied.
17   A.  And then --
18   Q.  Now, how often would you get a schedule?
19   A.  There was a schedule that was developed once a month,
20       and those schedules then would delineate who was on
21       call for that day, and the times were designated.  The
22       residents who needed to be available 24 hours a day
23       were designated, and that would usually include both
24       the first-year residents, who were referred to as
25       interns, and then also the upper residents,

Page 103

1    upper-level residents.
2           There was a difference between the
3        different hospitals in terms of what the hours were
4        and how the night shift worked, who was, who was
5        responsible, who was supposed to be available, whether
6        or not you could go home, whether you had to stay in
7        the hospital.  It was endless.  There was a tremendous
8        amount of variability there.
9    Q.  Okay.
10   A.  So the way that the --
11   Q.  I'm sorry.
12   A.  If you want to understand the workday, what we did is
13       we got up as early as we needed to to be able to get
14       ready for the day, get dressed, get to see the
15       patients before we had our morning conference, which
16       was the residents getting together with faculty, in
17       many cases.
18           We always liked it when faculty came for
19       basically the handoff.  It was a conference where we
20       would talk about our patients and explain what's going
21       on with them, so that the residents who were coming on
22       call, who'd have responsibility for those patients
23       when others weren't available, would know what's going
24       on.
25   Q.  Debriefed?

Page 104

1    A.  Yes.
2    Q.  Okay.
3    A.  So we had, oh, an hour or two -- depending on how many
4        patients we were carrying would determine how much
5        time it would take to get -- to see all the patients,
6        to write all the chart notes, to write the orders, and
7        to get to the conference, which always started at
8        seven a.m.
9    Q.  These are all surgical patients, either pre or
10       post-op?
11   A.  Yes.
12   Q.  Is that pretty much the group we're talking about?
13   A.  Pretty much.  There were some outpatients, too.
14       Again, the special rotations, the subspecialties, and
15       even when patients were doing general surgery
16       rotations, there would be times when they would be
17       required to do some outpatient work, as well.
18           So, yes, generally surgical patients.  And
19       critical care, of course.
20   Q.  So you'd get this schedule from Tracy or her
21       replacement on a monthly basis?
22   A.  Yes.
23   Q.  And you knew from the schedule where to report, which
24       hospital, is that right?
25   A.  Yes.

MARGARET LOEWEN, M.D.
August 30, 2011

Page 109

1  proceed through the rooms, sometimes alone, sometimes
2  with other residents or interns?
3  A.  And medical students --
4  Q.  Or medical students?
5  A.  -- because we were always teaching medical students.
6  Q.  What else would be involved in the day?
7  A.  Well, that was the first hour or two.  Then we would
8  go -- we would have our meeting, our conference, our
9  sign-out time.
10  Q.  Debriefing?
11  A.  There would be debriefing.  We'd also have -- some
12  education would be involved, have breakfast, and then
13  we would start operating --
14  Q.  Okay, and --
15  A.  -- and we would have assignments.
16  Q.  I'm sorry, in the debriefing, would that be all
17  residents and interns again?
18  A.  Yes.
19  Q.  Okay.  And then, I'm sorry, you said there would be
20  days when you'd do operating or assignments?
21  A.  Yes, there would always be surgeries every day.
22  Q.  Every day.  How would you know when you are to scrub
23  in for surgery?
24  A.  That list would be in the surgeon's lounge at whatever
25  hospital you were working at.

Page 110

1  Q.  What is the list?
2  A.  Pardon?
3  Q.  What is the list?  Is it Margaret Loewen for surgery,
4  or is it just a list of surgeries?
5  A.  It's a list of all the surgeries that are happening
6  that day at that facility, and then the more
7  senior-level residents would make assignments for the
8  entire team.
9  Q.  Okay.  So there may be a gallbladder today, and you
10  would see your name next to the gallbladder?
11  A.  That's right, and then I would go do it.
12  Q.  And then you'd scrub in?
13  A.  Scrub in.
14  Q.  And there would be a surgeon in charge, right?
15  A.  Correct.
16  Q.  Would that surgeon in charge, by necessity, have to be
17  an instructor listed in our manual?
18  A.  Yes.
19  Q.  Okay.  So I assume at the hospitals there were other
20  surgeons who might be doing a gallbladder that day.
21  You would never be assigned to go to a nonfaculty
22  gallbladder surgery, is that right?
23  A.  That's correct.
24  Q.  Okay.  So the senior, the fifth-year residents would
25  put you on the surgery?

Page 111

1  A.  Well, the senior -- the chief residents always did the
2  assignments with regard to which hospital and who's on
3  call.  The residents on the team, if they're -- it
4  could be a chief, but it could also just be an upper
5  level, like a third or four year.  Whoever's the most
6  senior resident that wanted to be involved in the
7  decision would decide who was going to be assigned
8  cases.
9  Q.  So the assignment to surgeries would be self-governing
10  by the residents, is that right?
11  A.  Ah, shoot.  Well, there was other input.  There was
12  input from Schlatter.  There was input also from the
13  surgeons themselves.  But since I was not involved in
14  that year of training, I don't know all the
15  discussions that happened behind the scenes.
16  Q.  Okay.  But as far as you knew, you'd go and see your
17  name next to a particular surgery --
18  A.  Right.
19  Q.  -- and, as far as you knew, that was assigned by the
20  senior resident in-house that day, generally?
21  A.  Yes.
22  Q.  Okay, I'm just trying to understand.  And then so that
23  would be the surgery part of your day?
24  A.  Right.
25  Q.  And then what would be the rest of your day, if any?

Page 112

1  A.  And then there would be -- in between cases there
2  would be emergency room calls for consults.  We would
3  always see all of the emergency room calls for
4  consults throughout the day.
5  Q.  How did that work?
6  A.  They would page, they would page us and say, we've got
7  a patient that needs to be seen.  There would be some
8  staff from the emergency department or there would be
9  a trauma at St. Mary's, for example -- the general
10  surgery work and the trauma team are one and the same,
11  so we would get a trauma call.
12  Whoever happened to be on the general
13  surgery team was supposed to respond, whoever was
14  available, could get out of the operating room quick
15  enough to go down and take care of that patient.
16  Q.  Could residents go handle a trauma ER case alone?
17  A.  Yes.
18  Q.  Okay.  You couldn't do surgery alone, but you could do
19  the ER cases alone?
20  A.  What we would do is actually do the assessment, and
21  then at some point the attending would come by.  But
22  no, either the attending teaching surgeon would come
23  by and take a look at the trauma -- they usually would
24  be present at the trauma evaluation, but the ER cases,
25  all of the consults we did, we had to call the

MARGARET LOEWEN, M.D.
August 30, 2011

Page 113

1    attending who was linked to the case, who the case
2    would go to, because they, the attendings, also had
3    their own on-call schedule.
4            And so whoever's on call that night or that
5    day would be the one that we would call and say, we've
6    got a case here I want to talk to you about, we'd
7    review it, and then they would say, yes, no, it sounds
8    good, whatever, and then we'd proceed.
9    Q.   And if they were a faculty attending, you might be
10   involved; if they were nonfaculty --
11   A.   No, they were always faculty.
12   Q.   They were always faculty?
13   A.   We didn't work with anybody that wasn't faculty.
14   Q.   Okay, got it.
15   A.   Yeah.
16   Q.   Got it.  So the page would -- tell me how that sounded
17   or looked.  Would it be a code, or what would that be?
18   A.   The page?
19   Q.   Yeah.  You're in a room or you're in surgery, and you
20   get a call.  What is that?  What do you hear or what
21   you do see?
22   A.   Somebody's beeper goes off, and in some of the
23   hospitals there would actually be a distinctive sound.
24   It would be a certain sound that you know this is a
25   trauma call.  There would sometimes be an

Page 114

1    announcement, this is a level-one pediatrics, you
2    know, and everybody's like talking, okay, who's
3    available, who's going to be able to go down there,
4    somebody might scrub out of a case to run down there,
5    that sort of thing.
6    Q.   So it would be a general call, not a specific.  It
7    wouldn't be, Margaret Loewen, come to ER, it would
8    be --
9    A.   It would be a general call.
10   Q.   A general call?
11   A.   Yeah.
12   Q.   Okay.
13   A.   And actually in Spectrum's level-one trauma center,
14   they had pagers that were only for the trauma team.
15   They had a separate team that took care of the
16   traumas --
17   Q.   Okay.
18   A.   -- and in that case, it would be a specific resident.
19   Q.   Well, on the team?
20   A.   On the team.
21   Q.   It would be nonspecific within the team, is that -- do
22   you understand what I'm saying?
23   A.   I think that's right.
24           MR. LIEBER:  Do you understand?
25           THE WITNESS:  Yeah, I understand what

Page 115

1    he's --
2    BY MR. BRETZ:
3    Q.   It wasn't perfectly phrased, but I think it was
4    correct.
5    A.   Right.
6    Q.   All right, got it.  Any other parts of the day that we
7    haven't talked about?
8    A.   Then at the end of the day, which could be probably
9    five or 6:00, you would need to go see your patients
10   before you left for the day, so you do another round
11   of rounds to make sure that everyone was tucked in and
12   that you had everybody up to speed.  And then you
13   would communicate with the night shift as to what was
14   going on with your patients.
15           Now, that's only a normal day.  On every
16   third or fourth day we'd be on call for 24 to 30
17   hours.  That was a whole different kind of a picture,
18   because then all of the new cases came to that person
19   who's on call, and we would be on duty for up to 30
20   hours at a time.
21   Q.   Similar kind of work, though, on the on-call day,
22   similar kind of functions as you've described?
23   A.   Similar, similar but responsibilities were different,
24   yeah.
25   Q.   So when you showed up in the morning, did you sign in

Page 116

1    or punch in at any hospital?
2    A.   We, we didn't punch in, but we did have responsibility
3    to document our hours very specifically down to the
4    ten minutes.
5    Q.   And to whom did you -- did you handwrite that?
6    A.   No.
7    Q.   How did you --
8    A.   That was documented in a system called New Innovations
9    that was run by the general surgery program.
10   Q.   Okay.  So you would log in and record your hours?
11   A.   Yes.
12   Q.   Okay.  And did you do that through the day?
13   A.   No.
14   Q.   When did you log in and do that, at home, or what?
15   A.   I would log in -- I could do it at home.  I could do
16   it at the hospital, too.  It was an internet-based
17   program that we would have access to anywhere if we
18   had internet access.
19           And, basically, what it involved is making
20   sure that the location of the hospital's identified,
21   the hours that were actually worked were identified,
22   and there were also some additional specifications
23   having to do with whether you were on call or whether
24   it was regular duty, whether you were finishing up.
25           There was a certain designation for hours

MARGARET LOEWEN, M.D.
August 30, 2011

---

**Page 121**

1  A.  Yes.
2  Q.  Okay.  And I don't see you on this list.  Am I right?
3  A.  I don't see me on this list, either.
4  Q.  And can I conclude that you did not do any rotation or
5     procedures at St. Mary's in April '09 from this?
6  A.  Yes.
7  Q.  Okay.  And then let's look at -- we don't have May,
8     and I can't explain why.  I don't know if we have it
9     or don't have it, but this is what I got.
10 A.  Hmm-hmm.
11 Q.  Let's look at June.
12 A.  Okay.
13 Q.  Again, I don't see you on the list.  Can I conclude
14    that you were not at St. Mary's in June of 2009?
15 A.  Yes.
16 Q.  Okay.  Same question for July, and I've got two Julys.
17    They look like it was, one was updated?
18 A.  Yeah, that could well be.  They were updated from time
19    to time because of scheduling problems.
20 Q.  Trades or vacations?
21 A.  Yeah.
22 Q.  Okay.  But I don't see you listed on either of the
23    July '09 St. Mary's schedules.  Can I conclude that
24    you were not at St. Mary's in July?
25 A.  That is correct.

---

**Page 122**

1  Q.  And I don't see you on the September '09.  Can I
2     conclude that you were not at St. Mary's in September
3     of '09?
4  A.  That would generally be true.  The only reason I'm
5     hesitating is that I believe in July of '09 I was
6     working with, with Brian Figg, who's a colorectal
7     surgeon, and I had a special kind of a schedule with
8     him.  And he did operate all over.
9        I don't recall having any cases at
10    St. Mary's, but that would be the only reason that
11    there would be an exception to that.
12 Q.  Okay.  You were not scheduled at St. Mary's in July of
13    '09, is that fair?
14 A.  I wasn't part of the team, right.  I wasn't part of
15    the general surgery rotation, that's true.
16 Q.  In October of '09 you do appear, and I've got you on
17    seven days, if I counted correctly?
18 A.  Actually, no, this is just the on-call schedule --
19 Q.  Okay.
20 A.  -- because I was there six days a week, of course.
21    This is only designating the call schedule, per se.
22    So these would be the hours I was actually there.  I
23    was responsible to be available during those hours to
24    receive any new consults, I was the trauma designee,
25    et cetera.

---

**Page 123**

1  Q.  Okay, so --
2  A.  That's what this means.  But, no, I was there
3     six-days-plus a week.
4  Q.  This is the on-call schedule --
5  A.  Yes.
6  Q.  -- for October?
7  A.  Correct.
8  Q.  Okay.  And then you were on trauma call in November,
9     those days.  I've got seven days again, is that right?
10 A.  General surgery and trauma, yes.
11 Q.  And these schedules that we're looking at here in
12    Exhibit 27, these were the ones that were produced by
13    Tracy or her successor at GRMERC?
14 A.  These were the schedules that they compiled from the
15    assignments that had been made, yes.
16 Q.  Okay, got it.
17 A.  Hmm-hmm.
18         MR. BRETZ:  Why don't we take five minutes?
19         MR. LIEBER:  Good.
20         (Recess taken at 11:39 a.m.)
21         (Back on the record at 11:50 a.m.)
22 BY MR. BRETZ:
23 Q.  Could you tell me, Dr. Loewen, let's go with the year
24    2009, from January 1 to November, however you want to
25    break this down, I'm trying to get an understanding

---

**Page 124**

1  for how much of your time, how many of your days,
2  would have been spent, what percentage of your time
3  would have been spent at St. Mary's.  Can you help me
4  with that?
5  A.  I would say that, roughly, we spent four out of twelve
6     rotations at St. Mary's, so ...
7  Q.  So four out of twelve work days, if you would?
8     Rotation would be a workday or --
9  A.  That's approximately right.  It was less than half,
10    but it was probably more than -- it was a third or a
11    bit more, yeah, because of the fact that we I think
12    spent four months at St. Mary's.  I'd have to go back
13    and double-check that, but that's approximately
14    right --
15 Q.  Was that true --
16 A.  -- four months a year at St. Mary's.
17 Q.  Okay.  So was that true throughout your four years,
18    that roughly a third of your time was at St. Mary's?
19 A.  Roughly, hmm-hmm.
20 Q.  And that would not be all at once, that would be
21    sprinkled throughout the year, is that right?
22 A.  That's right.
23 Q.  And the other two-thirds would be -- can you tell me
24    how that would be broken down?
25 A.  That would be Butterworth Hospital, DeVos Children's,

---

MARGARET LOEWEN, M.D.
August 30, 2011

Page 125

1    Blodgett.
2  Q.  Okay.  And of your total time, of a hundred percent,
3     how much of that time was in the hospital?  A hundred
4     percent, something less?
5  A.  Something less, because we did have an office
6     requirement.  Originally it was two half-days a week
7     that we needed to spend in the offices of the
8     practicing surgeons that we were working with.
9          At the very -- the last year they changed
10    the requirements, it was only a half-day a week, so
11    whatever that calculates out to be, the rest of the
12    time was spent in the hospitals.
13 Q.  So maybe ninety percent of your time was in the
14    hospitals, whatever that calculation is?  I'm just
15    trying to get an idea.
16 A.  Actually, it's more, because we would spend 24 hours a
17    day in the hospital and we'd only be in an office
18    maybe four hours.  It's a lot more than ninety
19    percent.
20 Q.  So a half-day out of an 80-hour work week?
21 A.  Yeah, officially, yes.
22 Q.  Okay.
23     MR. LIEBER:  What'd you say?
24     THE WITNESS:  I was saying an 80-hour work
25    week -- well, there were weeks that we worked more

Page 126

1     than 80 hours, but the average was supposed to be not
2     more than 80 hours.
3  BY MR. BRETZ:
4  Q.  Right, okay.  Let me just do a little cleanup here.
5          MARKED FOR IDENTIFICATION
6          DEPOSITION EXHIBIT 28
7          11:53 a.m.
8  BY MR. BRETZ:
9  Q.  This is a W-2 form.  I have extra copies if folks need
10    it.  This is Exhibit 28.  Is that a W-2 form that you
11    received from GRMERC?
12 A.  Yes.
13 Q.  And I believe I asked you earlier if you received in
14    2009 any W-2s from any other entity, and your answer
15    was?
16 A.  No.
17 Q.  Okay.  Did you receive any 1099s from any entity in
18    2009?
19 A.  I don't believe so.
20 Q.  All right.
21     MR. BRETZ:  Is there a Bates number on that
22 document?
23     MR. LIEBER:  Yeah, 001296.
24     MARKED FOR IDENTIFICATION
25     DEPOSITION EXHIBIT 29

Page 127

1     11:54 a.m.
2  BY MR. BRETZ:
3  Q.  I'll show you Exhibit 29 --
4     MR. LIEBER:  Do you have another copy of
5     28?
6     MS. LACHMAN:  Yes.
7     MR. LIEBER:  Thank you.
8  BY MR. BRETZ:
9  Q.  It's a one-page email -- two emails on one page.  You
10    are one of the recipients on the top there?
11 A.  Yes.
12 Q.  And this is something you produced?
13 A.  Yes.
14 Q.  Bates-stamped 535?
15 A.  Yes.
16 Q.  You received this during your residency in or about
17    July 2007?
18 A.  Yes.
19 Q.  And it's from -- the first email is from Karalyn
20    Ferguson, human resources representative, Grand Rapids
21    Medical Education & Research Center, correct?
22 A.  Yes.
23 Q.  Okay.  And it's asking program coordinators to remind
24    the residents that they are GRMERC employees.  You
25    received this during your residency?

