UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MARGARET J. LOEWEN, M.D.,

        Plaintiff,

v.                                                                                  Case No. 1:10-CV-1284

GRAND RAPIDS MEDICAL                                      HON. GORDON J. QUIST
EDUCATION PARTNERS,
SPECTRUM HEALTH SYSTEM,
TRINITY HEALTH CORPORATION,
t/d/b/a SAINT MARY'S HEALTH CARE,
MICHIGAN STATE UNIVERSITY,
MARC SCHLATTER, and JOHN
vanSCHAGEN,

        Defendants.

_____/

**<u>OPINION</u>**

Table of Contents

I. BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    GRMEP's Organization and Programs. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    B.    Loewen's Allegations Regarding Her Residency. . . . . . . . . . . . . . . . . . . . 3
    C.    Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. MOTION STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.    Title VII, ADEA and Elliott-Larsen. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        1.    MSU. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        2.    The Hospitals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            (a) *interrelated operations*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
            (b) *common management*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            (c) *centralized control over labor relations*. . . . . . . . . . . . . . . . . 16
            (d) *common ownership*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    B.    Title IX Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1.    The Hospitals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        2.    MSU. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    C.    Public Accommodation Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    D.    Unjust Enrichment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

<u>OPINION</u>

Plaintiff, Margaret J. Loewen, M.D., was a medical resident in the Grand Rapids Medical Education Partners' (GRMEP) general surgery program between 2005 and 2009. GRMEP terminated her from the program. Loewen has sued GRMEP, as well as Spectrum Health System (Spectrum), Trinity Health Corporation, d/b/a St. Mary's Health Care (St. Mary's), Michigan State University (MSU), Marc Schlatter, and John vanSchagen. In her Amended Complaint, Loewen alleges claims for sex discrimination under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681, *et seq.*, Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e, *et seq.*, and the Michigan Elliott-Larsen Civil Rights Act (ELCRA), M.C.L. §§ 37.2101, *et seq.* (Counts I, II, and XV); age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621, *et seq.*, and ELCRA (Counts III and IV); hostile work environment on the basis of sex under Title IX, Title VII, and ELCRA (Counts V and XVI); hostile work environment on the basis of age under the ADEA and ELCRA (Count VI); retaliation in violation of Title IX, Title VII, the ADEA, and ELCRA (Counts VII-IX and XVII); breach of contract (Counts X-XIII); and unjust enrichment (Count XIV).[1]

Defendants MSU, and St. Mary's and Spectrum, jointly, move for dismissal of, or for summary judgment on, all of Loewen's claims against them. For the foregoing reasons, the Court will grant summary judgment to MSU, St. Mary's and Spectrum on all of Loewen's claims against them.

## I. BACKGROUND

### A. GRMEP's Organization and Programs

GRMEP is a member-based Michigan nonprofit educational corporation located in Grand Rapids, Michigan, that sponsors and operates various post-graduate resident medical training

---

[1]The Court has previously dismissed Loewen's unjust enrichment claim against GRMEP. (Dkt m no. 28.)

programs, as well as training programs for medical and other healthcare-related students.[2] (1st Am. Compl. ¶ 3.) GRMEP conducts its programs in collaboration with two acute care hospitals, Spectrum and St. Mary's (the Hospitals), and two degree-granting academic institutions, MSU's College of Human Medicine and Grand Valley State University (the Universities).

In 2003, GRMEP, the Hospitals, and the Universities entered into an Operating Agreement governing the operation of GRMEP's residency and other training programs. (Def. MSU's Br. Supp. Mot. Ex. 1.) The Operating Agreement specifies the roles and responsibilities of each of the participants. With regard to the residency program, the Operating Agreement provides, in part:

> [GRMEP] shall serve as the sponsor of the Programs for the Residents (the "Residency Programs") and shall employ the Residents. [GRMEP] will have overall responsibility for the recruitment, selection, employment and orientation of the Residents. [GRMEP] will supervise and evaluate the overall performance of the Residents and develop and maintain a curriculum for each Program that meets the requirements for the appropriate accreditation agencies.

(*Id.* § 2.1(a); Rogers Dep. at 119-20; Hern Aff. ¶ 4.) GRMEP is also responsible for scheduling rotations; providing health, dental, and workers compensation insurance to the residents; and withholding income and social security taxes from payments to residents. (*Id.* § 2.1(e)-(g); Loewen Dep. at 37, 39-40, 101-02.) GRMEP is responsible for disciplining any resident or student who violates a University or Hospital policy or rule. (2003 Operating Agreement § 3.1.)