Page 128

1  A.  Yes.
2  Q.  Did you ever dispute this?
3     MR. LIEBER:  This particular document?
4     MR. BRETZ:  Yes.
5  BY MR. BRETZ:
6  Q.  Did you ever write back and say, no, I'm not, or take
7     any action?
8  A.  No, not at the time.
9  Q.  Okay.
10     MARKED FOR IDENTIFICATION
11     DEPOSITION EXHIBIT 30
12     11:57 a.m.
13 BY MR. BRETZ:
14 Q.  Let me show you Exhibit 30.  It's an email, change in
15    payroll practices, dated June 9, 2009?
16 A.  Yes.
17 Q.  Did you receive this?
18 A.  I did.
19 Q.  It's got your designation as coming from your
20    attorney, Bates-stamped 595, correct?
21 A.  Yes.
22 Q.  And it's from Nancy Bolthouse, at GRMERC?
23 A.  Yes.
24 Q.  Who's Nancy Bolthouse?
25 A.  She is the director of human resources at GRMERC.

MARGARET LOEWEN, M.D.
August 30, 2011

Page 129

1    Q.  Okay.  Did she replace Karalyn?
2    A.  Did she replace Karalyn?  I don't know.
3    Q.  Karalyn is the human resources representative, so she
4        may be Karalyn's boss.  Do you know?
5    A.  I don't know.
6    Q.  Okay.  And this announces to all the residents that
7        GRMERC was going to change how often you were paid?
8    A.  Right.
9    Q.  Okay.  So GRMERC changed its payroll system from 26
10       times a year to 24 pays per year?
11   A.  Yes.
12   Q.  And the GRMERC HR representative informed you of that
13       change?
14   A.  Yes.
15   Q.  Okay.
16               MARKED FOR IDENTIFICATION
17               DEPOSITION EXHIBIT 31
18               11:58 a.m.
19   BY MR. BRETZ:
20   Q.  Let me show you Exhibit 31.  These are documents that
21       you produced.  It's a series of emails, if you want to
22       take a second to look at them.  They all have Bates
23       stamps bearing your designation, as coming from your
24       attorney's office, is that correct?
25   A.  Yes, they do.

Page 130

1    Q.  Okay.  The first one, top one is an email regarding
2        expenses from Tracy VanDeWeg?
3    A.  Yes.
4    Q.  She said she added mileage, so she added something to
5        a reimbursement check for you that you had forgotten?
6    A.  She, well, she did, although -- yes, that's
7        basically -- the simple answer is yes.
8    Q.  Okay.  And this was an expense check that you received
9        for mileage and other --
10   A.  Yes.
11   Q.  -- related business expenses?
12   A.  Yes.
13   Q.  Did you receive that check from GRMERC?
14   A.  Yes.
15   Q.  Okay.  The second page is Bates-stamped 882.  It says,
16       hi, Margaret, from Tracy?
17   A.  Hmm-hmm.
18   Q.  Yes?
19   A.  Yes.
20   Q.  And it says, your vacation for February 16 to 22 has
21       been approved, and then 23 and 24 have been requested
22       as off call?
23   A.  Right.
24   Q.  So who approved your vacation request?
25   A.  That would have been Dr. Schlatter.

Page 131

1    Q.  Okay.  And he's the program director for GRMERC?
2    A.  Program doctor for general surgery residency program.
3    Q.  Okay.  Let's look at Bates stamp 448, extra day off
4        email?
5    A.  Right.
6    Q.  Okay.  This is to Manny, Manuel Lozano.  Is that a
7        fellow resident?
8    A.  He was a chief resident.
9    Q.  Okay.  So what were you doing here?  Were you asking
10       Manny to trade or give you a day off, is that --
11   A.  Well, the background on this is that we had a resident
12       who was not a chief.  She was scheduled to be on call
13       on the day that she went into labor, and so they were
14       calling around looking for somebody else who could
15       cover at St. Mary's that day because they had no
16       resident.
17   Q.  Who's they was looking.
18   A.  The chief --
19   Q.  Chief residents, okay.
20   A.  -- chief residents, because they were in charge of the
21       schedule and coordinating the lower-level residents as
22       to where they were working.
23               So I had been asked by a different chief,
24       who was responsible for the call schedule at
25       St. Mary's at the time that she went into labor,

Page 132

1    asking if I would be willing -- I was an intern, I
2    want you to know.  I had not completed my first year
3    of residency.  They wanted me to take the job of a
4    full resident, in other words, a second year, to be on
5    call alone, which was a little bit not kosher,
6    actually, but they couldn't find somebody else.
7               So I worked that day, and the chief who had
8    asked me to do that, as an incentive, said, well,
9    we'll get you an extra day off.
10              Well, that never happened.  So I was asking
11   for it and I never got it, actually, but it was worth
12   a try.
13   Q.  So Manny was the one assigning you to replace this --
14   A.  Manny --
15   Q.  Let me finish.
16   A.  I'm sorry.
17   Q.  -- to replace or trade this day off as a result of
18       this other resident's labor and delivery?
19   A.  No, he was not, actually.
20   Q.  Oh.
21   A.  The resident who was responsible to do that was, had
22       been on duty at that hospital at a previous -- several
23       months previously, and by the time I think that Manny
24       was in charge of doing the scheduling, I was realizing
25       I had not been given that extra day off.

MARGARET LOEWEN, M.D.
August 30, 2011

---

Page 145

1    any attached or provided.
2    A.  No.  I don't think that I would have copies.  The
3    only -- I'm thinking of some documents that I had
4    submitted, but probably not a contract.
5    Q.  Okay.
6    A.  You know, I can add to that question.  I'm thinking
7    about all the signatures I put on patient charts, and,
8    of course, those were St. Mary's documents.
9    Q.  Those would be patient charts, right?  Okay.
10   A.  They would be documents that are probably owned by
11   St. Mary's, however.
12   Q.  Right, PHI?
13   A.  What is PHI?
14   Q.  Protected health information type records, yes?
15   A.  Right.
16   Q.  Clinical records?  That's a yes, clinical records?
17   A.  Clinical records, yes.
18   Q.  All right.  I'll show you Exhibit 33.
19                MARKED FOR IDENTIFICATION
20                DEPOSITION EXHIBIT 33
21                12:18 p.m.
22   BY MR. BRETZ:
23   Q.  It's a memo signed by you and Dr. Schlatter, dated
24   March 19?
25   A.  That's the date at the top, but the date that it was

---

Page 146

1    signed was April 1 --
2    Q.  Correct.
3    A.  -- 2009.
4    Q.  And was this signed at a meeting between you and
5    Dr. Schlatter on April 1?
6    A.  I'd have to look.
7          MR. LIEBER:  Is this Exhibit 33?
8          MR. BRETZ:  Yes.
9    A.  I think, actually, we had discussed this on March 19,
10   and then it was signed later.
11   Q.  Okay, it was reduced to writing and signed later?
12   A.  Yes.
13   Q.  Okay.  It proposes -- Dr. Schlatter writes, I propose
14   a short-term evaluation plan over the next six weeks,
15   correct?
16   A.  Yes.
17   Q.  And he outlines that plan, three items.  He said, this
18   plan was discussed with, understood and agreed to by
19   Dr. Loewen.  Is that correct?
20   A.  That's what it says, yes.
21   Q.  Okay.  Did you agree to the plan?
22   A.  I did.
23   Q.  Okay.  Do you have any facts that anyone at St. Mary's
24   or Trinity Health had any input into this short-term
25   evaluation plan?

---

Page 147

1    A.  I don't have such facts.
2    Q.  Do you have of any facts that anybody at Spectrum had
3    any input into this short-term evaluation plan?
4    A.  Well, I want to say -- I need to state that
5    Dr. Scheeres and Dr. Foster both were faculty who
6    worked primarily at Spectrum.  So, yes, I'm sure he
7    did confer with them before he wrote this up.
8    Q.  You're sure or you think?
9    A.  He told me that he was speaking with them, so I
10   believe that he did speak with them, yes.
11   Q.  And do you know whether Scheeres and -- I'm sorry, the
12   other doctor?
13   A.  Foster.
14   Q.  -- Foster are employees of Spectrum, or are they
15   doctors with privileges at the hospital?
16          MR. LIEBER:  Objection, form.
17   BY MR. BRETZ:
18   Q.  Do you know?
19          MR. WURST:  Was there an answer to the
20   question?
21          MR. BRETZ:  No.
22   BY MR. BRETZ:
23   Q.  Do you need me to repeat it?
24   A.  Go ahead, please do.
25   Q.  Do you know for a fact whether Drs. Scheeres or Foster

---

Page 148

1    are employees at Spectrum?
2    A.  I don't know.
3    Q.  Okay.  I'll show you Exhibit 34.
4                MARKED FOR IDENTIFICATION
5                DEPOSITION EXHIBIT 34
6                12:21 p.m.
7    BY MR. BRETZ:
8    Q.  That's a remediation study plan, signed by you
9    April 6, 2008, and Dr. Paulson April 7, 2008, correct?
10   A.  Yes.
11   Q.  You agreed to this remediation study plan?
12   A.  Yes.
13   Q.  Do you know who Dr. Paulson's employer is?
14   A.  I'm not sure.
15   Q.  Okay.  She's a member of the surgical faculty through
16   GRMERC?
17   A.  She is a faculty member, yes.
18   Q.  Okay.  And she was going to be your mentor in this
19   remediation phase?
20   A.  Yes, hmm-hmm.
21                MARKED FOR IDENTIFICATION
22                DEPOSITION EXHIBIT 35
23                12:22 p.m.
24   BY MR. BRETZ:
25   Q.  I'll show you Exhibit 35, an April 27, 2009, meeting

---

MARGARET LOEWEN, M.D.
August 30, 2011

Page 165

1 and ask you a couple questions. There was a Mark
2 Spoelstra?
3 A. Yes.
4 Q. Was he the chair of the panel?
5 A. Yes.
6 Q. Okay. And, if you know, is he an employee of
7 St. Mary's Health, do you know?
8 A. I don't.
9 Q. Okay. Where does he practice?
10 A. I never worked for him or with him. I know that he --
11 I understand that he was the residency program
12 director for internal medicine.
13 Q. Okay. He's not a surgical instructor?
14 A. He's not a surgical, no.
15 Q. Gina Barletta, M.D., do you know who she is?
16 A. Yes.
17 Q. Who is she?
18 A. She was the -- are you talking professionally?
19 Q. Let me ask it this way.
20 A. Okay.
21 Q. Is she an instructor for GRMERC and a program
22 director?
23 A. She is a program director, and I think it's pediatric
24 nephrology, some specialty of pediatrics.
25 Q. Do you know whether she's an employee of St. Mary's

Page 166

1 Health or Trinity Health?
2 A. I don't know that she is, no.
3 Q. And with regard to Spoelstra or Barletta, do you know
4 whether they're employees of Spectrum or Michigan
5 State University?
6 A. I don't know.
7 Q. Okay. Dale Ray, he's a program director, Dale Ray,
8 M.D., if you know?
9 A. I don't -- let's see, I believe he is a program
10 director. I'm sorry, I don't know the specialty,
11 though.
12 Q. Okay. Do you know whether he is an employee of
13 St. Mary's, Trinity Health, or Michigan State
14 University?
15 A. I don't know.
16 Q. Pam Yager?
17 A. I remember the name, yes.
18 Q. Did you know her before this panel?
19 A. No.
20 Q. Okay. She's listed as an RN, nurse?
21 A. Okay.
22 Q. Do you know who she's employed by?
23 A. I think she's employed by MERC.
24 Q. Okay, in-house GRMERC?
25 A. I think so.

Page 167

1 Q. Okay. So she was a staff person?
2 A. That's what I understood, involved in education.
3 Q. Okay. And Sarah Milliken, M.D., who is she?
4 A. She was a resident.
5 Q. Okay. Was she your appointment? Did you request her?
6 A. No.
7 Q. Okay. But one of the requirements for the panel is
8 that a fellow resident be on the panel, right?
9 A. Right.
10 Q. Okay. She was the designee?
11 A. Yes.
12 Q. Okay. Do you have -- you received a decision from the
13 panel?
14 A. I did.
15 Q. And that was adverse to you?
16 A. Yes.
17 Q. I'll show you Exhibit 38.
18         MARKED FOR IDENTIFICATION
19         DEPOSITION EXHIBIT 38
20         12:43 p.m.
21 BY MR. BRETZ:
22 Q. Do you have any evidence that anybody at St. Mary's
23 Health, Trinity Health, Spectrum, or Michigan State
24 had any input into the panel's decision to deny your
25 grievance?

Page 168

1 A. I do not have any evidence, no.
2 Q. Okay. Following the termination of your residency,
3 you sought to become affiliated with another residency
4 program?
5 A. Actually, the discussion with family medicine had
6 started much earlier, and I had my first conversation
7 with them in, I think it was January, I had actually
8 interviewed.
9 Q. January of what year, 2009 or ten?
10 A. Ten.
11 Q. Okay. So after the termination of your residency
12 program --
13 A. Right.
14 Q. -- but before the conclusion of the grievance?
15 A. Yes.
16 Q. Okay. Did you seek to become affiliated with the
17 family medicine residency program before you were
18 terminated from surgery?
19 A. No.
20 Q. Okay, only after?
21 A. Right.
22 Q. Okay. And you had some interviews in January?
23 A. I began a conversation in January, but I didn't have
24 interviews until I think it was May. I think it was
25 May, end of April or May, yes.

MARGARET LOEWEN, M.D.
August 30, 2011

Page 169

1  Q.  And what was the result of your attempt to get into
2      the family medicine residency program?
3  A.  They turned me down.
4  Q.  Did you get a reason?
5  A.  They only said that they had decided I was not a good
6      fit, but no other reason.
7  Q.  Did you hear anything about funding or lack of
8      available funding for that?
9  A.  I did.
10 Q.  What did you hear?
11 A.  Well, the problem was -- the way that they stated it
12     is that because I had been designated as a general
13     surgery resident, the federal government would only
14     allocate five years of residency training for me.
15         And since I was already into my fifth year
16     of training, although they, although they actually had
17     already -- they, as in MERC, had already designated an
18     extra year of funding for me to complete my training,
19     on the assumption that I would complete the remedial
20     fourth year, they were -- they stated that there was
21     only five years of a hundred percent funding
22     available, and that because I was already well into or
23     like a third of the way into the fifth year, that
24     there would not be adequate funding available for me
25     to complete my training in family medicine, which

Page 170

1      would have required an additional two years.
2  Q.  An additional two years?
3  A.  Yes.  And that's it.
4  Q.  Do you have any reason to dispute those facts?
5  A.  Well, I do know that they had allocated the extra
6      funding for an additional year following, for me to
7      complete general surgery, in other words, that was the
8      plan or that's what I thought was the plan.  That was
9      my understanding of the plan.
10         I went into this remediation process in
11     good faith that I would have an opportunity to
12     complete the program.  So that would have been six
13     years total, not five.
14         So I knew that there was some money
15     available for those kinds of, you know, flexibility
16     and judgment calls, perhaps, or special needs, or I
17     don't know what you want to call it.
18 Q.  Okay.  So there may have been one more year of surgery
19     funding?
20 A.  Yes.
21 Q.  But you needed two --
22 A.  Yes.
23 Q.  -- for the family medicine?
24 A.  Hmm-hmm.
25 Q.  And do you know for a fact whether the surgery funding

Page 171

1      was transferrable to family medicine?
2  A.  Well, I don't know.  I attempted to determine that,
3      but I was never given any information.
4  Q.  But at the end you were told that there was a problem
5      with having your family medicine residency funded?
6  A.  Yes.
7  Q.  Okay.  And at least insofar as one year, you don't
8      dispute that, right?
9  A.  There was, there was at least one year available, and
10     the second year I guess was the question.
11 Q.  Okay.
12 A.  But I have to say, though, that when I was terminated,
13     Dr. Schlatter said that he thought there was a good
14     possibility I could be transferred.  There was always
15     a lot of sort of -- there was a lot of discussion
16     about that being a possibility.
17         And I met with Dr. Coggan shortly after
18     that, and he agreed that there was certainly a
19     possibility, was going to look into funding, and would
20     get back with me.  He wanted me to do my, finish my
21     licensing, which I did, got back with him, didn't hear
22     anything.
23         It was, it felt to me like they were
24     planning -- in fact, Van Schagen himself told me the
25     first time I spoke with him in February that he was

Page 172

1      looking forward to having me join their residency
2      program on July 1st.  And so on that basis, then, I of
3      course had made the plans to stay in the area and to
4      prepare myself to begin working with the family
5      residency program, which when we did the second series
6      of interviews which involved other faculty members
7      from St. Mary's, as well as some residents, they were
8      several weeks delayed before they announced to me in
9      June that they had decided against it because I was
10     not a good fit.
11         At that point they did not state that there
12     were financial difficulties, that I recall.
13 Q.  Do you know whether you received positive reviews from
14     your fellow residents, or from the residents who
15     interviewed you?
16 A.  I didn't get any direct information as to what their
17     feedback had been.
18 Q.  Okay.  So just to go over the players here, Dr. Coggan
19     is who?
20 A.  He's the CEO of GRMERC and an associate dean of the
21     MSU College of Human Medicine.
22 Q.  Did he have any particular involvement in the family
23     medicine residency program, or was he just the CEO of
24     GRMERC?
25 A.  I don't know.