The Hospitals provide funding, as well as infrastructure and certain services to GRMEP's hospital-based employees, including office space and furniture, on-site parking, access to the computer system, and access to the cafeterias at employee rates. (*Id.* § 2.2(a), (b).) The Hospitals are the major sources of funding for GRMEP, (Baumgartner Dep. at 14; Rogers Dep. at 40), although the Hospitals are not GRMEP's exclusive sources of funds. (GRMEP Budget, Spectrum Health's Supplemental Br. Ex. 15.) The Hospitals also accept, subject to their approval for

---

[2]GRMEP is the successor to the Grand Rapids Area Medical Education Consortium, Inc., d/b/a Grand Rapids Medical Education & Research Center for Health Professions. (1st Am. Compl. ¶ 3.) For purposes of the instant motions, the Court will refer to both GRMEP and its predecessor as GRMEP.

qualifications, residents, medical students, and health professions students for placement and training. (*Id.* § 2.2(d).)

For their part, the Universities provide funding for the non-resident programs and, upon request, services and infrastructure. (*Id.* § 2.3(a), (b); Sousa Aff. ¶ 7.) Until July 2009, MSU made an annual $1 million contribution to GRMEP to pay for GRMEP's support of MSU's College of Human Medicine (CHM) medical students in Grand Rapids, who are not part of GRMEP's residency programs.[3] (Sousa Dep. at 40-41.) MSU serves as the "affiliated institution" for the residency programs, meaning that the educational departments of GRMEP and MSU work together to implement GRMEP's educational and training programs. (2003 Operating Agreement § 2.3(c).)

Pursuant to the Operating Agreement, GRMEP enters into annual Resident Agreements with graduate students participating in one of GRMEP's residency programs. (Defs. Spectrum and St. Mary's Br. Supp. Mot. Ex. 3.) The Resident Agreement sets forth the resident's and GRMEP's respective obligations and addresses related issues, such as the compensation and benefits GRMEP is obligated to provide. Finally, the Resident Agreement provides the procedures for termination of the residency, which allow GRMEP to terminate the residency "with or without cause by providing Resident written notice of termination." (*Id.* ¶ 6(b).)

A new Operating Agreement was signed in 2009, to which only GRMEP and the Hospitals are parties. The 2009 Operating Agreement is similar to the 2003 Operating Agreement, with the exception that the Universities are *ex officio* nonvoting members of GRMEP.

## B. Loewen's Allegations Regarding Her Residency

While in her forties, Loewen decided to pursue her lifelong ambition of becoming a physician. After completing her undergraduate studies and medical school, Loewen accepted a

---

[3]As of July 2009, MSU no longer makes a yearly contribution to GRMEP. Instead, as a result of the expansion of CHM into Grand Rapids, CHM has assumed most of the responsibilities associated with its medical student programs. (Sousa Dep. at 15-20.) MSU does continue to receive some services from GRMEP, but it separately contracts with GRMEP directly for the specific services. (*Id.*)

residency position with GRMEP in the general surgery program. (1st Am. Compl. ¶ 20.) At the time, Loewen was 50 years old. (*Id.*) As part of her residency, Loewen signed a Resident Agreement with GRMEP. Loewen was supervised by Defendant Dr. Marc Schlatter, GRMEP's Program Director for General Surgery Residence Program. (*Id.* ¶ 48.)

Loewen alleges that she successfully completed the first three years of the five-year program, although during that time she was subjected to gender and sex-related harassment, discrimination, and abuse from her superiors and colleagues. (*Id.* ¶¶ 22-24.) Loewen further alleges that she received less desirable assignments, was given less support, and was required to work more hours than younger and/or male residents. (*Id.* ¶¶ 36, 38, 40.) Dr. Schlatter required Loewen to work an excessive number of hours, and in April 2009, he placed Dr. Loewen on a short term evaluation plan due to negative clinical evaluations and poor exam scores. (*Id.* ¶¶ 52, 53.)

In May 2009, toward the end of her fourth year, GRMEP informed Loewen that she would have to repeat her fourth year as part of a remediation program. (*Id.* ¶ 59.) On November 19, 2009, just four months into her twelve-month contract, Dr. Schlatter and Dr. Sherman, the Assistant Program Director for the General Surgery Program, notified Loewen that she was being dismissed from the general surgery program. (*Id.* ¶ 69.) Loewen alleges that younger male residents who were also required to repeat their fourth years in remediation were treated more favorably, as they were allowed to finish their repeat fourth years while Loewen was not. (*Id.* ¶ 68.)

Loewen claims that in the process of terminating her, GRMEP failed to comply with various provisions of the Resident Agreement. (*Id.* ¶¶ 84-90.) Loewen filed a grievance with GRMEP regarding her dismissal in February 2010, (Loewen Dep. at 174), and attempted to transfer to the family practice residency program. A short time later, Loewen filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and served it on GRMEP, MSU, Spectrum, and St. Mary's. Following a hearing, GRMEP denied Loewen's grievance, but she claims

that GRMEP failed to afford her due process in connection with the hearing.  (1st Am. Compl. ¶¶ 98, 103-111.)  After GRMEP denied Loewen's grievance, Dr. John vanSchagen denied Loewen's request to transfer to the family practice program.  Thereafter, Loewen filed another charge with the EEOC alleging that the denial of due process at the grievance hearing and the rejection of her transfer request were retaliatory acts.  (*Id.* ¶ 125.)