MARGARET LOEWEN, M.D.
August 30, 2011

Page 173

1    Q.  Okay.  And Van Schagen?
2    A.  Van Schagen, he was the program director for the
3         family medicine program at St. Mary's.
4    Q.  And are either Coggan or Van Schagen employees of
5         St. Mary's or Trinity Health, to your knowledge?
6    A.  I don't know.
7    Q.  Okay.  And you said you interviewed with some other
8         residents who were in the program --
9    A.  Yes.
10   Q.  -- right?
11   A.  Correct.
12   Q.  And were there other faculty members in family
13        residency that interviewed you?
14   A.  Yes.
15   Q.  Do you remember any of them?
16   A.  There was a female.  I don't remember her name.
17   Q.  Okay, just one?
18   A.  Just one that I remember, yes.
19   Q.  Do you know whether she was an employee of Trinity
20        Health or St. Mary's?
21   A.  I don't recall.
22   Q.  Okay.
23        MR. BRETZ:  Let me take five minutes.  I
24   think I'm pretty close to the end.
25        MR. LIEBER:  Okay.

Page 174

1         (Recess taken at 12:51 p.m.)
2         (Back on the record at 12:56 p.m.)
3         MR. BRETZ:  I have no further questions at
4    this time.
5              EXAMINATION
6    BY MR. WURST:
7    Q.  Dr. Loewen, my name is Tom Wurst.  We've been
8         introduced, and I represent GRMEP and Spectrum with
9         regard to this deposition.  I have a few questions for
10        you today.  Bear with me if I'm redundant.  I'll try
11        not to be.
12        As I understand it, you were dismissed from
13        the MERC, the GRMEP program in November of 2009, is
14        that accurate?
15   A.  Yes.
16   Q.  And you appealed that termination, correct?
17   A.  Yes.
18   Q.  To whom did you appeal?
19   A.  I appealed to the organization, the administrative
20        organization that oversaw the general surgery
21        residency program.
22   Q.  That was GRMEP, right?
23   A.  That was the administrative organization, yes.
24   Q.  Okay.  Did you appeal through any internal grievance
25        procedure at Spectrum?

Page 175

1    A.  I had not gone through a Spectrum internal grievance
2         procedure, but I had --
3    Q.  That's the answer to my question.  Same question with
4         respect to St. Mary's.  Did you pursue any internal
5         grievance procedure through St. Mary's?
6    A.  I would have.
7    Q.  My question is, did you.
8    A.  I did actually bring some objections to a supervisor
9         in the emergency department where I was working, and I
10        didn't get anywhere.  So, yes, I attempted to do so at
11        St. Mary's.
12   Q.  Did you process in writing any grievance at either
13        Spectrum or St. Mary's?
14   A.  In writing, no.
15   Q.  Okay.  And then it's obvious that you didn't follow up
16        with any appeals of any grievances at either of those
17        entities, because you did not process any in writing
18        in the first instance, fair?
19        MR. LIEBER:  You mean internally?
20        MR. WURST:  Sure.
21   A.  Internally?
22   BY MR. WURST:
23   Q.  Right.
24   A.  No.
25   Q.  With respect to your dismissal from the program, you

Page 176

1         pursued the process that was outlined in the GRMEP
2         program, correct?
3    A.  Yes.
4    Q.  And you didn't grieve it in any other form or in any
5         other -- well, strike that.
6         Who are you presently employed by?
7    A.  High Plains Community Health Center.
8    Q.  And you indicated that you were recruited for that?
9    A.  Yes.
10   Q.  Since you were dismissed from the GRMEP program, have
11        you had any other employment?
12   A.  Yes.
13   Q.  Where?
14   A.  I worked for a, actually a health care recruiting
15        company here in Grand Rapids for about six weeks.
16   Q.  Okay.  How did you obtain that employment?
17   A.  That was a job that I'd gotten through word of mouth
18        in my neighborhood.  I knew they were looking for a
19        temporary person in the office staff, so I applied for
20        it and worked temporarily while they were attempting
21        to procure full-time employment for that position.
22   Q.  What is that organization?
23   A.  Let's see -- I'm sorry, I'm just -- I've got a mental
24        block.  I'll just, I'll have to get back with you on
25        that.

# Baumgartner Deposition

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

* * *

MARGARET J. LOEWEN, M.D.,

        Plaintiff,

V                              Civil Action No. 1:10-cv-1284

GRAND RAPIDS MEDICAL EDUCATION PARTNERS, a
corporation, SPECTRUM HEALTH SYSTEM, a
corporation, TRINITY HEALTH CORPORATION, a
corporation t/d/b/a SAINT MARY'S HEALTH
CARE, MICHIGAN STATE UNIVERSITY, a
corporation, MARC SCHLATTER, an individual,
JOHN VANSCHAGEN, an individual,

        Defendants.

_____/

DEPOSITION OF DAVID BAUMGARTNER, MD

taken on August 30, 2011, at 80 Ottawa Avenue NW, Grand

Rapids, Michigan, commencing at about 2:16 p.m.

APPEARANCES:

On behalf of Plaintiff:
        LIEBER HAMMER HUBER BENNINGTON
        BY:  Mr. James B. Lieber - PA 21748
             5528 Walnut Street
             Pittsburgh, Pennsylvania 15232-2312

On behalf of Defendants Grand Rapids Medical Education
Partners, Spectrum Health System, Marc Schlatter and John Van
Schagen:

        MILLER JOHNSON
        BY:  Mr. Thomas R. Wurst - P30177
             Ms. Sara G. Lachman - P67523
             250 Monroe Avenue NW #800
             Grand Rapids, Michigan 49503

Loewen v. GRMEP                    8/30/2011                    David Baumgartner, MD

---

Page 12

1   A   In terms of what time frame are you talking about?
2   Q   At any time.
3   A   Well, they have changed over time.
4   Q   Okay.  Maybe you can explain that.
5   A   So when the consortium was originally formed, there were four
6       what we call voting members who had governance authority.
7       They included Saint Mary's, Spectrum Health, Michigan State
8       University College of Human Medicine, and Grand Valley State
9       University.  Currently they -- those powers are vested in
10      Saint Mary's and Spectrum Health and not in the universities.
11  Q   Now, in terms of the approval of the budget of GRMEP, who was
12      involved in that process?
13  A   So approval of the budget is done by the board and exercised
14      by the designated voting member of the board representing
15      that institution.  In the case of Saint Mary's, that's the
16      CEO of Saint Mary's.
17  Q   Who is?
18  A   Phil McCorkle.
19  Q   And the board that you spoke of, what board is that?
20  A   The board of directors of GRMEP.
21  Q   I see.  Now, what does the budget of GRMEP include?  The
22      budget that is reviewed and over which the board and the CEO
23      have final approval power.
24  A   Okay.  So the budget of GRMEP includes a variety of different
25      items, but putting them into broad categories they include

---

Page 13

1       but are not -- but don't exclusively involve resident
2       salaries, resident benefits, administrative salaries,
3       administrative benefits, faculty salaries, faculty benefits,
4       cost of the GRMEP facilities, so rent, heating, lighting of
5       the GRMEP offices.  Those are the major components of the
6       budget.
7   Q   And what are the funding streams that go into the budget?
8   A   When you say funding streams, what --
9   Q   I mean, where does the money come from to pay the residents,
10      the buildings for MEP, and -- go ahead.
11  A   So the -- and what time period are you talking about?
12  Q   Well, you can begin -- you can relate it chronologically from
13      the beginning until now.
14  A   Well, so the -- the process is really the same both in terms
15      of previously and currently.  It's just the members have
16      changed as the bylaws have changed.  But basically what
17      occurs is the chief financial officer of GRMEP prepares a
18      document that describes what the budget requirements are of
19      GRMEP.  It's submitted through the CEO of GRMEP to the
20      hospitals through the board of directors, where it's
21      reserved -- where it's reviewed and either approved or
22      rejected.
23  Q   I see.  But where does the actual money for the budget come
24      from?
25  A   It comes from the dollars in the -- the money in the budget?

---

Page 14

1       Say that again.
2   Q   Yes.  The money that is -- the budget goes through some sort
3       of approval process, correct?
4   A   Yes.
5   Q   By the hospital, its CEO and its board of directors.
6   A   Currently.
7   Q   Currently.  Okay.  How long has that been the case?
8   A   Well, as I said, it depends on who the -- the funding streams
9       come from the voting members as well as from affiliate
10      members and others who may have fees assessed or applied by
11      GRMEP, but the major stream of funding comes from the two
12      health care systems, Spectrum Health and Saint Mary's.
13  Q   And how long has that been the case?
14  A   Since the inception of the program.
15  Q   Remind me when that was.
16  A   Okay.
17          (Ms. Kelley leaves the room)
18          THE WITNESS:  The current bylaws -- I'm sorry, not
19      the current bylaws, but GRMEP came together in January of
20      2000.
21  BY MR. LIEBER:
22  Q   Okay.  Now, what percentage of the budget comes from the
23      hospitals, meaning Saint Mary's -- well, of each hospital,
24      from Saint Mary's and from the Spectrum hospitals.
25  A   It varies by year.

---

Page 15

1   Q   Can you relate what you recall about that?  What is it
2       presently?
3   A   At present, it's currently -- for the current fiscal year
4       that we're in, the funding streams are -- from the hospitals,
5       are probably over 95 percent.
6          (Ms. Kelley returns to the room)
7   BY MR. LIEBER:
8   Q   What is the overall budget?
9   A   Um --
10  Q   Approximately.
11  A   It's somewhat in excess of $33 million a year.
12  Q   So it's -- 95 percent comes from Trinity/Saint Mary's and the
13      Spectrum system; is that what you're saying?
14  A   Say that again.
15  Q   Okay.  Ninety-five percent of this $33 million budget for
16      GRMEP comes from two pots; one is the Trinity/Saint Mary's
17      pot and one is the Spectrum system pot.  Is that correct?
18  A   Yeah.  It's -- currently, approximately 95 percent of the
19      funding comes from those streams.  I -- if I said 33 million,
20      I meant to say in excess of 30 million.  It might be close to
21      33 million, but the proportions are -- you know, are right.
22  Q   Okay.  Now, can you tell me how much of that 95 percent is
23      the Trinity/Saint Mary's piece and how much is the Spectrum
24      piece?
25  A   The Saint Mary's piece for the current fiscal year is

---

6 (Pages 12 to 15)

Loewen v. GRMEP                    8/30/2011                    David Baumgartner, MD

## Page 16

1     somewhere around the order of $7 million.
2  Q  And how long have those proportions been in effect, roughly?
3     I mean those rough proportions, how long have they been in
4     effect?
5  A  Well, there was a significant change that occurred when
6     Michigan State stepped out of its membership, so that changed
7     the proportions. That was a couple of years ago. I don't
8     remember the exact year.
9  Q  A couple of years ago. Like '09, '10, '08?
10  A  I don't remember exactly.
11  Q  Why did Michigan State leave the consortium? Or leave the
12     funding agreement, I should say.
13  A  They stopped being voting members of the -- of the
14     consortium.
15  Q  Now, do they -- do they -- and what was their percentage
16     before they stopped being members?
17  A  I don't recall the exact number. It was on the order of a
18     million or two dollars a year, is my recollection, but I
19     can't tell you the exact number.
20  Q  Okay. So going back to -- what is your fiscal year, by the
21     way?
22  A  It's July 1st, fiscal year.
23  Q  And what is MEP's fiscal year?
24  A  July 1st.
25  Q  During the 2009 and 2010 calendar years, would these

## Page 17

1     percentages of 95 percent coming from the hospital, the
2     hospitals, for roughly $30 million total, with Saint Mary's
3     contributing about 7 million have been the case?
4  A  I'd have to review the budget from that period of time. I
5     can't tell you for sure.
6  Q  Do you know any distinctions between now and then that would
7     have affected it materially?
8  A  The biggest thing would be at what point Michigan State
9     stepped out.
10  Q  Okay.
11  A  Grand Valley had some changes in their contribution as well
12     during somewhere in that time period, give or take a year.
13  Q  Now, in terms of the -- the affiliation agreement with
14     Michigan State that exists now, that began to exist after
15     Michigan State pulled out as a voting member of the MEP
16     consortium; is that correct?
17  A  Yes. The change occurred with the institution of the current
18     bylaws.
19  Q  And those medical students who come through, are they
20     instructed by MEP residents at any point in time?
21  A  The Michigan State students have a curriculum that's
22     determined by the medical school, and the specifics of how
23     that occurs really is not something that I can speak to.
24  Q  So Michigan State governs that education at the hospital; is
25     that correct?

## Page 18

1  A  Michigan State has responsibility for the medical students'
2     curriculum.
3  Q  Does it include -- and who are the teachers that you know of?
4  A  The teachers that I know of for who?
5  Q  These students when they come to Saint Mary's.
6  A  Well, there's a large number of teachers.
7  Q  How would you define them? Are they --
8  A  They're defined by the relationship between the medical
9     school and the faculty members.
10  Q  Are any of those faculty members members of GRMEP?
11     MR. BRETZ: Well --
12     THE WITNESS: I'm sure there's overlap, but I can't
13     say --
14  BY MR. LIEBER:
15  Q  Are any of those --
16  A  -- to what extent.
17  Q  I'm sorry. Are any --
18  A  And I guess I would have to also say I'm not sure what you
19     mean by a member of GRMEP.
20  Q  Participating GRMEP faculty.
21  A  So if I understand your question correctly, you're saying are
22     there individuals who are GRMEP faculty who are also medical
23     school faculty?
24  Q  Right.
25  A  Is that what you're asking?

## Page 19

1  Q  Right, who teach these Michigan State College of Human
2     Medicine mainly second-year students.
3  A  So your question is are there -- are there faculty who teach
4     second-year students who are also involved as GRMEP faculty?
5  Q  Correct.
6  A  I would say that there likely are. I don't know the extent
7     of that.
8  Q  Now, are there GRMEP residents who serve as clinical
9     instructors of these medical students?
10  A  Clinical instructor is a title that's bestowed by the dean
11     upon faculty members and so that really is under the control
12     of the dean of the medical school. I can't answer that
13     question as to whether or to the extent that occurs.
14  Q  Now, in terms of GRMEP, okay, do -- in what fields do the
15     residents of GRMEP work in at Saint Mary's Hospital, if you
16     know? What residency programs are there?
17  A  What residency programs are there at Saint Mary's?
18  Q  That pertain to GRMEP.
19  A  Okay. So the GRMEP residencies at Saint Mary's would include
20     family medicine, internal medicine, OB/GYN, orthopedics,
21     general surgery, radiology, plastic surgery, transitional
22     year. I don't know if I'm forgetting anybody. There might
23     be one or two others. We have med-peds residents who spend
24     some time there. Very occasionally we might have a pediatric
25     resident who comes that way, but mostly not. Those are

Loewen v. GRMEP                    8/30/2011                    David Baumgartner, MD

---

Page 20

1    probably the primary residents who are from GRMEP who spend
2    time at Saint Mary's.
3    Q   Now, in terms of the -- this is an overused word, but the
4    infrastructure that the medical -- that the residents utilize
5    while they're at Saint Mary's in terms of tools, rooms,
6    amphitheaters, sleeping rooms, what have you, can you tell me
7    what that infrastructure -- what parts of the environment are
8    provided by Saint Mary's to GRMEP residents?
9    A   The --
10         MR. BRETZ:  Object to the form of the question,
11   provided to --
12   BY MR. LIEBER:
13   Q   Well, do you understand the question?  What is provided in
14   the hospital to GRMEP residents as part of their environment?
15   A   Well, the facilities that are made available are any facility
16   that -- that the independent medical staff of Saint Mary's
17   who are faculty members deem necessary for their education.
18   Q   Okay.  And what would those things include, to your
19   knowledge, at this point in time?
20   A   It would include those -- those facilities that the
21   independent medical staff who supervise the residents utilize
22   as part of the curriculum that's under the control of the
23   program director of that residency within GRMEP.
24   Q   In terms of physical resources, what does that mean?
25   A   So --

---

Page 21

1    Q   In other words, hall rooms, break rooms.  I'm getting pretty
2    mundane here, but it's my burden.
3    A   Yep.  So it would include, obviously, the clinical areas
4    where patients are cared for, any clinical area where
5    patients are cared for.  It would include things such as call
6    rooms or medical library.
7    Q   Okay.  What about food; are the residents fed?
8    A   We have a cafeteria that's available for anyone to come and
9    use, whether they're a visitor, a member of our independent
10   medical staff, or a resident.
11   Q   Is their food subsidized?  Do they receive a subsidy or some
12   quantity of free food?
13   A   No.
14   Q   Are you sure about that?
15   A   Yes.  They don't receive free food from Saint Mary's.  They
16   have a contract with GRMEP that provides benefits, and as
17   part of those benefits they have a stipend for food, but it's
18   not free food.
19   Q   And who pays for that stipend?
20   A   The -- well, we've already discussed the flow of dollars to
21   GRMEP, and so how those dollars are distributed within GRMEP,
22   I don't have knowledge.  That's an internal policy within
23   GRMEP.
24   Q   All right.  Now, what about patient flow; how is that
25   determined, to GRMEP residents?