### C. Procedural History

On March 7, 2011, MSU filed a motion to dismiss or, in the alternative, motion for summary judgment.  MSU argued, among other things, that it was not Loewen's employer and thus cannot be held liable on Loewen's claims under Title VII, the ADEA, and ELCRA.  The same day, the Hospitals filed a joint motion to dismiss and for summary judgment in which they too argued that they were not Loewen's employers.  Although Loewen essentially conceded that MSU and the Hospitals were not her formal employer, she argued in her responses to the motions that MSU and the hospitals can be held liable under the "joint employer" doctrine.  The Court heard oral argument on the motions on May 18, 2011.  Although Loewen did not allege a joint employer theory of liability against MSU and the Hospitals in her First Amended Complaint, the Court deferred ruling on the motions to allow Loewen to conduct discovery on her assertion that MSU and the Hospitals were joint employers with GRMEP, in addition to other issues pertaining to her claims against those Defendants, and granted the parties an opportunity to file supplemental briefs.  The parties have now completed their discovery on those issues and have filed supplemental briefs.

### II. Motion Standard[4]

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

---

[4]Although MSU and the Hospitals moved for dismissal pursuant to Rule 12(b)(6) and for summary judgment under Rule 56, the Court treats the motions as motions for summary judgment because the parties rely on evidentiary materials outside of the pleadings.  Fed. R. Civ. P. 12(d).

56(a). Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

## III. DISCUSSION

### A. Title VII, ADEA and Elliott-Larsen

Generally, a defendant may be held liable under Title VII, the ADEA, and ELCRA only if the defendant was the plaintiff's employer. *See* 42 U.S.C. § 2000e-2(a) (Title VII); *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 795 (6th Cir. 2000) (noting that "Congress chose to limit Title VII liability to employers only"); 29 U.S.C. § 623(a) (ADEA); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir. 1994) ("Section 630(b) restricts the application of the ADEA to those 'employers' who employ twenty or more workers."); M.C.L.A. § 37.2202(1) (ELCRA). A defendant that does not directly employ a plaintiff may still be held liable under the "joint employer" or "single employer" doctrines. *See*, *e.g.*, *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997). Regarding the joint employer doctrine, the Sixth has observed that:

> The basis of the [joint employer] finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus, the "joint employer" concept recognizes that the business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment.

*Id.* at 993 n.4 (quoting *NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1123 (3d Cir.

1982)).  The joint employer doctrine "applies when separate legal entities have 'chosen to handle certain aspects of their employer-employee relationship jointly.'" *Lima v. Addeco*, 634 F. Supp. 2d 394, 400 (S.D.N.Y. 2009) (quoting *Gore v. RBA Group, Inc.*, No. 03-CV-9442 (KMK) (JCF), 2008 WL 857530, at *3 (S.D.N.Y. Mar. 31, 2008)).  Whether two separate entities are joint employers "is a factual question depending largely on such factors as the supervision of the employees' day-to-day activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work assignments, and issuance of operating instructions."  *W.W. Grainger, Inc. v. NLRB*, 860 F.2d 244, 247 (6th Cir. 1988); *see also DiMucci Constr. Co. v. NLRB*, 24 F.3d 949, 952 (7th Cir. 1994) (same).

The "single employer" doctrine provides for liability where "two nominally independent entities are so interrelated" that all of the employees of one entity are attributed to the other. *Swallows*, 128 F.3d at 993 n.4.  In contrast, the joint employer doctrine applies only to those employees over whom the separate businesses maintain sufficient control.  *Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011).  In determining whether two entities constitute a single employer, the Sixth Circuit applies the Supreme Court's four-part test from *Radio and Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 85 S. Ct. 876 (1965).  *See Armbruster v. Quinn*, 711 F.2d 1332, 1337 (6th Cir. 1983), *abrogated on other grounds by Arbaugyh v. Y & H Corp*, 546 U.S. 500, 126 S. Ct. 1235 (2006).  Under this test, courts must consider "the degree of (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Armbruster*, 711 F.2d at 1337 (citation and footnote omitted).  No single factor is "conclusive" and "[a]ll four criteria need not be present in all cases."  *Id.* at 1338.  However, "control over labor relations is a central concern."  *Swallows*, 128 F.3d at 994.

7

1.     **MSU**

In her response to MSU's motion, Loewen argued that the following circumstances demonstrate MSU's joint employer status:

1.     MSU is "jointly engaged" with GRMEP and the Hospitals in "residency training programs."

2.     The surgery program was called thee "GRMEP/MSU General Surgery Residency Program."

3.     Dr. Schlatter is a professor in the Department of Surgery at MSU-CHM, and he is alleged to have been involved in the discriminatory acts.

4.     Dr. vanSchagen is a member of MSU's faculty as well as GRMEP's Program Director and is alleged to have retaliated against Loewen.