---

Page 22

1    A   When you say how is patient flow determined, I'm not sure
2    what you mean.
3    Q   Well, inpatients in the hospital, okay, how are they
4    allocated to GRMEP residents for learning or services?
5    A   That's done as an internal aspect of the GRMEP residency
6    program by the independent members of our medical staff who
7    serve as faculty members.
8    Q   What about when GRMEP residents serve in areas where you
9    don't have a program, such as when they're called down to the
10   emergency room to stitch someone up or something like that.
11   A   They're always working under the supervision of an
12   independent member of our medical staff.
13   Q   Are there any other areas besides the emergency room where
14   GRMEP residents work where there is not a GRMEP residency
15   program?
16         Do you understand what I've said?  In other words,
17   do GRMEP -- I mean, we know that they go to the emergency
18   room and it doesn't appear that there is a GRMEP emergency
19   residency program.  Are there any other programs in the
20   hospital where residents serve, GRMEP residents serve besides
21   in the emergency room area where there is not actually a
22   residency program?
23   A   Well, our medical staff bylaws require that all residents
24   work under the supervision, either directly or indirectly, of
25   an independent member of our medical staff who have

---

Page 23

1    privileges to provide the services that that resident is
2    providing.
3    Q   Now, that need not be a -- someone who is on the residency
4    program staff, is that correct, as long as it's a member of
5    the medical staff?  In other words -- do you understand the
6    question?
7         MR. BRETZ:  Well --
8         MR. LIEBER:  I can rephrase it.
9         MR. BRETZ:  It's not a clear question because it
10   assumes facts not in evidence.
11         MR. LIEBER:  All right.
12         MR. BRETZ:  Whether that's a Saint Mary's
13   requirement or a GRMERC's requirement.
14   BY MR. LIEBER:
15   Q   Let's say that Margaret Loewen goes down to the emergency
16   room where there is not a GRMEP program.  Can she be
17   supervised down there by a member of your medical staff who
18   is not a member of MERC?  Of MEP; I'm sorry.
19   A   Well, as I stated, the bylaws of the medical staff require
20   that all residents be supervised by an independent member of
21   the medical staff who has the privileges to -- that the
22   resident is exercising.
23   Q   Okay.  Now, in terms of -- let's say, we know Dr. Loewen
24   often went down to the emergency room and performed some
25   function that she was capable of performing such as stitching

---

8  (Pages 20 to 23)

Loewen v. GRMEP                    8/30/2011              David Baumgartner, MD

---

Page 24

1  somebody up.  Okay?  Are there any other programs in the
2  hospital, in Saint Mary's, besides the emergency room that
3  aren't part of identified MEP programs where MEP residents
4  work under your staff?  In other words, you've listed some,
5  but let's say endocrinology.  Would MEP residents ever go to
6  endocrinology even though you don't have a MEP program there?
7  A  So, again, the residents are required to work under the
8  supervision of a member of the independent medical staff who
9  is a faculty member and only allowed to exercise those --
10  perform those activities that that supervising faculty member
11  has.  If they were to act otherwise, that's a violation of
12  our bylaws.  The extent of the activities that a resident
13  would perform is under the control of the GRMEP program
14  director ultimately, not under the control of the hospital.
15  Q  When Margaret Loewen goes down -- went down to the emergency
16  room and there wasn't a GRMEP faculty member there, who would
17  be supervising her?
18        MR. BRETZ:  Well, assumes facts not in evidence.
19  In fact, it's directly contrary to what she said earlier.
20        MR. LIEBER:  I don't think it is, but go ahead.
21  You can answer.
22        MR. BRETZ:  That's not what she said, not what she
23  testified to, but --
24        MR. LIEBER:  Well, let's state this in a different
25  question.

---

Page 25

1        MR. BRETZ:  He is the 30(B)(6) representative of
2  Saint Mary's and Trinity, not GRMERC, and your questions are
3  conflating both.
4  BY MR. LIEBER:
5  Q  Well, I'm asking you, based on your services of
6  representative here, if Margaret Loewen or when Margaret
7  Loewen or some member of the GRMEP general surgery residency
8  program went to the emergency room and there wasn't a faculty
9  member from the GRMEP general surgery program, who, if
10  anyone, in the hospital was supervising her.
11        MR. BRETZ:  Same objection.  Go ahead, if you know.
12        THE WITNESS:  The supervision should have been
13  provided by the independent member of the medical staff who
14  has privileges to exercise the activities that the resident
15  is doing.  That supervision can either be direct at the elbow
16  or that supervision can be at a distance.
17  BY MR. LIEBER:
18  Q  Okay.  Now, is there any department in the hospital where
19  GRMEP resident physicians could not consult with that type of
20  direct or indirect supervision?
21  A  The rules of the medical staff state that there must be
22  supervision at all times.
23  Q  I understand.  What I'm saying is, let's say that there is a
24  patient on a floor and is being treated for diabetes, okay,
25  and has a wound, and a member of the general surgery

---

Page 26

1  faculty -- not faculty, residency program is asked to come
2  down and look at it.  Okay.  Is there anything wrong with
3  that as long as there is ultimately supervision by the
4  faculty?
5        MR. BRETZ:  Again, he's a 30(B)(6) representative
6  of Saint Mary's, not GRMERC, so --
7        MR. LIEBER:  That's right.  No, but I'm talking
8  about from his perspective.
9        MR. BRETZ:  From his perspective on that, on that
10  level.
11        THE WITNESS:  If the supervision falls -- if the
12  supervising independent member of the medical staff has
13  privileges that allow them to carry out that clinical
14  activity, then there is not a problem.  If there -- if it's
15  not within their privileges, it's a bylaws violation.
16  BY MR. LIEBER:
17  Q  Now, do residents conduct clinical trials?  GRMEP residents,
18  are they -- do they participate in clinical trials at Saint
19  Mary's?
20  A  If it's with -- if it's been determined by the GRMEP program
21  director that it would be appropriate for them to do so and
22  under the supervision of the independent member of the
23  medical staff, GRMEP faculty member, it could be done.
24  Q  Do you know of any clinical trials that GRMEP residents have
25  participated in since you've been in your present capacity?

---

Page 27

1  A  I know that they have occurred.
2  Q  Do you know what they are?
3  A  I can't give you a specific instance.
4  Q  Okay.  Now, is that listed or documented anywhere?
5  A  Is what listed?
6  Q  The clinical trials that GRMEP or MERC residents participated
7  in during such time as you've been in your capacity?  Is it
8  documented anywhere?
9  A  All -- all clinical trials if they involve human subjects
10  would have to be approved by the institutional review board
11  of the hospital.
12  Q  Now, is there any way that we could determine whether GRMEP
13  residents or GRMERC residents participate in those clinical
14  trials?
15  A  If they were an investigator or a sub-investigator, they
16  should be listed on the application to the institutional
17  review board.
18  Q  Now, do doctors on the staff of -- at Saint Mary's evaluate
19  the performance of residents?
20  A  State that again.
21  Q  Do doctors on the staff at Saint Mary's evaluate the
22  performance of residents?
23  A  The evaluation of residents is a function that resides within
24  GRMEP.  It's not done by the hospital.  So I can't answer
25  that question outside the context of GRMEP.

9 (Pages 24 to 27)

Loewen v. GRMEP                    8/30/2011                David Baumgartner, MD

Page 28

1    Q   Are there any doctors on the staff of Saint Mary's who are
2        also affiliated with GRMEP who evaluate residents in GRMEP?
3    A   I don't know who the faculty members are that are involved in
4        the evaluation process.  The evaluation process is an
5        internal GRMEP function.  The hospitals, and specifically
6        Saint Mary's, does not get involved in evaluation of
7        residents.
8    Q   Does Saint Mary's pay for the medical insurance of any
9        members of its staff?
10   A   Saint Mary's is self-insured.
11           MR. BRETZ:  Well -- yeah.  Let's be clear here.
12       Staff is a very broad term.  Are you talking about the staff
13       with privileges?  Are you talking about the employees of the
14       hospital?  So --
15           MR. LIEBER:  Yes.  Staff with -- physicians with
16       staff privileges.
17   BY MR. LIEBER:
18   Q   Does the hospital pay -- provide them with coverage?
19   A   Not as part of their staff membership.
20   Q   Which physicians does the hospital provide with coverage?
21           MR. BRETZ:  Health care?  Health care?
22           MR. LIEBER:  No, no, malpractice.
23           THE WITNESS:  Malpractice coverage?
24   BY MR. LIEBER:
25   Q   Yes.

Page 29

1    A   So the hospital provides malpractice coverage to -- through
2        GRMEP for residents for any actions that occur while they're
3        at Saint Mary's.  It also provides malpractice coverage as
4        part of contractual -- and that's specified in the
5        affiliation agreement with GRMEP, and then any other
6        additional physicians where there is a contractual
7        relationship that calls for coverage to be provided.
8    Q   And who would those physicians be at this point in time?
9    A   Well, it would be -- you'd have to look at the individual
10       contracts.
11   Q   Do you know what capacity some of them serve in?
12   A   Can you be more specific?
13   Q   Yes.  I mean, what are their roles in the hospital, the ones
14       who receive coverage from the hospital?
15   A   So the other physicians who receive some malpractice coverage
16       through the hospital would in general be members of the Saint
17       Mary's Multispecialty Group practice.
18   Q   And who are they?  What multispecialty?
19   A   That's the name of the practice.
20   Q   Are they hospitalists?
21   A   They include hospitalists.
22   Q   Anyone else?
23   A   It's a variety of individuals currently.
24   Q   Do they work --
25   A   You're talking about currently, I'm taking that question to

Page 30

1        mean.
2    Q   During the workday, what percentage of their day is at the
3        hospital?
4    A   Some of them are never at the hospital and others spend all
5        day at the hospital.
6    Q   Any others that you can recall who receive coverage from the
7        hospital?
8    A   Primarily they would include intensive care physicians,
9        neonatal physicians.  At the current time, this is just in
10       the last year now, it involves a large number of primary care
11       physicians, internists, family medicine physicians.  That's
12       new.
13   Q   And how does the --
14   A   Some obstetricians.
15   Q   How does the hospital make the determination about whether to
16       provide coverage?
17   A   We provide coverage to the members of the Saint Mary's
18       Multispecialty Group.
19   Q   What was on -- what's the justification for that?  Why does
20       the hospital do it?
21   A   That's part of the affiliation agreement with the
22       multispecialty group practice.
23   Q   What's the name of the multispecialty group?
24   A   Saint Mary's -- Advantage Health/Saint Mary's Multispecialty
25       Group, and that was effective July 1st of 2010.

Page 31

1    Q   Now, do you know how residents are trained, GRMEP residents
2        are trained to present themselves at Saint Mary's?  Are they
3        told to tell patients and their families that they are
4        residents at Saint Mary's or residents -- resident members of
5        some other organization?
6    A   I have no knowledge of how they're trained.
7    Q   Do you know how they present themselves?
8    A   No.
9    Q   Okay.  I'm going to show you some exhibits, and what I'd ask
10       you to do after you review it is pass it to Maureen, our
11       court reporter.
12           And, you guys, this is Exhibit 1.  It's been
13       previously marked in another deposition.
14           This is an operating agreement among GRMERC, MSU,
15       Saint Mary's, and Spectrum stated July 1st, 2002.  It's
16       signed in January 2003 by, among others, Philip McCorkle on
17       the last page, president and CEO of Saint Mary's and Mercy
18       Medical Center.  Have you seen this document before?
19   A   Let me review it.
20           (Discussion held off the record)
21           MR. BRETZ:  The question is has he seen it before?
22           MR. LIEBER:  Yes.
23   BY MR. LIEBER:
24   Q   Doctor, you're welcome to have all you want as far as time,
25       but I'm just going to ask you a few focused questions.

                                              10  (Pages 28 to 31)

**Page 36**

1    or -- I think we call it just medical education.
2    Q    Now --
3    A    And it's a line item in our budget for medical education.
4    Q    And who generates the money in that cost center?
5    A    When you say who --
6    Q    Which -- which individuals? Which providers? Which
7         residents?
8    A    It's a cost center. There's no revenue associated with it.
9    Q    So you just find a -- you just designated a cost center from
10        all of your revenue streams or any of your revenue streams?
11   A    Yes. It only shows expense.
12   Q    Now, when a resident performs a service such as participating
13        in a surgery or taking out stitches or casting someone, what
14        have you, does Saint Mary's charge for those services?
15   A    No.
16   Q    Okay.
17   A    Not -- not a professional fee.
18   Q    Does the supervising or attending physician charge for those
19        services?
20   A    Any charges would be under the auspices of that independent
21        member of the medical staff. The hospital doesn't have any
22        control about whether a charge is or isn't identified and
23        billed.
24   Q    But so if Dr. Loewen would perform a service such as
25        stitching someone up, then that service could be billed by

**Page 37**

1    her supervising physician to Medicare, Medicaid, CMMS, other
2    carriers, what have you?
3    A    That -- that type of a bill would not be under control of the
4         hospital. An independent medical staff member could choose
5         to bill a service, provided they met CMS requirements for
6         supervision as it pertains to -- or they could generate a
7         bill provided they meet the documentation requirements and
8         under CMS as well as the supervision requirements that CMS
9         has for supervision of residents. Again, though, I can't
10        speak specifically to that because that would be up to the
11        independent faculty member, not up to the hospital.
12   Q    All right. Now, under the next -- under Paragraph 2.2(c), it
13        says:
14             "Participating Institutions. The Hospitals agree
15        to serve as the major participating institutions for the
16        Programs for Residents."
17             Do you see that?
18   A    Yes.
19   Q    And you might as well read the whole paragraph to yourself.
20   A    Okay.
21   Q    What does it mean that the hospitals serve as the major
22        participating institutions for the residency programs?
23   A    That refers to the bylaws and the affiliation agreement --
24        the bylaws and the operating agreement for GRMEP.
25   Q    Can you be more specific? Which bylaws or which parts of the

**Page 38**

1    operating agreement?
2    A    Well, the -- the hospitals are agreeing to serve as the
3         primary facilities for training to take place.
4    Q    Now, besides -- just to be clear to the extent that you can,
5         besides the MERC and later MEP residents, who else receives
6         training and/or education in the hospital?
7    A    Training and education is carried out by -- in a variety of
8         different professions and with a variety of different
9         educational institutions. So, for instance, in nursing, we
10        have nursing students who make use of our facilities. We
11        have an agreement with Grand Rapids Community College, Calvin
12        College, Aquinas -- actually, it's not Aquinas, it's Mercy
13        College in cooperation with Aquinas College, Calvin College,
14        Hope College, Grand Valley, a variety of different
15        educational organizations in nursing. We have agreements
16        with programs in other disciplines such as physician
17        assistants, physical therapy, occupational therapy, social
18        work. We have students from Ferris State University who are
19        pharmacy students. We have students who are coders from
20        Ferris State. So just kind of a whole gamut of different
21        kinds of students and residents from a variety of
22        organizations use -- make use of Saint Mary's as a training
23        institution.
24   Q    Now, is there any federal funding of the education, federal
25        or state funding of the education of any of these students?