5.     Every surgeon who was faculty in MSU-CHM supervised the residents' day-to-day activities and evaluated their performance.

6.     MSU appointed Loewen as a Clinical Instructor Resident in the Department of Surgery and congratulated her on the appointment.  MSU also provided Loewen malpractice insurance coverage in connection with her teaching appointment.

(Pl.'s Resp. Def. MSU's Mot. at 9.)

With the benefit of discovery, Loewen continues to rely on MSU faculty appointments - physicians, like herself, who supervised and reviewed her work and other residents' work in their residencies with GRMEP - to show that MSU jointly controlled the terms and conditions of her residency with GRMEP.  Neither Loewen's own faculty appointment nor those of the physicians who contracted with GRMEP to teach, supervise, and evaluate Loewen in her residency suffice to render MSU a joint employer.

Loewen was appointed a Clinical Instructor Resident for MSU-CHM's Department of Surgery in 2005.  The appointment was a voluntary, non-paid position that enabled Loewen to teach MSU's medical students in Grand Rapids.  (Sousa Dep. at 25, 77.)  In order to teach MSU medical students, a physician or resident must have an MSU faculty appointment.  (*Id.* at 21-22.) An MSU faculty appointment, such as the appointment Loewen received, entitles the appointee to

8

use MSU resources, such as the library, participate in educational activities, and buy parking. (*Id.* at 77.) MSU has certain rules for faculty members. For example, they must teach CHM's curriculum. (*Id.* at 36-37.) MSU can and does revoke academic titles for egregious behavior by faculty members. (*Id.* at 26.) MSU did not supervise or evaluate Loewen in her role as Clinical Instructor, although CHM medical students do complete evaluations of clinical faculty. (*Id.* at 81-82.) MSU generally reviews the student evaluations only if things are not going well with the faculty member. In such cases, a review is performed to determine if improvements can be made or whether MSU would terminate the faculty appointment. (*Id.* at 82-83.) Thus, the review is intended to ensure that MSU's students are receiving appropriate instruction. MSU has given faculty appointments to approximately 900 physicians in Grand Rapids, most of whom are not associated with GRMEP. (MSU's Answers to Pl.'s 1st Set of Interrog. No. 14.)

Loewen's MSU faculty appointment does not suffice to render MSU her employer. All of Loewen's claims stem from her treatment and dismissal during her residency, not from her activities as a Clinical Instructor for MSU. Loewen admits, and the record evidence confirms, that GRMEP was responsible for all material terms and conditions of her employment as a resident. Loewen alleges that she accepted a residency program with GRMEP (1st Am. Compl. ¶ 20); she signed a Resident Agreement with GRMEP (*id.* ¶ 82); she was supervised by GRMEP's employees (*id.* ¶¶ 42, 48); GRMEP employees made the decision to dismiss her (*id.* ¶ 69); and GRMEP heard and denied her grievance. (*Id.* ¶¶ 97-104,108-116.) It is undisputed that MSU was the educational affiliate for GRMEP's residency programs and was not responsible for operating the residency programs or supervising the residents. MSU does not select, pay, or discipline residents or remove them from their residencies. (Sousa Dep. at 31.) MSU was not involved in terminating Loewen's residency. (Loewen Dep. at 163-64.)

Similarly, the fact that the physicians who supervised and evaluated Loewen had MSU

9

faculty appointments provides no basis for a finding that MSU had any control over the terms or conditions of Loewen's residency. The physicians who supervised and evaluated Loewen and other residents did so not because of their MSU faculty appointments, but because of their agreements with GRMEP. (Rogers Dep. at 14-15 (noting that some physicians at Spectrum have interactions with GRMEP which arise out of their agreements with GRMEP); Sousa Dep. at 62 (noting that faculty evaluations of residents refers to faculty who work in the residency program and have an agreement with GRMEP).) In short, Loewen fails to show that MSU supervised her day-to-day activities as a resident, had authority to hire and fire residents, promulgated work rules for residents, or did anything else that affected Loewen's work as a resident. In that regard, the instant case is distinguishable on its facts from *EEOC v. Regency Windsor Management Co.*, 862 F. Supp. 189 (W.D. Mich. 1994), and other cases Loewen cites. In *Regency Windsor Management*, the court denied a defendant's motion for summary judgment because the two defendants "shared authority to control the compensation, terms, conditions and privileges of employment for workers at the apartment complex," creating an issue of fact. *Id.* at 191. There is no similar evidence in the instant case. Thus, MSU was not Loewen's employer in any respect.

## 2.  The Hospitals

In response to the Hospitals' motion, Loewen argues that the following circumstances render the Hospitals joint employers[5]:

1.  The 2009 Operating Agreement states that "[GRMEP] is a membership-based nonprofit corporation" and its members include St. Mary's, Spectrum, and MSU.