**Page 39**

1    A    I don't know.
2    Q    Do any of them have federal -- do any of them have federal
3         student loans?
4    A    I don't know the answer to that.
5    Q    In terms of --
6    A    I'm not really involved in those programs, so I don't have
7         any firsthand knowledge.
8    Q    Under 2.2(c), which you've read, it says:
9             The Hospitals provide orientation to its faculty
10        [sic] and infrastructure resources utilized to conduct the
11        programs, including but -- well, you can -- including but
12        not -- that --
13             "The Hospitals shall determine these resources, in
14        consultation with MERC, and they may include, but not be
15        limited to, patient accesses, nursing services, library
16        services, classroom and conference room space, equipment and
17        supplies for patient care, locker rooms, on-call rooms,
18        on-site parking, and access to cafeterias at employee rates."
19             Do you see that?
20   A    Yes.
21   Q    Okay. Are there any additional -- well, in your mind, is
22        there -- is there any -- can you tell me what the orientation
23        process is for residents of GRMEP? Who does the orientation?
24   A    The orientation is done primarily by GRMEP staff, but does
25        include some participation from representatives of the

Loewen v. GRMEP                     8/30/2011                  David Baumgartner, MD

---

Page 40

1    hospital. So, for instance, our risk manager will provide
2    some orientation in terms of who are -- who to contact should
3    there be concerns regarding malpractice issues. Our medical
4    director of informatics is involved in orientation in terms
5    of how to utilize the computer system, would be a couple of
6    examples.
7    Q   Any other examples of hospital participation in the
8        orientation process?
9    A   I think our vice president of patient safety speaks related
10       to patient safety and quality of care issues in a general
11       sense, and there's -- but I can't speak to the specific
12       orientation. It changes year to year. I'm not really
13       involved in putting it together. It not under the direction
14       of the hospitals. It's really organized by the GRMEP staff,
15       and they ask for specific individuals from the hospitals to
16       participate as they deem appropriate.
17   Q   Now, besides the services provided here, including but not
18       limited to patient access, do you see that?
19   A   Yes.
20   Q   Are there any other services to your knowledge that the
21       hospital provides to residents?
22           MR. BRETZ: Well, services is not in here.
23       Resources, not services.
24           MR. LIEBER: Okay. I'll accept resources.
25           THE WITNESS: So the resources, they're -- they're

Page 41

1    listed here. They're really, you know, pretty much --
2    they're kind of generic in terms of how -- you know, what
3    they consist of. So, for instance, you know, a lot of these
4    things are common across all the different training programs,
5    be they residency training programs, medical student
6    programs, nursing student programs, things like, you know,
7    access to patient nursing services, library services,
8    classrooms and conference room. That's applicable to
9    everybody. Equipment for patient care is applicable to
10   everybody. Parking is free for everybody, so it doesn't make
11   any difference really. It's -- parking is free regardless of
12   whether or not you're a student or a resident or a visitor.
13   Access to cafeteria at employee rates is kind of an outmoded
14   concept. We haven't had employee rates in a number of years,
15   so there's one rate for the cafeteria for everybody. There's
16   some specific requirements for accreditation of residency
17   programs related to on-call rooms and locker rooms and we
18   make those available to be in compliance with the
19   accreditation requirements.
20   Q   Are you required to make those equal on a gender basis?
21   A   There are -- restate your question.
22   Q   Are you required to make resources in terms of the locker
23       rooms, break rooms, call rooms, equal on a gender basis?
24   A   I guess I'm not sure exactly what you mean by equal.
25   Q   In terms of the amenities, the space, things of that nature.

Page 42

1    A   Well, the requirements are spelled out in the RRC, Residency
2        Review Committee of the Accreditation Council for Graduate
3        Medical Education Requirements. I haven't looked at them as
4        it relates to this issue in a number of years. I do know
5        that there needs to be appropriate provisions based upon
6        gender and there needs to be some -- and there needs to be
7        equity in a general sense, but the -- you know, to be
8        specific -- but they're not proscriptive in terms of the
9        actual number of rooms, the last time I reviewed that.
10   Q   When was that?
11   A   Pardon me?
12   Q   When was the last time you reviewed this matter for --
13   A   It's been a number of years.
14   Q   Five years, ten years?
15   A   Probably sometime within the last five years.
16   Q   All right. Now, in terms of -- you say this employee food --
17       access to the cafeteria at employee rates. What were
18       employee rates?
19   A   We don't have employee rates.
20   Q   What were they at the time your CEO signed this agreement?
21   A   Actually, I don't think we had employee rates. I think it
22       was Spectrum that had employee rates. We got rid of them a
23       number of years ago because the IRS ruled that you had to tax
24       people for the discount if you had an employee rate. So we
25       eliminated them because it was unworkable.

Page 43

1    Q   That would be true for free food as well, correct? You'd
2        have to -- that would be an income if you provided people
3        with free food, according to the IRS.
4            MR. BRETZ: If you know.
5            THE WITNESS: I -- I don't know the answer to that.
6    BY MR. LIEBER:
7    Q   Well, the IRS was telling you or told someone, you've
8        gathered, that if you gave a discount that would be a matter
9        of income, correct, and the people would have to be taxed on
10       it.
11   A   Yes. That's what I was told by our chief financial officer
12       is why we eliminated the discount for employee rates.
13   Q   All right. Let's look at -- besides MERC or MEP residents,
14       does any other group at the hospital receive similar --
15       receive the same orientation and infrastructure resources as
16       the resident group?
17   A   Well, there's orientation done to -- done in some manner for
18       any -- anyone who's at the organization in an educational
19       capacity. The orientation is really under the purview of the
20       program director of that individual program, as it is with
21       GRMEP. It's not under hospital control.
22   Q   But what I'm asking, Doctor, is does anybody besides GRMERC
23       or GRMEP receive the equivalent orientation and/or
24       infrastructure resources, to your knowledge?
25   A   I don't know the answer to that. There's many, many other

13  (Pages 40 to 43)

Loewen v. GRMEP                    8/30/2011                    David Baumgartner, MD

---

Page 44

1    programs that, as I already testified, who utilize many of
2    the same resources.  In terms of the degree of orientation,
3    again, that's under the purview of their training program.
4    Q   So that completes your recollection?
5    A   Yes.
6    Q   All right.  Let's look at 2.2(d).  Okay.  With regard to --
7        (Ms. Lachman enters the room; Mr. Wurst leaves the
8        room; discussion held off the record)
9    BY MR. LIEBER:
10   Q   Okay.  In terms of 2.2 -- I'm sorry -- (c), it says that:
11           "The parties agree that MSU shall serve as the
12       'affiliated institution' for the Residency Programs."
13           What does that mean?
14   A   I'm sorry.  You said 2.2(c)?
15   Q   I'm sorry.  I apologize.  2.3(c).
16   A   2.3(c).
17   Q   "The parties agree that MSU shall serve as the 'affiliated
18       institution' for the Residency Programs."
19           What does that mean?
20   A   Well, I think it means what it says there, that the term
21       affiliated institution means that the educational departments
22       of GRMERC will work cooperatively with educational
23       departments of MSU College of Human Medicine in implementing
24       educational and training programs that GRMERC operates and
25       manages.  It's a fairly loose kind of agreement to cooperate.

---

Page 45

1        It does not give any control function to Michigan State.
2        It's just their general agreement to try to work together
3        cooperatively.
4    Q   What I'd like you to do is read the paragraph 2.2(d) above to
5        yourself.
6    A   Okay.
7    Q   Now, 2.2(d) indicates that the hospitals agree to accept
8        students, which includes -- include residents, and that the:
9        "obligation is contingent on the Students being acceptable to
10       the Hospital and the Students' performance of duties in a
11       manner that the Hospitals and MERC deem appropriate in
12       accordance with the terms and conditions set forth in this
13       Agreement."
14           Do you see that?
15   A   Yes.
16   Q   All right.  What does it mean that the students are
17       acceptable to the hospital?
18   A   So it would really revolve around two aspects.  The first is
19       that they're appropriately enrolled in that training program,
20       meet the criteria for that training program, and are subject
21       to the oversight and of the independent -- specifically in
22       the case of residents, subject to the supervision and
23       oversight of the independent members of the medical staff or
24       faculty.  That's the first component.  The second component
25       to that is that they act in an appropriate fashion consistent

---

Page 46

1    with organizational policies that would apply to anyone,
2    regardless of whether they're a staff member, a visitor, or
3    others.  So that relates to things, like we have a no-smoking
4    policy on the campus, so they're subject to no smoking just
5    as a visitor or anyone else might be.
6    Q   Okay.  Any other policies that are part of paragraph -- Part
7        2 as you articulated it that they are subject to?
8    A   Well, the only specific policy that we have regarding
9        residencies is in the medical staff bylaws, which is that
10       they're subject to the supervision of an independent member
11       of the medical staff who's been granted the privileges to
12       carry out those activities that they're supervising the
13       residents for.
14   Q   What about licensure?
15   A   Well, they're subject -- they are required to have licensure.
16       That's part of the first piece, which is there's -- they fall
17       underneath the requirements of the program.  So the program
18       itself requires anyone who's in -- any resident have a
19       license.  You can't be a resident without a license.
20   Q   Has Saint Mary's ever found that a student had not performed
21       his or her duties in an appropriate manner?
22   A   What duties are you referring to?
23   Q   The duties as a resident.
24   A   Well, we don't evaluate residents, so we can't really say
25       whether or not they have performed their duties as a

---

Page 47

1    resident.
2    Q   Has Saint Mary's ever removed, terminated -- or terminated a
3        student of any type?
4    A   Saint Mary's doesn't have the authority to remove or
5        terminate residents for performance.  We do have the ability
6        to ask that they not be in the organization if they don't
7        follow the general -- the general policies.  If there are
8        concerns about a resident in their performance, that's
9        referred to the program director for the program to deal with
10       internally.  It's not under the control of the hospital.
11   Q   When has the hospital done that, referred problems or
12       removed -- participated in removing a student for conduct,
13       general conduct issues?
14   A   You kind of asked a couple questions there.
15   Q   We can break them down.
16   A   Can you restate that?
17   Q   Has the hospital removed any student for the general
18       conduct -- for general conduct issues?  Removed, suspended,
19       punished, or disciplined?
20   A   And when you say student, are you referring to student in the
21       context of this definition?
22   Q   I'm referring to any student.
23   A   Well, I can't answer for any student.  I -- the hospital
24       itself has not removed a student, that I'm aware of.  The
25       hospital has expressed concerns about students that have

---

14  (Pages 44 to 47)

Loewen v. GRMEP                    8/30/2011              David Baumgartner, MD

---

Page 48

1    resulted in investigations within their own program.
2          MR. BRETZ: Are you talking about residents or are
3    you talking about non-residents?
4          THE WITNESS: Well, I understood his question to
5    mean he was broadening it, not residents. He was talking in
6    a very general sense.
7          MR. BRETZ: Let's be clear on that.
8    BY MR. LIEBER:
9    Q    Which students were those?
10         MR. BRETZ: By program orientation?
11   BY MR. LIEBER:
12   Q    By any way you want to identify them.
13   A    Well, I guess I need to have you define what do you mean by
14   remove? The hospital -- I guess I -- if you could define
15   what you mean by remove.
16   Q    Which students has the hospital expressed concerns about that
17   resulted in their eventual punishment?
18   A    In their eventual what?
19   Q    Punishment.
20   A    Punishment?
21   Q    Sanction, suspension, removal.
22   A    Well, the hospital expresses concerns about students.
23   Whether the hospital's concern is specifically what leads to
24   the removal of an individual student from our environment is
25   unknown to us, because there may be other factors that play a

---

Page 49

1    role, things that have happened at other places, overall
2    performance that we're not privy to.
3    Q    Well, let's talk about the ones where concerns were expressed
4    by the hospital and sanctions were levied.
5    A    All I can say is that we've expressed concerns and -- to the
6    appropriate individuals with oversight of that program and
7    some of those students eventually did not come back to the
8    hospital. Whether there's a cause and effect there, I don't
9    know.
10   Q    Okay. Well, let's talk about the cases. Which ones do you
11   know about? What you can do, sir, is you can pick a year or
12   approximate time, tell the program, what the concerns were,
13   and who you brought the concerns to the attention of what
14   the sanction was. I don't really need the names at this
15   point. Okay?
16   A    Uh-huh. I really can't remember the specifics of an
17   individual case other than to know that over time we've
18   reported concerns, and then, kind of after the fact, way
19   after the fact in some cases, learned that that student did
20   not finish their program.
21   Q    What programs?
22   A    I can think of it primarily with a medical student that maybe
23   occurred 20 years ago.
24   Q    That's at MSU?
25   A    A Michigan State medical student.

---

Page 50

1    Q    Any others? Any residents?
2    A    I can't think of any residents.
3    Q    All right. Let's look at Exhibit 2, if you would, which
4    is --
5          Oh, let me just ask you one other question. In
6    terms of professional liability insurance, does the hospital
7    provide coverage for any employees such as nurses or other
8    non-physicians?
9    A    Yes.
10   Q    And who does it provide it for?
11   A    Well, it provides it for employees.
12   Q    Okay. That would include nurses, correct?
13   A    Yes.
14   Q    Would it include -- would it include pharmacists?
15   A    Yes.
16   Q    Would it include lab personnel?
17   A    Yes.
18   Q    Would it include techs such as in radiology or phlebotomy?
19   A    Yes.
20   Q    All employees?
21   A    All employees. For activities as it relates to malpractice,
22   not for criminal activity.
23   Q    No. I'm just talking about malpractice.
24   A    Yes.
25   Q    Okay. I'm going to give you --

---

Page 51

1          You can give that to Maureen.
2          MR. BRETZ: What's the number?
3          MR. LIEBER: Two.
4          MR. BRETZ: Exhibit 2?
5          MR. LIEBER: Actually, no questions.
6          (Discussion held off the record.)
7    BY MR. LIEBER:
8    Q    All right. This is Exhibit 4. Exhibit 4 is the proposed
9    bylaws of GRMERC.
10         (Ms. Kelley leaves the room.)
11   BY MR. LIEBER:
12   Q    And this is dated September 2009 at the bottom. Have you
13   seen these proposed bylaws before?
14   A    We went through probably about 35 iterations of proposed
15   bylaws during that time period, so I don't know if this is
16   one I specifically ever looked at or not.
17   Q    Do you know what the terminology on the bottom of the page,
18   GRMERC Bylaws Final - September 2009 means?
19   A    No. I don't know whether that means that this is what the
20   final copy looked like or not. It's not the signed copy.
21   Q    I hesitate to do this, but if you read it, would you know if
22   these are the final bylaws?
23   A    No. I'd really want to look at the signed copy, because
24   there were changes being made up to the moment they were
25   signed.

15  (Pages 48 to 51)

Loewen v. GRMEP                    8/30/2011                    David Baumgartner, MD

---

Page 52

1  Q   Okay. Let's go to page 2 of 10. Okay. Article II,
2      Membership & Voting. Okay. And under 2.1(A)(i), it
3      indicates that Saint Mary's as a voting member must meet the
4      following qualifications:
5          (i) "Active involvement in the mission and
6      activities of the corporation."
7          Okay. What does active involvement in the mission
8      and activities of the corporation mean?
9  A   It really means serving as a training site.
10 Q   And what does -- activity, what does that mean?
11 A   Serving as a training site for the educational activities
12     that are occurring by GRMEP.
13 Q   Okay. All right. Number (iii):
14         "Willingness to integrate appropriate educational
15     and research programs into their organization's operations."
16         This is for the voting members. Has Saint Mary's
17     integrated an educational or research program into its
18     operations?
19 A   So what that means is that in serving as a training site,
20     that residents can participate in the care of patients under
21     the supervision of independent members of the medical staff
22     who are faculty members with appropriate privileges. As it
23     relates to research programs, residents could participate
24     under the supervision of independent members of the medical
25     staff who have appropriate privileges to carry out those

Page 53

1      activities and have met organizational approval by the
2      institutional review board for those research projects
3      they're carrying out.
4  Q   Okay. Number (iv) says:
5          "Willingness to support infrastructure needs of the
6      corporation."
7          Do you know what that means in this document?
8  A   So in the context of this document, it means providing the
9      physical structure that's needed for a training environment
10     that would include things like provision of library, clinics,
11     other things such as informatics support, a computer system
12     and so forth as needed to support the educational activities
13     of GRMEP.
14 Q   You can give that to the court reporter. I'm going to skip
15     some more documents here.
16         Exhibit 9 is a document entitled Grand
17     Rapids/Michigan State University General Surgery Residency
18     Program. Do you see that?
19 A   Yes.
20 Q   Now, at times we see the term MERC or MEP used and at times
21     we don't. We just see things like Grand Rapids/Michigan
22     State University. Do you know what controls the use of the
23     title or rubric?
24 A   I believe that these are decisions the residency program
25     probably made themselves in terms of how they wanted to title

Page 54

1      themself.
2  Q   Now, if you go to -- well, on the first page -- this is a
3      handbook, do you see that, beginning of a handbook.
4          MR. BRETZ:  Just for the record, Jim, I think this
5      Exhibit 9 is an excerpt from the handbook.
6          MR. LIEBER:  That's fair.
7  BY MR. LIEBER:
8  Q   Have you seen this handbook before?
9  A   No, I haven't.
10 Q   Well, in the last line of the first paragraph it says:
11         "Residents are expected to abide by these
12     requirements as well as the policies at the hospitals in
13     which they are rotating."
14         Do you see that?
15 A   Yes.
16 Q   Now, in terms of education on the policies of the hospitals,
17     does that actually occur?
18 A   Well, this looks likes it's an internal document for GRMEP
19     and -- and prepared by -- by them, and in particular this
20     looks like a document that would have been prepared by the
21     under the authority of the program director. So the
22     expectations are expectations being set by the program
23     director, not by the hospital. The expectations for the
24     hospital are those outlined in the bylaws and in the
25     operating agreement.