2.  The Operating Agreement states that St. Mary's, Spectrum, and MSU are "jointly engaged in certain Accreditation Council for Graduate Medical Education ("ACGME") residency training programs that [GRMEP] sponsors and other training programs for medical school and other health professions students ('Programs')."

---

[5]These are only a summary of the numerous factors Loewen cited in her response, but the Court believes they fairly represent all of the relevant circumstances Loewen cited as supporting her argument.

3.     Although he had the authority to hire, fire, and discipline residents, Dr. Schlatter was required to obtain the approval of the Surgical Education Committee, which consisted of all of the surgeons that taught in the general surgery residence program. Members of that committee, including Dr. Carlos Rodriguez and Dr. Jay LaBine, had part-time contracts with Spectrum and St. Mary's. Both of these members would have been consulted on the termination decision. In her affidavit, Loewen states that at the November 19, 2009, termination meeting, Dr. Schlatter told her that the surgical committee had approved the termination decision the preceding day. (Loewen Decl. ¶ 6.)

4.     GRMEP's Associate Program Director, Dr. Stanley Sherman, is an Associate Clinical Professor at MSU, is associated/employed by St. Mary's Health Care, and was involved in the termination decision as well as the hostile environment.

5.     GRMEP's Board of Directors, which is made up of employees of MSU, St. Mary's, and Spectrum, "determined compensation and employee benefits . . . for Residents."

(Pl.'s Resp. St. Mary's/Spectrum's Mot. at 5-6.)

As previously discussed, it is undisputed that GRMEP, not MSU or the Hospitals, was responsible for all of the material terms and conditions of the residents' employment. Loewen's joint employer argument essentially hinges on the fact that the GRMEP physicians who supervised and reviewed her work were employees of, or were affiliated in some way, with the Hospitals. But this line of argument fails for several reasons. First, the Hospitals have submitted evidence refuting Loewen's unsupported assertions that various physician-faculty at GRMEP, such as Drs. Schlatter, Sherman, Rodriguez, and LaBine, were employed either by Spectrum or St. Mary's. (Karel Decl. ¶¶ 3-4; Spectrum's Supplemental Information in Lieu of Dr. Ralph Rogers' Dep. Testimony.) Second, regardless of the physicians' employment by, or affiliation with, the Hospitals, Loewen's argument ignores the well-recognized legal principal that individuals may act in multiple capacities. *See Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 543 n.6, 106 S. Ct. 1326, 1332 n.6 (1986) ("Acts performed by the same person in two different capacities are generally treated as the transactions of two different legal personages." (internal quotation marks omitted)). As the Court has already recognized, regardless of any relationship or affiliation that physicians may have had with the Hospitals, the physicians who supervised and evaluated Loewen in her residency did so on

behalf of GRMEP through their agreements with GRMEP. Finally, as Loewen recognizes, all of the physicians who were involved in any adverse action against Loewen did so on behalf of GRMEP. In other words, Loewen has presented no evidence that Drs. Schlatter or Sherman, or any other faculty member, purported to act on behalf of any entity other than GRMEP when interacting with Loewen during her residency.

In her second brief following discovery, Loewen suggests that the Hospitals affected Loewen's employment relationship because the Hospitals pay the salaries of residents and the physicians who train and supervise them, and GRMEP's Board, which is comprised mostly of representatives of St. Mary's and Spectrum, determines the amount of residents' compensation and benefits. But this assertion is contrary to the record. Although the Hospitals contribute the major portion of the funding for GRMEP's residency programs, they do not pay the residents' and physician-faculty salaries. Rather, GRMEP pays the residents and the salaries. (Rogers Dep. at 40, 121; Hern Aff. ¶ 6.) Moreover, GRMEP's Board sets GRMEP's budget, but it does not set resident and faculty salaries. (Baumgartner Dep. at 98, 142.)

Loewen also argues that the Hospitals treated her like an employee in many ways, such as by controlling her daily start time, directing her to use Hospital scrubs, providing her on-site parking, and requiring her to sign confidentiality agreements in order to access confidential materials. Loewen testified, contrary to her assertion, that GRMEP's Chief Residents and Program Director set her work schedule. (Loewen Dep. at 101-02.) Moreover, the other circumstances Loewen cites do not reflect an employment relationship; those circumstances reflect the Hospitals' application of general rules and policies applicable not only to Hospital employees but to all who use or access the Hospitals' facilities. Similarly, Loewen contends that pursuant to the Operating Agreement, the Hospitals had the authority to reject residents if their performance was not up to the Hospitals' standards or if residents failed to comply with the Hospitals' policies. However, Dr.

Rogers, Spectrum's Vice President of Medical Affairs, testified that the Hospitals had authority to reject a resident for health-related issues, such as lack of proof of TB testing, immunization, and the like–a policy that applies to all health professionals and vendors.  (Rogers Dep. at 31-32, 123.) Rogers also said that residents could be removed for an incident involving "harm or potential harm to a patient or employees," (*id.* at 33-34), but again, that policy is not limited to residents.  (*Id.* at 124.)  Moreover, GRMEP, not the Hospitals, was responsible for screening residents and ensuring they had they were properly credentialed.  (*Id.* at 32.)