Page 55

1  Q   If you go to the second page of the document, which is -- it
2      says Grand Rapids/Michigan State University General Surgery
3      Residency Program, Part I, Program Leadership. Do you see
4      that?
5  A   Yes.
6  Q   Okay. Then it says program director, Marc Schlatter MD,
7      FACS, FAAP.
8          Now, does Saint Mary's have any dealings with
9      Dr. Schlatter, to your knowledge, about the residency
10     program?
11 A   Well, we have -- we don't have direct dealings with the
12     program director of any of the programs unless there's a
13     specific issue that we need to communicate with them about.
14     Most of the -- most of the relationship between Saint Mary's
15     and GRMEP is through the president and CEO of GRMEP, not
16     directly with the program directors.
17 Q   Now, in terms of the associate program director, it says
18     associate program director, Saint Mary's Health Care, Stanley
19     Sherman, MD, FACS. Do you see that?
20 A   Yes.
21 Q   Do you know why he is listed as being associated with Saint
22     Mary's Health Care?
23 A   No, I don't. I -- again, this is an internal document. It
24     appears, for the surgery residency, and I don't know why they
25     have identified him that way. He's -- he's an independent

                                              16  (Pages 52 to 55)

Loewen v. GRMEP                    8/30/2011                   David Baumgartner, MD

Page 56

1     member of the medical staff and not an employee of Saint
2     Mary's.
3  Q  Is he an agent of Saint Mary's with regard to the residency
4     program or GRMEP?
5  A  He's -- he's not an agent of Saint Mary's Health Care. If
6     he's been appointed to a position within the residency
7     program as an independent member of the medical staff and a
8     faculty member with some responsibility for Saint Mary's,
9     that would have been a decision for Dr. Schlatter.
10 Q  Did -- do you know whether Saint Mary's had any objection to
11    being -- to his being listed under associate program director
12    as Saint Mary's Health Care?
13        MR. BRETZ: Just -- assumes facts not in evidence,
14    that they have knowledge of it.
15        THE WITNESS: Saint Mary's wasn't asked to give any
16    input.
17 BY MR. LIEBER:
18 Q  Saint Mary's --
19 A  A one -- way or the other.
20 Q  Did Saint Mary's object?
21        MR. BRETZ: Would they or did they? I'm sorry.
22        MR. LIEBER: Do they.
23        MR. BRETZ: Do they.
24        THE WITNESS: Does Saint Mary's object?
25 BY MR. LIEBER:

Page 57

1  Q  Yes.
2  A  Well, we haven't -- we haven't been asked to weigh in one way
3     or another as to his appropriateness. I don't even know what
4     the responsibilities are for the associate program director,
5     so I have no way of judging whether that's an appropriate
6     appointment or not.
7  Q  Do you have any objections to him being listed in this way
8     under the program leadership?
9  A  I don't know what the responsibilities are within the
10    residency program.
11 Q  So you don't know of any -- that completes your answer and
12    you don't know of any objections at this point to have him --
13    have him listed as associate program director, Saint
14    Mary's Health Care?
15        MR. BRETZ: Is that a question?
16        MR. LIEBER: That's a question.
17 BY MR. LIEBER:
18 Q  Do you know of any objections at this point or does that
19    complete your recollection?
20 A  I don't know what the responsibilities of the associate
21    program director of Saint Mary's Health Care are; therefore,
22    I'm not in a position to make a judgment.
23 Q  Let's go to --
24 A  And I would just add, furthermore, it would be inappropriate
25    for me to make a judgment because the responsibilities for

Page 58

1     carrying out and operating the residency program are really
2     not under the purview of the hospital. The RRC requirements
3     for accreditation of a residency program clearly state that
4     academic appointments and decisions about academic affairs
5     are under the auspices of the program director, so it would
6     be inappropriate for me to interject my thoughts into that
7     process.
8  Q  Now, do you -- is it your testimony that you don't know what
9     Dr. Sherman does in his role as the associate program
10    director?
11 A  No, I don't.
12 Q  Do you know what he does at Saint Mary's Health Care?
13 A  He's an independent member of the medical staff.
14 Q  And what does he do while he's there?
15 A  He has privileges in general surgery.
16 Q  Does he do anything else? Does he do any teaching?
17 A  Well, you've furnished me with a document that says he's an
18    associate program director, so I would take this to mean he's
19    a faculty member of the GRMEP surgery program.
20 Q  Does he supervise residents who come through Saint Mary's
21    Hospital?
22 A  As -- if he's a faculty member, he would supervise residents.
23 Q  All right. Now, let's go to the fifth page of the document,
24    which at the bottom appears to be page 1.7., and the title of
25    this page is Grand Rapid/Michigan State University General

Page 59

1     Surgery Residency Program, General Surgery Teaching Faculty.
2     And it appears, you're welcome to take a look, that these
3     faculty are all associated with either Saint Mary's or
4     Spectrum. The question I'm going to ask you is, with regard
5     to GRMERC and GRMEP, do you know if they have any teaching
6     faculty in regard to medical residents who are not associated
7     with Saint Mary's or Spectrum?
8  A  Well, as I look at this list, there -- I guess I'm -- which
9     I'm seeing for the first time, I'm a little puzzled because a
10    number of these individuals have -- are independent medical
11    staff members at both Saint Mary's and Spectrum, and so I'm
12    not sure how they decided to list one or the other. That
13    must be a decision that was made within the residency, and
14    none of these individuals that I see here are employees of
15    Saint Mary's. They're all independent -- the individuals who
16    are listed who have an association with Saint Mary's medical
17    staff are all independent numbers of the medical staff.
18 Q  Okay. When you say they're not employees, what do you mean?
19 A  They're not employed by Saint Mary's.
20 Q  In what sense?
21 A  They're not employed. They don't -- they are not our
22    employees.
23 Q  And what constitutes an employee at Saint Mary's?
24 A  They don't have an employment contract.
25 Q  A contract that would pay them for services?

                                              17 (Pages 56 to 59)

Loewen v. GRMEP                        8/30/2011                    David Baumgartner, MD

## Page 96

1  Q   And who is Philip McCorkle?
2  A   He's the president and CEO of Saint Mary's.
3  Q   Is he an employee of Saint Mary's?
4  A   He's a Trinity Health employee.
5  Q   And has he ever served as the president of GRMERC or GRMEP?
6  A   Well, the president of GRMEP is the administrative head of
7      MERC. It's not -- it's not the chairman of the board.
8  Q   I --
9  A   So I -- can you distinguish which you are asking me about?
10 Q   I think you answered the question.
11         MR. BRETZ: Well, I think the question is has
12     McCorkle ever been the president of GRMEP or MERC.
13         MR. LIEBER: I think he answered the question.
14         THE WITNESS: The answer to the question is no.
15 BY MR. LIEBER:
16 Q   Now, in terms of these individuals --
17 A   And just to clarify, I've never been the president of GRMEP.
18 Q   So this is incorrect?
19 A   That's incorrect.
20 Q   All of these individuals it's fair to say have been involved
21     in discussions about determining the budget?
22 A   Yes.
23 Q   Have all of these individuals been involved in discussions
24     about resident resources and compensation?
25         MR. BRETZ: As board members?

## Page 97

1  BY MR. LIEBER:
2  Q   As board members of GRMEP.
3  A   They have been involved at the level of approving the overall
4      budget.
5  Q   Including those features?
6  A   Not --
7  Q   Salary.
8  A   Not including the details of salary, no.
9  Q   Not including salary. Which ones besides yourself and the
10     others that you mentioned have been involved in the
11     discussions --
12 A   The individuals --
13         MR. BRETZ: Wait until he finishes his question. I
14     don't think he was finished. I'm sorry.
15 BY MR. LIEBER:
16 Q   Which of these individuals have been involved in the
17     discussions about salary of residents?
18         MR. BRETZ: Okay. There was a distinction made
19     between general salary discussions and the details that he
20     made, so --
21 BY MR. LIEBER:
22 Q   Setting the salary of residents.
23 A   So, in general, the individuals who are listed here, our
24     level of discussion has been what's the overall line item,
25     the roll-up cost of resident compensation and not at the

## Page 98

1      level of individual -- we've had no discussion about
2      individual resident compensation. It's really more at the
3      roll-up level. We have had discussion that -- where we've
4      given the president of GRMEP the direction that we want to
5      ensure that we're at least at the 50th percentile for our
6      region in terms of compensation, but then have asked him to,
7      within those parameters, bring us a roll-up budget.
8  Q   And have you been involved in discussions about the number of
9      residents that the program will hire?
10 A   Well, the number of residents in a program is determined by
11     the RRC.
12 Q   Right.
13 A   That's part of the accreditation process.
14 Q   And have you been aware of those numbers during the course of
15     your service on the MERC and MEP board?
16 A   Yes.
17 Q   Have these other individuals been aware of those numbers?
18 A   Some, but not all of them.
19 Q   Which ones wouldn't be aware of those numbers?
20 A   I think Mr. McCorkle and Mr. Van Vranken probably have not
21     been very intimately involved in those discussions.
22 Q   And which have been involved in the discussions pertaining to
23     your market research?
24 A   That would --
25         MR. BRETZ: Whoa, whoa, whoa. Your market

## Page 99

1      research, that's inappropriate.
2  BY MR. LIEBER:
3  Q   The market research that you became exposed to.
4          MR. BRETZ: No. I think he said they asked for
5      market research to be performed.
6  BY MR. LIEBER:
7  Q   Did you perform market research? Did someone perform market
8      research?
9  A   The -- you're talking about in terms of compensation?
10 Q   Right.
11 A   We would get survey data. We, being the members of the
12     board, would receive survey information that looks at overall
13     residency compensation compared to the regional and national
14     markets.
15 Q   Who received that information?
16         MS. LACHMAN: He just testified to that.
17         MR. LIEBER: He said we.
18         THE WITNESS: No. I said members of the board.
19 BY MR. LIEBER:
20 Q   All members of the board?
21 A   Yes.
22 Q   All right. And how long has that been the case?
23 A   That that type of information was out there?
24 Q   Yes.
25 A   Well, it's been going on since before I took this position.

info@wmreporting.com        WEST MICHIGAN REPORTING        616-361-1700
                            SCAO FIRM #8204

Loewen v. GRMEP                    8/30/2011                  David Baumgartner, MD

Page 100

1        MR. LIEBER:  The next exhibit is going to be what
2    was sent to you as Exhibit 25, but we're going to renumber it
3    as Exhibit 40, Maureen, if you would put a new sticker on
4    there.
5        (Exhibit 40 marked)
6        (Discussion held off the record)
7    BY MR. LIEBER:
8    Q   Okay.  Dr. Baumgartner, these are Trinity Health's Answers
9    and Objections to Plaintiff's First Set of Interrogatories,
10   and these were signed by you; you verified them?
11   A   Yes.
12   Q   Okay.  If you look at Interrogatory Number 5, it says:
13       "State the full name . . . employer(s), home
14   address, and telephone number of each individual who was
15   consulted or otherwise involved in the decision to terminate
16   Dr. Loewen as a resident."
17       MS. LACHMAN:  What number?
18       MR. LIEBER:  Five on page three.
19   BY MR. LIEBER:
20   Q   Do you see that?
21   A   Yes.
22   Q   Did you make any investigation before you wrote that?
23   A   No.  I -- I did not do any investigation.
24   Q   Okay.  You just basically relied on your counsel?
25   A   Well, no.  It was because any issues with GRMEP come -- get

Page 101

1    funneled by the organization through me.
2    Q   And so it just didn't arise through you; is that correct?
3        MS. LACHMAN:  What was the word?
4        MR. BRETZ:  Arise?
5    BY MR. LIEBER:
6    Q   The information did not come to your attention because it
7    wasn't funneled through you?
8    A   Well, Saint Mary's does not get involved in discussions about
9    hiring or terminating residents, ever.
10   Q   Now --
11   A   And, again, as I said before, the accreditation requirements
12   for residencies put such decisions in the hands of the
13   program director, so it would be inappropriate for me or
14   anyone else at the hospital to do so, otherwise it would
15   jeopardize the accreditation of the residency.  Those are
16   academic matters that are in the hands of the program
17   director and the faculty.
18   Q   And the associate program director?
19   A   Depends on the residency and how they have put their -- their
20   program together.
21   Q   And how did you become aware of Dr. Loewen's termination?
22   A   When I got a call from one of the attorneys saying we had
23   gotten notice of this suit.
24   Q   And you didn't talk to any physician at the hospital; is that
25   correct?

Page 102

1    A   Yes.
2    Q   Do you know whether Dr. Stanley Sherman was involved in the
3    decision to terminate Dr. Loewen?
4    A   No, I don't.
5    Q   Let's look at Paragraph 10, and what I'd like you to do is
6    read the question and answer to yourself.
7    A   Are you talking about Interrogatory 10?
8    Q   Yes, on page five and six.
9    A   Okay.
10   Q   Is this the answer that you wrote?
11   A   Yes.
12       MR. BRETZ:  Well, no.  Sorry, Doctor, I don't mean
13   to correct you.  The objections are the lawyer's.  The
14   answers are the signatory's.  So this is an objection the
15   lawyer raised.
16   BY MR. LIEBER:
17   Q   What did you mean by when you were asked to, in the last
18   sentence -- well, when you were asked the questions in
19   Paragraph 10, what did you -- or what does this answer mean:
20       "The question requires an analysis of complex
21   federal and state health care finance laws and regulations
22   which bear no relevance to this case."
23       What --
24       MR. BRETZ:  Well --
25   BY MR. LIEBER:

Page 103

1    Q   What did you mean by an analysis of complex federal and state
2    health care finance laws?
3        MR. BRETZ:  For the record, Dr. Loewen -- or
4    Dr. Baumgartner did not write that answer.
5        MR. LIEBER:  Okay.
6        MR. BRETZ:  The lawyers wrote that answer, so
7    that's an objection.  It's not an answer to the question.
8    It's an objection for lack of relevance to the case, and I'll
9    stipulate that funding in hospitals is extremely complex and
10   byzantine and beyond the scope of my knowledge and this
11   witness's knowledge and certainly beyond the relevance of
12   this case.  So not his answer.
13   BY MR. LIEBER:
14   Q   Okay.  Does this answer mean anything to you, the sentence
15   that says the question requires an analysis of complex
16   federal and state health care finance laws?  Does that mean
17   anything to you and can you explain what that means to you?
18   A   So what I interpreted when I saw this question is -- well,
19   what was unclear to me in the question is what the -- what
20   level of detail was being asked about.
21   Q   Now, does Saint Mary's -- excuse me a second.
22       Does Saint Mary's receive any external funds for
23   having the residents at its facilities, state, federal,
24   grant, any NIH funding, what have you, for having the
25   residents at its facility?

28  (Pages 100 to 103)

Loewen v. GRMEP                    8/30/2011                  David Baumgartner, MD

---

Page 116

1    Q   Do you know if they became involved as clinical instructors
2        in terms of teaching these medical students?
3    A   I have no idea whether they did or not.
4    Q   If they did become involved, it would be outside any
5        agreement with MERC or MEP; is that correct?
6    A   No.  It --
7            MR. BRETZ:  He said he doesn't know anything about
8        it, so we're now into --
9            MR. LIEBER:  I'm just trying to add two plus two
10       and move it along.
11           MR. BRETZ:  It's zero plus zero.
12           MR. LIEBER:  I recognize your argumentative point.
13   BY MR. LIEBER:
14   Q   But this agreement does not involve MERC or MEP in any way.
15   A   No, it doesn't.
16   Q   Okay.  All right.  So if these residents became involved in
17       teaching second-year students as clinical instructors through
18       Michigan State University, would it have been outside of
19       the -- any agreement that the hospital had with MERC or MEP?
20           MR. BRETZ:  Objection, lack of foundation, lack of
21       personal knowledge.  You're asking him just to guess.
22           MR. LIEBER:  I'm asking him to give a reasonable
23       response.
24   BY MR. LIEBER:
25   Q   Or do you know any reason why it would have involved MERC or

---

Page 117

1        MEP?
2    A   Any activities of the residents are under the control of the
3        GRMEP program director for that specialty.
4    Q   All right.  Let's -- just to be clear, this agreement for
5        second-year students had nothing to do MERC or MEP, correct?
6            MS. LACHMAN:  Objection.
7            MR. LIEBER:  Excuse me.
8            MS. LACHMAN:  Mischaracterizes his testimony.
9    BY MR. LIEBER:
10   Q   Did it have anything economic to do with MERC or MEP?
11   A   No.  This was an agreement between Saint Mary's and Michigan
12       State.
13   Q   MERC and MEP did not sign the agreement in any way?
14   A   No.
15   Q   They're not subject to the terms or conditions of the
16       agreement, correct?
17   A   No.
18   Q   All right.
19           (Exhibit 43 marked)
20   BY MR. LIEBER:
21   Q   I'm showing you Exhibit 43.  This is the 2008-09 GRMERC
22       Resident Manual.  Do you think you've seen this document
23       before.
24   A   No, I haven't.
25   Q   Okay.  If you look on the bottom of these pages, it says