Loewen also cites instances when residents reported that they were Hospital employees or when plaintiffs sued Spectrum or St. Mary's for malpractice involving a resident.  Such evidence does not support Loewen's argument.  The email Loewen cites from GRMEP's Human Resources Representative states that Program Coordinators should remind residents that "they are [GRMEP] Employees."  (Email of 7/3/07 from Ferguson to Program Coordinators.)  Likewise, third party characterizations in unrelated lawsuits are irrelevant, and Loewen fails to show that the Hospitals ever conceded in those cases that the residents were Spectrum or St. Mary's employees.  In short, Loewen cannot show that the Hospitals were joint employers.

In her second response to the Hospitals' motion following discovery, Loewen claimed, for the first time, that the Hospitals may be deemed employers under a single employer theory.  Loewen did not raise her single employer theory in her second response to MSU's motion.  Thus, the Court considers only whether the Hospitals and GRMEP constitute a single enterprise.  Such a conclusion is warranted only if Loewen can show that the Hospitals "exercise[] a degree of control that exceeds the control normally exercised by a parent corporation which is separate and distinct from the subsidiary corporate entity." *Armbruster*, 711 F.2d at 1338.  Application of the four factors set forth above shows that Loewen cannot meet this burden.

13

### (a) *interrelated operations*

In considering whether the operations of two entities are interrelated, courts look for indicia of shared operations, such as "'combined accounting records, bank accounts, lines of credit, payroll preparation, telephone numbers or offices.'" *Sears v. Magnolia Plumbing, Inc.*, 778 F. Supp. 2d 80, 83 (D.D.C. 2011) (quoting *Woodland v. Viacom, Inc.*, 569 F. Supp. 2d 83, 87 (D.D.C. 2008)); *see also Armbruster*, 711 F.2d at 1338 (noting that the parent corporation handled the subsidiary's accounts receivable, payroll and cash accounting, monitored its sales shipments, provided administrative backup, and the subsidiary's bank accounts were located at the parent's headquarters); *Wali v. Chelsea Plastics*, No. 07 Civ. 7549 (DAB) (THK), 2010 WL 2710763, at *5 (S.D.N.Y. June 8, 2010) (related companies that made different products and sold them to different customers, operated in different office space and autonomously with their own employees, bank accounts, equipment, etc., purchased and used their own materials, and paid their own employees separately were not a single employer for purposes of Title VII).  In this case, it is undisputed that GRMEP: (1) is a separate entity from the Hospitals; (2) has its own corporate offices located away from the Hospitals; (3) has its own bank accounts and keeps its own business and financial records; (4) has its own corporate executives; and (5) handles all of the employment and related administrative functions for residents without assistance or support from the Hospitals.  (Hern. Aff. ¶¶ 3, 4, and 6.)

Loewen offers no evidence showing that the Hospitals perform any operational functions for GRMEP.  Instead, she notes that the one or both of the Hospitals: (1) are the major participating institutions and provide substantial resources for the residency program; (2) pay all of GRMEP's expenses (an erroneous claim, as noted above); (3) solicit and receive funding for the residency programs; (4) provide professional liability insurance for the residents; (5) charge third-party payers for professional services rendered by the residents (an inaccurate claim, as only the attending

14

physician's services are billed (Rogers Dep. at 26-27)); and (6) provided GRMEP's General Surgery Program Director and Program Coordinator offices and email addresses.[6]  Loewen also notes that Dr. Schlatter used letterhead containing the names Spectrum, St. Mary's, and MSU.  Rather than showing an interrelation of operations, i.e., one entity performing operational services for the other, Loewen's evidence illustrates the collaborative nature of the residency program.  In fact, Loewen's evidence simply shows that the parties acted according to the Operating Agreement, each performing its respective obligations.  After all, hospital facilities would seem to be a desirable, if not necessary, aspect of a surgical residency.

### (b) *common management*

Loewen contends that the common management factor weighs in favor of a single employer because the voting members of GRMEP control the Board and make all of the key decisions. Loewen notes that over the years, the Hospitals' representatives have acted as Board Chair, and as of 2009, the Hospitals have complete control of the Board.  While this is some evidence of common management, "[t]his type of arrangement is not always enough by itself to meet the second factor." *Sanford*, 449 F. App'x at 494-95 (noting that the plaintiff's evidence that two church pastors served as the chairman and president of the board of directors for the plaintiff's employer was "some evidence of common management").  But Loewen's evidence shows nothing more than the extent of control normally exercised by a board of directors.  *Armbruster*, 711 F.2d at 1338.  It is undisputed that GRMEP had its own executives who ran GRMEP's day-to-day operations without interference from the Board.  This limited involvement does not transform the Hospitals and GRMEP into a single employer.  *See Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536

---

[6] Spectrum provided offices to GRMEP's Program Director and Program Coordinator for the General Surgery Resident Program as a matter of convenience, since residents often perform surgery in the hospital's facilities and GRMEP's offices are located approximately a mile away.  (Maas Aff. ¶ 2.)  Spectrum also provides office space for others, including independent contractors and vendors.  (*Id.* ¶ 2.)