---

Page 118

1        ML000022.  Do you see that?
2    A   Yes.
3    Q   Let's go to the page that is ML000 ending in 25.  Yes, it has
4        three columns in it.  Have you seen this document before?
5    A   I've seen elements of this.  I don't know if I've seen it in
6        precisely this kind of format or with all these elements
7        present in it.
8    Q   This says -- in the partnership section at the end, it says
9        that:
10           "These institutions share a commitment to support
11       physician and health professions education at every level."
12           Do you see that?
13   A   Uh-huh.
14   Q   Would that be accurate from Saint Mary's --
15   A   Yes.
16   Q   All right.  Then it says and:
17           "Use physician and health professions education and
18       research as strategic assets to achieve their missions and
19       community goals."
20           Do you know what that means, particularly the term
21       strategic assets?
22   A   Well, in the context of Saint Mary's, we look at involvement
23       in resident education -- and in education in general, so that
24       actually includes nursing education, physical therapists, et
25       cetera -- we look at education as an important part of

---

Page 119

1        achieving better patient care, and -- which is -- which is
2        the key part of our mission to provide the highest quality of
3        patient care, and we think of that along the terms of
4        professionals who are involved in teaching will use more
5        evidenced-based practice.  It provides a higher quality of
6        intellectual environment that is stimulating.  It attracts
7        physicians in other health professions who want to work in an
8        environment which is evidenced-based.  So we see this as
9        really improving the overall quality of care in the
10       organization as well as attracting a higher performing
11       professional to work in our organization, which is why we're
12       willing to make an investment in the expense of supporting
13       educational at all levels.
14   Q   Does Saint Mary's agree that physician and health professions
15       education and research are strategic assets to achieve Saint
16       Mary's mission and community goals?
17   A   I'm not sure that I follow what you're saying.  I thought
18       that's what I just answered.
19   Q   Okay.  The strategic assets here are physician and health
20       education professions education and research.  Do you see
21       that?
22   A   Uh-huh.
23   Q   Okay.  Does Saint Mary regard those as -- these strategic
24       assets as ways to achieve its mission and community goals?
25   A   Well, I -- I already gave the answer --

32  (Pages 116 to 119)

Loewen v. GRMEP                    8/30/2011                    David Baumgartner, MD

## Page 132

1   signed an agreement indicating that the official at Saint
2   Mary's Hospital responsible for education -- resident
3   education and supervision was Stanley Sherman, MD, Assistant
4   Program Director, Saint Mary's Health Care?
5        MR. BRETZ:  Well, I object, from -- taking a page
6   from Bill Clinton, it depends on what your definition of "at"
7   is.  Is it the situs or the person or the official from and
8   designated by the hospital?
9   BY MR. LIEBER:
10  Q   Do you understand the question?
11  A   Well, as I interpret this document, first of all, the
12      authority for operation of the program is delegated to the
13      program director in the paragraph up above.  I note that in
14      the agreement signatories you also have Matt Van Vranken,
15      president of Spectrum Health Hospital, signing as a
16      signatory, and I don't think -- and Jane Paulson's named as
17      the assistant program director for Spectrum Health.  I don't
18      think that this is -- either Saint Mary's naming the Spectrum
19      assistant program director or Spectrum naming the Saint
20      Mary's program director.  I read this more as an
21      acknowledgment that these are the officials that the program
22      director is designating.  It doesn't say anything about what
23      their scope of responsibility is.
24  Q   Okay.  Okay.  If you go to the next page, GRMEP 001752, Part
25      4, Responsibility for Teaching, Supervision, and Evaluation

## Page 133

1   of the Residents Performance, and the bottom paragraph says
2   that:
3        "Hospitals, and their medical staffs, agree to
4   provide an environment that supports and facilitates the
5   teaching, supervision and former evaluation of General
6   Surgery Residency Program Residents assigned to their
7   institutions."
8        You would agree that that was, in fact, a
9   responsibility that was acknowledged and agreed to by Saint
10  Mary's, correct?
11  A   Well, the statement is a bit ambiguous.  The hospital is
12      agreeing to provide, and, again, you have to kind of refer
13      back, I think, to the operating agreement -- you know,
14      this -- in the purpose, it says the agreement serves as a
15      supporting document to the operating agreement.  If anything,
16      this document actually, I think, is a bit ambiguous.  It has
17      the smell of something that got put together right before a
18      site visit because the surgery RRC needed some kind of
19      specific document, but that --
20  Q   Excuse me.  Is that your testimony, that it was thrown
21      together right before a site visit?
22  A   No.  No.  That's -- that's conjecture on my part, and I
23      really can't say what -- anything to that effect, but let
24      me -- let me answer your question specifically.  So the
25      hospitals and their medical staff, which would be an

## Page 134

1   independent medical staff, do agree to provide an environment
2   that supports teaching, supervision, and evaluation, yes.
3   The teaching and supervision and evaluation are, going back
4   to earlier in the document to C on the previous page, are
5   under the authority of the general surgery residency program
6   as delegated to the program director.
7   Q   Let's go to the last exhibit of the day.  This was
8       Exhibit 37, so this will be 46.
9           (Exhibit 46 marked)
10          MR. BRETZ:  It will be 46.  Is that the number?
11          MR. LIEBER:  Yes.
12  BY MR. LIEBER:
13  Q   I'm showing you Exhibit 46, which is a Teaching Services
14      Agreement between Grand Rapids Medical Education & Research
15      Center for Health Professions and Saint Mary's Health Care
16      and Advantage Health Physicians, PC.  Have you ever seen this
17      document before?
18  A   Yes, I have.
19  Q   And how did you come to see this document?
20  A   It came to me for signature, and this is a fairly standard --
21      this is kind of a standard teaching services template that is
22      utilized primarily for services that occur that are not in
23      the acute care setting, but in -- in offsite -- off acute
24      care hospital site, although not exclusively so, and this
25      specifically is a document that is related to -- the duties

## Page 135

1   are spelled out in the appendix for -- that would be
2   Appendix -- that's actually a generic appendix, see.  Where
3   is that.  Yes, Exhibit -- it's in the Exhibit A, which is --
4   this is the undergraduate medical education clerkship
5   director, so this is for responsibility for oversight of the
6   resident -- or, I'm sorry, oversight of students who are
7   rotating in family medicine.
8   Q   What --
9   A   This was -- let's see, the date.  This is probably, yes,
10      2005.  This is when those experiences were being delegated by
11      Michigan State to GRMERC.
12  Q   What was Advantage Health Care, Advantage Health Physicians,
13      PC?
14  A   It was an independent PC.
15  Q   And what were they providing?
16  A   They were providing -- what were they providing?
17          MR. BRETZ:  In this agreement or to the public in
18      general?
19  BY MR. LIEBER:
20  Q   In this agreement.
21  A   They were providing --
22          MR. BRETZ:  If you know outside of that you can
23      tell him that.  If you have to read the agreement to
24      interpret it --
25          MR. LIEBER:  You don't have to read it.

info@wmreporting.com        WEST MICHIGAN REPORTING        616-361-1700
                            SCAO FIRM #8204

Loewen v. GRMEP                8/30/2011                David Baumgartner, MD

Page 140

1          MR. BRETZ:  For GRMERC?
2          THE WITNESS:  For GRMERC.  Yes.  Not for the
3    hospital, for GRMERC.
4    BY MR. LIEBER:
5    Q    Is he still on the staff of the hospital?
6    A    Yes.
7    Q    Do you know if he or his group receives any type of stipend
8    contract?
9    A    Well, they are now employees of the hospital, became
10   employees of the hospital about a year ago.
11   Q    When did they become employees of the hospital?
12   A    About a year ago.  I think it was July 1, 2010.
13   Q    And what's his position at the hospital, Dr. VanSchagen?
14   A    He is a staff physician.  He's a member -- he's an employee
15   physician within the Advantage Health/Saint Mary's
16   Multispecialty Group practice.
17   Q    Okay.
18   A    He also holds and has an independent relationship with
19   GRMERC, which is -- there's a separate contract that
20   specifies his duties there as program director.
21   Q    Do you know what this position -- this is in Exhibit 3 --
22   Ortho/Surgery/ER coordinator means?
23   A    I think those are referring to similar positions in those
24   specialties.  There's a -- there's a coordinator for the
25   ortho clerkships, the surgery clerkships, the ER clerkships,

Page 141

1    for the third-year students.  I don't -- that, again, I think
2    they took those templates and just plopped it in here.  He
3    was not providing services for those -- you know, in any
4    relationship to those areas.
5    Q    All right.  And how long has GRMERC or GRMEP had a family
6    practice residency program that collaborates with Saint
7    Mary's?
8    A    Well, the family medicine residency was started in the '70s,
9    I believe it was, and became -- it was taken over by GRMERC
10   January 1st -- January 1st of 2000.
11         MR. LIEBER:  Okay.  That will conclude my
12   questions.
13              EXAMINATION
14   BY MR. BRETZ:
15   Q    Just a few questions, Doctor.
16         You testified earlier about your role as a board
17   member of GRMERC or GRMEP.  Do you recall that testimony?
18   A    Yes.
19   Q    Okay.  You talked -- Mr. Lieber asked you about salaries and
20   the board's role in budgets and reviewing budgets and
21   reviewing salaries of the residents, correct?
22   A    Yes.
23   Q    And you said that you review the salaries as part of the
24   budget; is that correct?
25   A    Yes.

Page 142

1    Q    Do you actually do an independent review or assessment of
2    resident salaries outside the budget process?
3    A    Well, we -- we don't set -- we don't set the salaries.  What
4    we do is as, as part of the budget process, we ask to have a
5    general idea of how our salaries are in reference to other
6    residency programs in the Midwest so that we're within -- so
7    that we're not underpaying the residents and falling behind.
8    We get that information from GRMERC as well as their proposal
9    for what they would like to do for the coming year in terms
10   of their general approach to salary by year, and specifically
11   they want to -- they want to know whether they're going to be
12   in the ballpark before they let contracts out for the
13   residents.  So what we'll do is look at the -- we'll say, you
14   know, in general, this looks fine, but we don't set those
15   salaries.  We look at it in the context of what's the
16   total -- what we're really interested in is what's the bottom
17   line number for everything all in, infrastructure, faculty
18   support, resident support, what's the number that each
19   hospital is responsible for.  That's what we approve, and
20   then GRMERC has the ability to modify anything within
21   those -- within those numbers, so they can change the salary
22   for the residents if they want.
23   Q    Without board approval?
24   A    Without board approval.
25   Q    So does the board set the salaries?

Page 143

1    A    No.
2          MR. LIEBER:  Objection to the form.  It's
3    argument --
4          MR. BRETZ:  I'm not arguing with my own client.
5          MR. LIEBER:  No.  You're leading your own client.
6          MR. BRETZ:  No, I'm not.  It's a simple question,
7    does the board set the salary.  That's not leading.
8          MR. LIEBER:  Objection.
9    BY MR. BRETZ:
10   Q    Does the board set the salary, Doctor?
11   A    No.
12   Q    And I think you said GRMERC can change the salary at its own
13   discretion?
14   A    Yes.  And they have in the past.
15   Q    And who does that at GRMERC?
16   A    The president of GRMERC.
17   Q    And there's no requirement he come back to the board to do
18   that?
19   A    No.
20   Q    Okay.  And you said you look at -- what you look at in terms
21   of the salary amounts is a roll-up or rolled-up number.  Is
22   that an aggregate of all expenditures for salaries?  Is that
23   what you get?
24   A    Well, that's what we spend the most time looking at.  It's --
25   salary is the biggest expense.  Like a lot of organizations,

## Page 144

1   salary is the biggest expense, and so that's a number you
2   have to kind of look at.
3   Q   Does the board, of which you are a member, get involved in
4   the hiring, recruitment, or selection of residents?
5   A   No.
6   Q   Do you set the standards for hiring or recruitment or
7   selection of residents?
8   A   Only insofar as the expectation is the residencies be
9   accredited, and so the selection process has to be in accord
10  with RRC requirements for accreditation.
11  Q   Okay, but that's the accreditation requirements?
12  A   Yes.
13  Q   Okay.  Not the board's.
14  A   No.  The board doesn't set any specific requirements.
15  Q   Do you get involved in any -- does the board get involved in
16  any individual hiring or appointment decisions of residents?
17  A   No.
18  Q   Does the board get involved in any individual evaluations or
19  assessment of residents' capabilities, skills, competence
20  levels?
21  A   No.
22  Q   Does the board get involved in any of the instructional
23  functions of GRMERC?
24  A   No, other than the requirement that the -- that the programs
25  be operated in such a way that accreditation is maintained,

## Page 145

1   but we don't get into the, you know, the micromanagement of
2   how to do that.
3   Q   Does the board get involved in any discipline or corrective
4   action taken against any resident?
5   A   No.
6   Q   Does the board set the policy for discipline or corrective
7   action?
8   A   No.
9   Q   Does the board get involved in termination of residents?
10  A   No.
11  Q   Does the board get involved in any adjustment or hearing of
12  grievances that a resident may have?
13  A   No.
14  Q   Okay.  Same question with regard to Saint Mary's Health Care,
15  and I'm just going to ask a big, long question.  Does Saint
16  Mary's Health Care have any involvement in the hiring,
17  evaluation, instruction, control, discipline, discharge, or
18  adjustment of grievances of the residents of the GRMERC
19  program?
20  A   No.
21     MR. BRETZ:  Okay.  I don't have anything else.
22     MR. LIEBER:  When you were asking questions about
23  the board, you're asking about the GRMERC and then GRMEP
24  board, correct?
25     MR. BRETZ:  Yes.

## Page 146

1     MR. LIEBER:  And then you asked about Saint Mary's.
2     MR. BRETZ:  Yes.
3     MS. LACHMAN:  I don't have any questions.
4   (Deposition concluded at 7:12 p.m.)
5           *  *  *

## Page 147

CERTIFICATE OF REPORTER

STATE OF MICHIGAN      )
                       ) SS
COUNTY OF KENT         )


    I, Maureen Jabour Nurmikko, Notary Public in and
for the County of Kent, State of Michigan, do certify that
this transcript, consisting of 146 pages, is a complete,
true, and correct transcript of the deposition of DAVID
BAUMGARTNER, M.D., and testimony taken in this case on August
30, 2011.
    IN WITNESS WHEREOF, I have hereunto set my hand
this 31st day of August, 2011.


    _____
    MAUREEN JABOUR NURMIKKO/CSR 3078
    Notary Public in and for the County of Kent,
    State of Michigan.
    My Commission expires 8-2-18.

# Rogers Deposition

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

* * *

MARGARET J. LOEWEN, M.D.,

        Plaintiff,

V                                          Civil Action No. 1:10-cv-1284

GRAND RAPIDS MEDICAL EDUCATION PARTNERS, a
corporation, SPECTRUM HEALTH SYSTEM, a
corporation, TRINITY HEALTH CORPORATION, a
corporation t/d/b/a SAINT MARY'S HEALTH
CARE, MICHIGAN STATE UNIVERSITY, a
corporation, MARC SCHLATTER, an individual,
JOHN VANSCHAGEN, an individual,

        Defendants.

_____/


    CONFIDENTIAL PORTIONS OF THE DEPOSITION OF RALPH ROGERS, MD

    taken on August 31, 2011, at 80 Ottawa Avenue NW, Grand

    Rapids, Michigan, commencing at about 11:07 a.m.

    APPEARANCES:

    On behalf of Plaintiff:
            LIEBER HAMMER HUBER BENNINGTON
            BY:  Mr. James B. Lieber - PA 21748
            5528 Walnut Street
            Pittsburgh, Pennsylvania 15232-2312

    On behalf of Defendants Grand Rapids Medical Education
    Partners, Spectrum Health System, Marc Schlatter and
    John Van Schagen:
            MILLER JOHNSON
            BY:  Mr. Thomas R. Wurst - P30177
                 Ms. Sara G. Lachman - P67523
                 250 Monroe Avenue NW #800
                 Grand Rapids, Michigan 49503

Loewen v. GRMEP                    8/31/2011 Ralph Rogers, MD CONFIDENTIAL

---

Page 16

1   A   So it really -- it really gives them -- it's not any
2       different necessarily than if we were to have a vendor that
3       needed access to a certain part of the hospital or -- and
4       these things are typically limited in terms of security and
5       what they're able to do.
6   Q   You said a Saint Mary's card. Is there a Spectrum card as
7       well?
8   A   Yes.
9   Q   Okay.
10  A   Oh, yes.
11  Q   Okay. Anything else that this Spectrum card provides to
12      residents or enables them to access or do?
13  A   I'm not certain, but it might allow them to charge meals in
14      an account. That function exists for medical staff also and
15      for, I think, volunteers and other people that frequently
16      visit the hospital. I'm not sure about that, but that's --
17      it's a possibility.
18  Q   Now, do doctors on the staff at Spectrum evaluate the
19      performance of residents?
20  A   Not as members of the medical staff.
21  Q   Okay. How do they do it?
22  A   Those are -- those are performed by those who have
23      administration and supervision functions from GRMEP.
24  Q   Okay. And what does the evaluation process entail, if you
25      know?