F.3d 640, 646 (7th Cir. 2008) (rejecting the plaintiff's suggestion that two municipalities were joint employers because municipal leaders sat on the board of directors of a jointly-created non-profit entity, and noting that such "fact alone cannot suffice to justify the extension of joint-employer liability"); *EEOC v. Con-Way, Inc.*, No. CV 06-1337-MO, 2007 WL 2610367, at *5 (D. Ore. Sept. 4, 2007) (giving little weight to the common management factor because courts look not to "the form of common management . . . for purposes of this analysis . . . [but] to whether the common officers or managers exert regular control, i.e. day-to-day, over the operations of both entities"). Accordingly, the Court gives this factor little weight.

### (c) *centralized control over labor relations*

Control over labor relations "is a central concern" in the single employer analysis, *Swallows*, 128 F. 3d at 994, yet, the record in this case is bereft of any evidence showing that the Hospitals had any control over Loewen's and other residents' employment relationships. As already discussed, GRMEP was responsible for all aspects of residents' employment, and Loewen has not offered any evidence to the contrary. Moreover, the Court has rejected Loewen's reliance on the physician-faculty's relationships or affiliations to impute liability to the Hospitals. Finally, many of the circumstances Loewen cites evince nothing more than the Hospitals' exercise of control over their facilities.

### (d) *common ownership*

The final factor, common ownership, is inapplicable. There is no evidence that any of the entities is a sham. *See id.* at 995 ("If neither of the entities is a sham then the fourth test is not met." (internal quotation marks omitted)).

Moreover, all of Loewen's factual allegations show that she was employed by GRMEP. In contrast, Loewen fails to allege a single fact showing that St. Mary's, Spectrum or MSU controlled her employment or participated in her employment decisions.

16

In light of the foregoing, Loewen fails to present any basis to support her claim that GRMEP and the Hospitals are a single employer.

### B.    Title IX Claims

Title IX provides, in pertinent part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

28 U.S.C. § 1681(a).  Educational institutions include "any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education."  28 U.S.C. § 1681(c); *see also* 45 C.F.R. § 86.31(a) (extending prohibition against sex discrimination to "any academic, extracurricular, research, occupational training, or other education program or activity").

Although Title IX does not provide an express right of action, the Supreme Court recognized an implied right of action in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S. Ct. 1946 (1979). In addition, in *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S. Ct. 1028 (1992), the Court  held that the relief available in an implied right of action recognized in *Cannon* includes money damages.  The Court observed in *Franklin* that because Congress enacted Title IX under its Spending Clause authority, rendering the legislation contractual in nature, damages in an implied right of action may be imposed only where the recipient of federal funding is adequately notified that it could be held liable for a monetary award.  *Id.* at 74-75, 112 S. Ct. at 1037.  Because the alleged discrimination was intentional, however, the Court had no need to address the scope of a recipient's liability.  Subsequently, in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 118 S. Ct. 1989 (1998), the Court considered whether a recipient could be held liable without notice of the discrimination.  Noting that, unlike Title VII, Title IX does not refer to agency principals, *id.* at 283, 118 S. Ct. 1995-96, the Court rejected the application of principles such as *respondeat superior* and constructive notice to impose liability.  *Id.* at 285, 118 S. Ct. at 1997.

Instead, the Court held that a recipient could be held liable only where it had actual knowledge or acted with deliberate indifference:

> Because the express remedial scheme under Title IX is predicated upon notice to an "appropriate person" and an opportunity to rectify any violation, 20 U.S.C. § 1682, we conclude, in the absence of further direction from Congress, that the implied damages remedy should be fashioned along the same lines. An "appropriate person" under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination. Consequently, in cases like this one that do not involve official policy of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond.

*Id.* at 290, 118 S. Ct at 1999. *See also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643-44, 112 S. Ct., 119 S. Ct. 1661, 1671-72 (1999) (extending deliberate indifference standard to student-student sexual harassment).

### 1.    The Hospitals

St. Mary's and Spectrum contend that they are entitled to summary judgment on Loewen's Title IX claims because they are not educational institutions and do not conduct an "education program or activity" as required for liability under Title IX. Although the Court tends to agree, it need not decide whether the Hospitals qualify as educational institutions because even if they did qualify as such, Loewen fails to present any evidence showing that they were deliberately indifferent to known acts of harassment or discrimination, as required under *Gebser*, *supra*. In other words, although the Court granted her the opportunity to obtain discovery on the issue, Loewen presents no evidence showing that she reported any acts of harassment or discrimination to Spectrum's or St. Mary's representatives. Therefore, the Hospitals are entitled to summary judgment on the Title IX claims.