---

Page 17

1   A   I believe it varies a bit from program to program, but
2       typically what would happen is the core faculty would
3       evaluate the experience. They might get some input from
4       non-core faculty, those that have teaching -- a teaching
5       arrangement, and that information is put together; it's
6       discussed typically for the program director and some of
7       the -- some of the staff at GRMEP. And so the decisions are
8       based on evaluation and performance, they're done through the
9       GRMEP system. It's not a hospital function.
10  Q   And do you have any familiarity with the general surgery
11      residency program?
12  A   Some.
13  Q   Okay. And how -- what is your level of familiarity with that
14      program?
15  A   Well, I'm aware that the general surgery program has been
16      around for many years, certainly well into the 1970s. It has
17      an affiliation with Michigan State. Residents participate at
18      several sites, Spectrum and Saint Mary's in particular.
19      They -- it's a -- it's been a -- my understanding, it's been
20      a good program over the years. They have a program director,
21      I believe they have an associate program director.
22  Q   Did you become aware, before this case, of any of the -- of
23      any facts or even the existence of the discharge of Margaret
24      Loewen from the general surgery program?
25  A   No.

---

Page 18

1   Q   Did you become aware of any other discharges or suspensions
2       or disciplines of residents in any GRMEP or GRMERC programs?
3   A   I believe there was an issue with one of the emergency
4       medicine residents a number of years ago. But my position
5       was -- I was not part of the core faculty. I was not
6       involved in any of those discussions. They really occurred
7       through GRMEP. And to be honest, I'm not sure what the
8       outcome was.
9   Q   What was the issue or the complaint about or the grievance or
10      infraction?
11          MS. LACHMAN: Objection. Based on peer review.
12  BY MR. LIEBER:
13  Q   Go ahead.
14  A   I don't know --
15          MS. LACHMAN: No, I don't believe that's an area
16      that he's going to testify to.
17          MR. LIEBER: Okay.
18          THE WITNESS: And I honestly don't know.
19          MR. LIEBER: You're instructing him not to testify?
20          MS. LACHMAN: If you're seeking peer review
21      information, yes. It's protected.
22          MR. LIEBER: Okay. Well, I would just argue in
23      terms of EEOC vs. The University of Pennsylvania. For
24      purposes of Title 7, peer review information, evaluative
25      information pertaining to comparators is --

---

Page 19

1           MS. LACHMAN: Is that a Sixth Circuit law?
2           MR. LIEBER: It's a United States Supreme Court
3       law.
4           MS. LACHMAN: Okay. I don't have the case in front
5       of me.
6           MR. LIEBER: Okay. Well, you can take a look at it
7       if you want.
8           MS. LACHMAN: Okay. Well, maybe what we do is come
9       back to that question later on in the day.
10          MR. LIEBER: Okay. That's one case. All right.
11  BY MR. LIEBER:
12  Q   Now, is it fair to say that Spectrum provides facilities used
13      in GRMEP programs?
14  A   Yes.
15  Q   Okay. And which facilities? By which, I mean which campuses
16      or hospitals?
17  A   Depending on the residency, it may be Butterworth, Blodgett,
18      or Helen DeVos Children's Hospital.
19  Q   Butterworth, Blodgett, and DeVos?
20  A   Helen DeVos.
21  Q   Is a children's hospital?
22  A   Yes. Helen DeVos Children's Hospital.
23  Q   And what happens at -- what facilities are provided and what
24      occurs at each of those sites with regard to the education
25      and teaching of residents? Education, teaching, or training

---

7 (Pages 16 to 19)

Loewen v. GRMEP                    8/31/2011 Ralph Rogers, MD CONFIDENTIAL

| Page 48 |
| --- |

```
 1    it lists program leadership. And again, this is of the Grand
 2    Rapids/Michigan State University General Surgery Residency
 3    Program. And it lists the program director, Marc Schlatter,
 4    the associate program director, Stanley Sherman, and then it
 5    goes to the assistant program director of Spectrum Health,
 6    David Figg, MD, FACS. Do you see that?
 7  A  Yes.
 8  Q  Okay. What is David Figg's position, if he has one, at
 9    Spectrum?
10  A  I don't know necessarily his current position.
11  Q  Okay.
12  A  If you're -- are you referencing to this document --
13  Q  No, I'm --
14  A  In terms of this document?
15  Q  No. What have been his positions at any time at Spectrum, if
16    you know?
17  A  I believe he was involved as a core faculty in the general
18    surgery program at some point. I'm not sure at what level.
19  Q  Do you know if he was an employee or a contractor through
20    Spectrum?
21  A  He was a -- if he was core faculty, he would be an
22    independent contractor with GRMEP. You know, that's not a
23    Spectrum function.
24  Q  Was he ever an employee or contractor of Spectrum, including
25    with regard to whatever group he may have been involved in?
```

| Page 49 |
| --- |

```
 1  A  I believe, at this point, he is -- and I'm not absolutely
 2    certain. I believe that he is an employee of the Spectrum
 3    Health Medical Group currently.
 4  Q  What is the Spectrum Health Medical Group?
 5  A  It's a separate organization from Spectrum Health Hospitals
 6    in which -- which is a subsidiary of Spectrum Health, the
 7    parent company, which employs physicians and other providers
 8    to provide care to patients.
 9  Q  At Spectrum Hospitals?
10  A  Or in the community.
11  Q  Okay.
12  A  And -- yes.
13  Q  Okay. Do you know, with regard to this document --
14  A  Now, I don't know if it occurred at this time.
15  Q  Okay.
16  A  I'm talking current.
17  Q  And how long has that relationship been in effect for -- with
18    the Spectrum Health Medical Group?
19  A  The medical group is about three years old. It's no more
20    than three years old. I suspect that his relationship with
21    the medical group is considerably less than that.
22  Q  Do you know how long it's been?
23  A  It'd be speculation. Maybe a year.
24  Q  Maybe two?
25  A  Don't know.
```

| Page 50 |
| --- |

```
 1  Q  All right. Okay. In terms of -- do you know why, in this
 2    form which appears at Exhibit 9, which appears to be a
 3    handbook for general surgery residents, the program
 4    leadership is listed by association to various hospitals,
 5    including Saint Mary's and Spectrum?
 6  A  Well, it's listed in terms of the hierarchy, with the program
 7    director being the most important administrator.
 8  Q  Right. And he is --
 9  A  And --
10  Q  Go ahead.
11  A  Oh. I was going to say, and I think when it refers to a
12    hospital underneath some of the other physicians, that that's
13    typically where they practice and where they can -- you know,
14    the site at which a lot of the care begins and they can
15    monitor performance there.
16  Q  Do you know why -- assuming this is a GRMERC or GRMEP
17    document, do you know why they did not list a hospital
18    regarding Dr. Schlatter but then they did for the other
19    leaders?
20       MS. LACHMAN: I just want to object that he
21    testified he's never seen the document before, and he
22    certainly can't speculate as to why GRMEP did anything they
23    did with regards to this document.
24  BY MR. LIEBER:
25  Q  Have you seen other documents from GRMEP or GRMERC that have
```

| Page 51 |
| --- |

```
 1    listed program leaders by hospital?
 2  A  I think, on occasion, that they may represent where -- as I
 3    said before, where -- where they practice. But I -- I don't
 4    know the rationale other than that.
 5  Q  Now, have you seen documents where the program director is
 6    not listed by where he practices?
 7  A  I'm not sure.
 8  Q  All right. So you don't know why these doctors actually are
 9    being listed in this document by where -- by hospital?
10       MS. LACHMAN: Objection, asked and answered.
11  BY MR. LIEBER:
12  Q  Is that correct?
13  A  I gave an answer to that.
14  Q  Okay. Let's go to the fifth page of the document, which, in
15    the bottom right, has the number I.7. Okay. Again, these
16    are the Grand Rapids/Michigan State University General
17    Surgery Residency Program, General Surgery Teaching Faculty.
18    And, again, we have designations by hospitals. Okay. Do you
19    know what these individuals do in terms of supervising and/or
20    evaluating residents?
21  A  These are part of what I would call the core faculty.
22  Q  Okay.
23  A  And so the core faculty, through GRMEP, is responsible for
24    the oversight of the program and the education of the
25    residents and their evaluations.
```

info@wmreporting.com       WEST MICHIGAN REPORTING       616-361-1700
                           SCAO FIRM #8204

Loewen v. GRMEP                    8/31/2011 Ralph Rogers, MD CONFIDENTIAL

| Page 68 | Page 70 |
|---|---|

**Page 68**

1    to -- I'd have to check Dr. --
2  Q   All right.  Well, hopefully, that will come through in the
3       discovery.
4  A   Yeah.
5  Q   All right.  Okay.  Now, the next document was in your group,
6       No. 23, but now it's No. 39.
7  A   Okay.
8  Q   Exhibit 39 is a Michigan Department of Labor filing.  It's a
9       multi-page document.  It's actually filings.  There's -- a
10      2008 document is the front page.  The second page includes
11      GRMERC Board of Directors 2008 and 2009.  The third page is a
12      2010 Department of Labor -- excuse me -- Department of
13      Energy, Labor & Economic Growth, Nonprofit Corporation
14      Information Update, which also includes your name.  And so
15      what I'd ask you, sir, is have you seen any of these
16      documents contained in Exhibit 39 before?
17  A   No.
18  Q   If you go to the second page, the GRMERC Board of Directors
19      2008 through 2009, the person listed as chairman is
20      David Baumgartner, MD.  Do you see that?
21  A   Yes.
22  Q   Do you know David Baumgartner?
23  A   Yes.
24  Q   What was -- do you know what he did in his role as chair?
25  A   Are you talking about between 2008 and '9?

**Page 69**

1  Q   Correct.
2  A   I wasn't part of the board, so I have no knowledge what he
3       did --
4  Q   Okay.
5  A   -- during that time frame.
6  Q   How about subsequent?
7  A   Well, when I joined the board last fall, he was the chair,
8       so -- of the board.  So he would -- he would manage the
9       agenda and chair the meeting.
10  Q   Anything else?
11  A   Just the normal function of what a chair would do.  Other
12      than that, no.
13  Q   Now, when you joined the board, he was still the chair,
14      correct?
15  A   Correct.
16  Q   Is he the chair now?
17  A   No.
18  Q   Who is the chair now?
19  A   I am.
20  Q   All right.  And how did you become chair?
21  A   I was elected by the board.
22  Q   And was there -- when were you elected chair of the board?
23  A   Within the last -- within the last few months.
24  Q   Okay.  And tell me, again, when did you join the board?
25  A   Last fall.  I can't give you the exact month.

**Page 70**

1  Q   The fall of 2010?
2  A   Yes.
3  Q   What prompted you to join the board?  Why did you join the
4       board?
5  A   I was asked by the president of -- Matt Van Vranken, the
6       president of Spectrum Health Hospitals, to join the board.
7  Q   And why -- if you know, why did he ask you to do that?  Why
8       did he want you to be on the board?
9  A   We -- we had a -- I was serving as the interim vice president
10      of research, and I believe he felt that that would be -- it
11      would be helpful to have me in that current role, to be a
12      member of the board, to give input.
13  Q   Okay.
14  A   And I had an interest in resident education.
15  Q   What kind of input did he want you to give?
16  A   Well, he didn't specify specifically what kind of input.
17  Q   Okay.
18  A   I think he wanted me to -- to my expectations, he wanted me
19      to -- to join in discussion and make decisions that would
20      benefit GRMEP and its residency programs.
21  Q   Why did he ask -- why would Spectrum care about that?
22  A   Spectrum has an interest in teaching not limiting to
23      residents; medical students, health professionals.  Being a
24      site where a lot of medical care occurs, it's natural that
25      organization would come to Spectrum -- organizations would

**Page 71**

1       come to Spectrum and ask for access to the site for purposes
2       of teaching and that organizations such as GRMEP would
3       contact physicians who might practice at that site, in this
4       case Spectrum, to help provide education.
5  Q   Okay.  Now, when you -- when you joined the board, who else
6       was on the board?
7  A   Dr. MacKeigan, Dr. Baumgartner, Mr. Van Vranken,
8       Mr. McCorkle, and then we had Jean Nagelkerk, Dr. Nagelkerk
9       from Grand Valley and Dr. Rappley from Michigan State.
10  Q   Now, if you look at the last page of the document, this
11      September 13th, 2010, filing, it lists a number of
12      individuals and their positions.  And this appears to have
13      been filed by a -- an individual named Coggan.  Do you know
14      Dr. Coggan?
15  A   Dr. Coggan is the president and CEO of Grand Rapids Medical
16      Education Partners.
17  Q   All right.  He signed the document.  And he listed certain
18      people on the board.  Are these offices accurate with regard
19      to these people?
20  A   At the time --
21  Q   Yes.
22  A   -- filed?
23      My understanding, yes.
24  Q   All right.  Now, it said -- in the last category it says
25      "Required 3 or more directors," and then this is the last --

info@wmreporting.com      WEST MICHIGAN REPORTING        616-361-1700
                          SCAO FIRM #8204

Loewen v. GRMEP                    8/31/2011 Ralph Rogers, MD CONFIDENTIAL

---

Page 92

1    THE WITNESS: And the same answer.
2    BY MR. LIEBER:
3    Q   All right. Now, did Jayne Paulson at this time have any
4        positions on the staff and/or as an employee or a contractor?
5        MS. LACHMAN: I --
6    BY MR. LIEBER:
7    Q   Either individually -- this is just at this time, and this is
8        actually before Dr. Loewen started.
9        MS. LACHMAN: I agree. And so to that extent, I
10       object based on relevancy.
11       MR. LIEBER: Okay.
12       MS. LACHMAN: In addition --
13       MR. LIEBER: Well --
14       MS. LACHMAN: -- to my previous objections.
15       MR. LIEBER: -- then I'll go with how long it
16       lasted.
17   BY MR. LIEBER:
18   Q   Did she have any positions at Spectrum that you know of?
19   A   Well, she was a member of the medical staff.
20   Q   All right. Was she an employee?
21   A   I don't believe so.
22   Q   Was she a contractor?
23   A   I don't believe so.
24   Q   Has she ever become a contractor or employee?
25   A   She has a contract to provide call services in general

---

Page 93

1    surgery.
2    Q   And do you know when that started?
3    A   About a year and a half ago.
4    Q   Okay. Well, we'll worry about that later.
5        Let's look at Paragraph 4 on page 1752. It says:
6        "Responsibility for Teaching, Supervision, and
7    Evaluation of the Residents Performance."
8        And this second paragraph pertains to the hospital
9    and their medical staffs. Do you see that?
10   A   Yes.
11   Q   Okay. It says:
12       "Hospitals, and their Medical Staffs, agree to
13   provide an environment that supports and facilitates the
14   teaching, supervision and formal evaluation of General
15   Surgery Residency Program Residents assigned to their
16   institutions."
17       Now, in terms of -- what does that mean in terms
18   if you know, of supervision --
19       MS. LACHMAN: Again --
20   BY MR. LIEBER:
21   Q   -- with regard to Spectrum Health?
22       MS. LACHMAN: Again, I want to place an objection
23   that you're asking him to interpret a document he's never
24   read before and that you selectively read from the paragraph
25   and specifically excluded the paragraph directly -- the

---

Page 94

1    sentence directly above it, which is also part of the
2    Paragraph 4.
3    BY MR. LIEBER:
4    Q   That's right. And I only -- and you're welcome to read that
5        and allude to it. My goal only was to ask you about the
6        hospital component. I wasn't going to ask you about the
7        other part, because it doesn't -- it doesn't mention the
8        hospitals and their medical staffs.
9    A   I think the operational word here is environment. I know
10       that the hospital is providing the functions of supervision
11       or formal evaluation, they're providing the environment, they
12       have the facility, that's where the patients are. In order
13       to teach residents you have to have patients, they have to be
14       located somewhere, and we've already talked about some of the
15       support functions that kind of enable this to occur. But the
16       real supervision is done by those members of the medical
17       staff that have teaching agreements, and, in particular,
18       those that are the GRMEP core faculty.
19   Q   Okay. What about evaluation? How does the hospital and its
20       medical staff facilitate the formal evaluation, if you know,
21       of general surgery residency program residents assigned to
22       the institution?
23       MS. LACHMAN: Object. It's a compound question
24       that you asked about the hospital and members of the medical
25       staff.

---

Page 95

1    BY MR. LIEBER:
2    Q   You can answer the question.
3    A   The hospitals don't have a function in that realm. Some of
4        the members of the medical staff might have a function but
5        only if they have a specific position from GRMEP.
6    Q   All right. That's how you interpret the document; is that
7        correct?
8        MS. LACHMAN: I object to your question --
9        THE REPORTER: Wait. I'm sorry. I didn't hear
10       your question. Could you repeat it?
11   BY MR. LIEBER:
12   Q   That's how you interpret the document?
13   A   That's my answer.
14   Q   All right. Okay. Let's look at what was provided as
15       Exhibit 34.
16       MR. LIEBER: I don't know if we have to renumber
17       this one or not.
18       MS. LACHMAN: Exhibit 34 is Dr. Loewen's
19       remediation study plan?
20       MR. LIEBER: No. Exhibit 34 was the Spectrum
21   Health acknowledgment of HIPAA privacy training. We may have
22   to get this one copied for everyone. We'll have to renumber
23   that document. Give me a minute, and I'll make copies for
24   everyone. This was --
25       MR. STEELE: I have a copy.

---

26  (Pages 92 to 95)