### 2.    MSU

MSU contends that it is entitled to dismissal of Loewen's Title IX claims because Loewen

was not a student at MSU and MSU did not operate the residency program.  Moreover, MSU notes that it may be held liable under Title IX only for its own acts and not the acts of others.

Loewen offers no evidence to show that she was an MSU student or that MSU operated the residency program.  As the Court has noted, GRMEP, alone, operated the residency programs.  Moreover, as is the case with the Hospitals, Loewen presents no evidence to show that MSU was deliberately indifferent to the alleged discrimination and harassment because Loewen failed to report such acts to MSU.

### C.    Public Accommodation Claim

Although Loewen did not allege such a claim in her First Amended Complaint, she argued in her response to the Hospitals' motion that the Hospitals could be liable under ELCRA's public accommodation provision.  The Court disagrees.  Loewen presents no evidence that the Hospitals took any action against her that could be construed as denying her access to their facilities.  Instead, GRMEP, alone, discharged Loewen from the residency program–the means through which Loewen had access to the Hospitals' facilities.  Therefore, even if Loewen had alleged such a claim, it would be subject to dismissal.

### D.    Unjust Enrichment

In Count XIV, Loewen alleges a claim for unjust enrichment against the Hospitals seeking compensation for the extra hours that GRMEP required her to work in excess of the 80-hour limit imposed by regulations.  The Hospitals contend that they are entitled to summary judgment on this claim because an unjust enrichment claim will not lie where an express contract governs the same subject matter.  *See, e.g.*, *Belle Isle Grill Corp. v. City of Detroit*, 256 Mich. App. 463, 666 N.W.2d 271 (2003).  The Hospitals note that Loewen acknowledges and relies on the Resident Agreement, which establishes the terms of her residency with GRMEP and addresses the issue of compensation.  With regard to compensation, the Resident Agreement provides:

19

> It is understood and agreed that all compensation, in any form, paid to Resident is not payment for patient care services but is a grant to further the medical education of Resident.  As the sole consideration to be received by Resident for the services to be provided hereunder, [GRMEP] agrees to provide Resident with an educational stipend in the amount of $40,000 for the Term, which [GRMEP] will disburse to Resident on a bi-weekly basis, less required withholding taxes.

(Resident Agreement ¶ 4.)  In addition, the Resident Agreement provides: "No compensation of any kind or nature shall be paid to or accepted by Resident from patients or third parties."  (*Id.*)

Citing *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 729 N.W.2d 898 (2006), Loewen argues that the Resident Agreement does not preclude her claim against the Hospitals  because they were not parties to the Resident Agreement.  Even so, in signing the Resident Agreement, Loewen specifically acknowledged that she would not accept compensation from any party other than GRMEP.  Loewen's claim is thus barred because it would not be unjust to not require St. Mary's and Spectrum to compensate Loewen for the extra hours she worked.

Unjust enrichment is an equitable doctrine based on the principle that a party should not be allowed to profit at the expense of another.  *McCreary v. Shields* , 333 Mich. 290, 294, 52 N.W.2d 853, 855 (1952).  In cases of unjust enrichment, the law implies a contract to prevent the inequity arising from a defendant's receipt of a benefit from the plaintiff.  *Sweet Air Inv., inc. v. Kenney* , 275 Mich. App. 492, 504, 739 N.W.2d 656, 663 (2007).  To establish  unjust enrichment, a plaintiff must show:  (1) the receipt of a benefit by the defendant from the plaintiff; and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant.  *Mich. Ed. Employees Mut. Ins. Co. v. Morris* , 460 Mich. 180, 198, 596 N.W.2d 142, 151 (1999).  Moreover, "not all enrichment is necessarily unjust in nature."  *Morris Pumps*, 273 Mich. App. at 196, 729 N.W.2d at 904.  That is,

> [a] third party is not unjustly enriched when it receives a benefit from a contract between two other parties, where the party benefitted [sic] has not requested the benefit or misled the other parties . . . .  Otherwise stated, the mere fact that a third person benefits from a contract between two other persons does not make such third

20

person liable in quasi-contract, unjust enrichment, or restitution.  Moreover, where a third person benefits from a contract entered into between two other persons, in the absence of some misleading act by the third person, the mere failure of performance by one of the contracting parties does not give rise to a right of restitution against the third person.

*Id.* (quoting 66 Am. Jur. 2d, *Restitution & Implied Contracts* § 32 at 628).

Since the Hospitals did not request Loewen to work the extra hours and she had no expectation of being compensated by them for her work, there is no basis for an unjust enrichment claim.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant MSU's motion for summary judgment and the Hospitals' motion for summary judgment on all of Loewen's claims against them.

An Order consistent with this Opinion will be entered.


Dated:  April 9, 2012                                            /s/ Gordon J. Quist
                                                  GORDON J. QUIST
                                                  UNITED STATES DISTRICT JUDGE

21